**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Neal J. Deckant (State Bar No. 322946)
Frederick J. Klorczyk III (State Bar. No. 320783)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
         jsmith@bursor.com
         ndeckant@bursor.com
         fklorczyk@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
701 Brickell Avenue, Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: scott@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMIAH REVITCH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NAVISTONE, INC.,<br><br>Defendant. | Case No. 3:18-cv-06827-VC<br><br>**DECLARATION OF JOEL D. SMITH IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL**

I, Joel D. Smith, declare as follows:

I am over the age of 18 and I submit this declaration in support of Plaintiff's Motion for Summary Judgment.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

### *Publicly Filed Documents*

1.      NaviStone marked some of the documents itemized below as confidential.  However, NaviStone later withdrew those designations on November 17, 2020.  *See* Dkt. No. 136.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the deposition transcript of NaviStone's CEO, Larry Kavanagh, taken in this matter on July 14, 2020.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the deposition transcript of NaviStone's 30(b)(6) witness, Larry Kavanagh, taken in this matter on August 24, 2020.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the deposition transcript of NaviStone's CTO, Thomas E. White, taken in this matter on July 16, 2020.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts of Plaintiff's deposition, taken in this matter on July 17, 2020.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of Plaintiff's second deposition, taken in this matter on September 18, 2020.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of a document produced by Defendant NaviStone in this case, which was Bates marked NAVISTONE_002356-62 and marked as Deposition Exhibit No. 13.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of a screenshot of Plaintiff's internet history, which he produced in this case.  The document is Bates marked PLF00001 and marked as Deposition Exhibit No. 41.  The document is authenticated at Revitch Dep., 98:12-99:5.

9.      Attached hereto as **Exhibit 8** are true and correct copies of two Gizmodo.com articles produced by Defendant NaviStone in this case, which were Bates marked NAVISTONE_007283-7310 and marked as Deposition Exhibit Nos. 19 and 20.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of a joint discovery letter filed by Plaintiff and Defendant NaviStone in this matter on July 29, 2020 (Dkt. No. 112).  Exhibits that were previously attached to the letter are omitted.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of excerpts of Defendant NaviStone's responses to Plaintiff's request for inspection, which were served by NaviStone in this case.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of a document produced by Defendant NaviStone in this case, which was Bates marked NAVISTONE_004818-46 and marked as Deposition Exhibit No. 25.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of a document produced by Defendant Moosejaw in this case, which was Bates marked MJ-(Revitch)-0026476 and marked as Deposition Exhibit No. 44.  The document is identified by Moosejaw's counsel as "a customer record from Moosejaw.com" at Plaintiff's Dep., 147:23-24.  In addition, an identical document bearing the same bates number was filed by Moosejaw at Dkt. No. 142-16, which is authenticated in Paragraph 8 of the Declaration of Kelli Patterson, wherein Ms. Patterson states the record reflects a visit by Plaintiff to Moosejaw.com in March 2017 (Dkt. No. 142-14).

14.     Attached hereto as **Exhibit 13** is a true and correct copy of excerpts of the deposition transcript of Daniel Pingree, Moosejaw's witness, taken in this matter on July 23, 2020.

15.     Attached hereto as **Exhibit 14** is a true and correct copy of NaviStone's Responses to Plaintiff's Third Set of Interrogatories, served upon Plaintiff on March 26, 2020.

***Documents Filed Under Seal***

16.     Attached hereto as **Exhibit 15** is a true and correct copy of excerpts of a document produced by Defendant Moosejaw in this case, which was Bates marked MJ-(Revitch)-0003820-23 and marked as Deposition Exhibit No. 8.  The entirety of this document is filed under seal.

17.     Attached hereto as **Exhibit 16** is a true and correct copy of excerpts of the deposition transcript of Dr. Greg Humphreys, Defendants' expert witness, taken in this matter on October 28, 2020.  The entirety of this document is filed under seal.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 31, 2021, in Walnut Creek, California.

Joel D. Smith

**EXHIBIT 1**

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4    JEREMIAH REVITCH,              )
     individually and on behalf of )
5    all others similarly          )
     situated,                      )
6                                   )
             Plaintiffs            )
7                                   )   Case No.:
             vs.                    )   3:18-cv-06827-VC
8                                   )
     NEW MOOSEJAW, LLC and          )
9    NAVISTONE, INC.                )
                                    )
10           Defendants             )
     _____)
11

12

13

14        Videotaped Deposition via Zoom of

15               Larry Kavanagh

16              Cincinatti, Ohio

17           Tuesday, July 14, 2020

18

19

20   Reported by:

21   JOANNE M. FARRELL, RPR, CRR

22   CSR Nos. 4838(CA)  507(NM)

23   Job No. 4159790

24

25   Pages 1 - 251

                                        Page 1

1    direct mail programs where they were sending out        8:07:01AM

2    things like catalogs, for example, on a monthly or

3    quarterly basis.  And for some clients we will -- or

4    Computech, our merge/purge data processor, will send

5    a list of prospects who browsed a website to the        8:07:28AM

6    client's merge/purge processor to be incorporated

7    into a larger catalog mailing.

8         Q.  Are there any other services that NaviStone

9    provides to other clients that you haven't described

10   yet?                                                     8:07:43AM

11        A.  There's a number of things we've done in

12   sort of small one-off basises; but in terms of what

13   are our main products, those are our main products.

14        Q.  How would you describe NaviStone's typical

15   client base?                                             8:08:00AM

16        A.  The typical client is a retailer.  They

17   will have more than 125,000 monthly unique visitors

18   to their website, and they will sell products that

19   tend to be what we call "considered purchases,"

20   things someone will think about for a little bit        8:08:20AM

21   before they buy.  That's how I would describe a

22   typical customer.

23        Q.  Does NaviStone offer any products or

24   services directly to retail consumers?

25        A.  No.                                             8:08:33AM

                                                     Page 30

```
 1        A.   So for Moosejaw, the next paragraph:          9:08:44AM

 2             "The prospect name and mailing address is

 3             then sent to a third-party data processor

 4             for merging with other audiences being

 5             mailed by the client."                        9:08:54AM

 6             They used our turnkey service, so there was

 7     no merging with other audiences.

 8             Yeah.   That's all on page 3.

 9        Q.   Okay.   Thank you.

10             On Exhibit 4, there's an occasional           9:09:40AM

11     reference to "OneTag."  Is OneTag the same as the

12     JavaScript code that gets put on Moosejaw's website?

13        A.   Yes.

14             MR. SMITH:   I've just introduced what

15     should be Exhibit 5.                                  9:11:00AM

16             (Exhibit 5 was marked for identification

17             and is attached hereto.)

18     BY MR. SMITH:

19        Q.   Let me know if you have that.

20        A.   I have Exhibit 5.                             9:11:15AM

21        Q.   Okay.   Have you seen Exhibit 5 before?

22        A.   Yes.

23        Q.   What is Exhibit 5?

24        A.   Exhibit 5 is the installation instructions

25     for adding NaviStone's JavaScript tag to Moosejaw's  9:11:30AM
```

Page 63

| | | |
|---|---|---|
| 1 | within 30 miles of a -- or X number of miles of a | 10:39:48AM |
| 2 | Moosejaw store or a Walmart, a Walmart store, that | |
| 3 | we could, you know, show a map of, like, the closest | |
| 4 | store, for example, and what the phone number and | |
| 5 | directions or address of that closest store is. | 10:40:05AM |
| 6 | Q.  How would you know if a particular store | |
| 7 | was close to a particular website visitor? | |
| 8 | A.  Well, at Computech where, you know, they | |
| 9 | would have received the name and address, and | |
| 10 | really -- they would have received the address and | 10:40:22AM |
| 11 | zip code, you know, you would -- Computech would use | |
| 12 | that zip code-based data to figure out what's the | |
| 13 | right store, you know, that's closest to that | |
| 14 | address. | |
| 15 | Q.  Are there any other ways that postcards | 10:40:42AM |
| 16 | could be individualized apart from the example you | |
| 17 | just gave? | |
| 18 | A.  Well, you know, I think that -- and, again, | |
| 19 | it's -- look.  The idea of, you know, this person | |
| 20 | visited tents so we are going to show them tents, | 10:41:12AM |
| 21 | this other person visited boots so we are going to | |
| 22 | show them boots would be another example. | |
| 23 | Q.  Let's say an anonymous visitor looks only | |
| 24 | at women's clothing on Moosejaw.com. | |
| 25 | Can NaviStone arrange for that person to | 10:41:29AM |

Page 91

```
 1    receive a postcard that advertises women's clothing    10:41:32AM

 2    sold on Moosejaw.com?

 3         A.  Yes.

 4         Q.  Okay.  And NaviStone would be able to do

 5    that as a result of information about the URL pages     10:41:44AM

 6    of the pages that were visited?

 7         A.  In collaboration with Moosejaw letting us

 8    know these are the URLs that they consider women's

 9    clothing.

10         Q.  Okay.  In that scenario is there any other    10:41:58AM

11    way that NaviStone would learn that anonymous

12    website visitor had been looking at women's

13    clothing?

14         A.  No.

15         Q.  What if -- what if an anonymous visitor       10:42:14AM

16    spent a lot of time looking at a certain brand while

17    on Moosejaw, like Arc'Teryx, for example, could that

18    person later receive an individualized postcard that

19    advertises the same brand the person was looking at?

20         A.  So in your specific example, we do not use    10:42:49AM

21    time as a metric for targeting.  Or for selection.

22         Q.  Okay.  Well, then let me rephrase that.

23              Regardless of how much time someone spent

24    on any particular page, if an anonymous visitor was

25    looking at a certain brand offered by -- on           10:43:17AM
```

Page 92

1    Moosejaw.com, could that person later receive an          10:43:19AM

2    individualized post card that advertises the same

3    brand the person was looking at?

4         A.  As long as Moosejaw has organized their

5    category structure to allow for that or to give us      10:43:31AM

6    that -- to give us that bit of data.  Then if they

7    have, then yes, it would be no different than boots.

8         Q.  Do you know if Moosejaw has provided that

9    kind of data to NaviStone?

10        A.  I do not.                                        10:43:49AM

11        Q.  Do you know someone named J. Kimberly

12   Bentz, last name B-E-N-T-Z?

13        A.  Yes.

14        Q.  Okay.  Is she a NaviStone employee?

15        A.  Yes, she is.                                     10:44:08AM

16        Q.  And the answer to the last question was

17   yes; is that right?

18        A.  Yes.

19        Q.  Does Ms. Bentz have some responsibility for

20   the Moosejaw account?                                    10:44:22AM

21        A.  She has -- she was a -- she was the account

22   manager of that account for some time.

23        Q.  Is she still employed by NaviStone?

24        A.  Yes, she is.

25        Q.  Okay.  But she's no longer the account          10:44:33AM

Page 93

```
 1    one brand.  There was some brand that they sold a        10:45:59AM
 2    lot of that stopped working with Moosejaw some years
 3    ago, or sometime ago, and that Moosejaw's sales were
 4    down.  And that was -- you know, I have a vague
 5    recollection that that was passed along.  I'm not        10:46:19AM
 6    sure, though, if that was not speculation as to why
 7    they stopped or actually a reason as to why they
 8    stopped.
 9         Q.  Okay.  Has anyone ever conveyed any other
10    information about other reasons Moosejaw may have         10:46:32AM
11    discontinued doing business with NaviStone?
12         A.  Not that I can recall.
13              MR. SMITH:  I just marked a document,
14    Exhibit 8.
15              (Exhibit 8 was marked for identification       10:48:09AM
16              and is attached hereto.)
17    BY MR. SMITH:
18         Q.  Do you have that document in front of you?
19         A.  Yes.
20         Q.  I'm sorry.  I think your audio cut out.         10:48:27AM
21    Was that a yes?
22         A.  Yes.
23         Q.  Okay.  Have you seen Exhibit 8 before?
24         A.  Yes.
25         Q.  What is Exhibit 8?                              10:48:41AM
```

Page 95

```
 1        A.   It's the NaviStone service agreement with     10:48:43AM

 2   Moosejaw.

 3        Q.   I want to direct your attention to

 4   Exhibit 8, page 3.  There's a header called

 5   "Compliance with Privacy Laws."                          10:49:05AM

 6        A.   Yes.

 7        Q.   Okay.  And there's a statement there that

 8   says:

 9             "Client is responsible for ensuring that it

10             is in full compliance with all applicable     10:49:14AM

11             laws and marketing regulations regarding

12             the privacy of its customers and the

13             collection, use and disclosure of its

14             customers' information."

15             Do you see that?                               10:49:27AM

16        A.   Yeah.

17        Q.   Did I read that correctly?

18        A.   Yes.

19        Q.   And in the context of this document,

20   Exhibit 8, the word "client" refers to Moosejaw; is     10:49:37AM

21   that correct?

22        A.   Yes.

23        Q.   Did NaviStone propose including the term I

24   just read to you in the contract or was that

25   Moosejaw's idea?                                         10:49:50AM
```

Page 96

1    haven't changed it.                              12:40:36PM

2         Q.   Okay.   As far as you know has NaviStone

3    complied with all the terms of the contract marked

4    as Exhibit 8?

5              MR. BERTONI:   Objection.   Calls for a legal  12:40:44PM

6    conclusion and speculation.

7              You can answer.

8              THE WITNESS:   So the list here includes

9    some services that we -- you know, that Moosejaw did

10   not ask us to do, and so we did not do.   This is a   12:40:56PM

11   list of things that we will do presupposing someone

12   might use all of our services, not -- we don't edit

13   the agreement to be specific to just the particular

14   service a client is starting with because hopefully

15   we can get them to expand into other services.       12:41:15PM

16   BY MR. SMITH:

17        Q.   I see.

18             On the list of NaviStone responsibilities

19   on the first page of Exhibit 8, number 4 references

20   collecting web browsing behavior 24x7x365.          12:41:26PM

21             Do you see that?

22        A.   Yes.

23        Q.   And is that particular provision applicable

24   to Moosejaw, or was it when you guys were still

25   doing business?                                     12:41:38PM

                                        Page 162

```
 1        A.   Yes.                                    12:41:39PM

 2        Q.   Okay.  And 24x7x365 means 24 hours, seven

 3   days a week, 365 days a year; is that correct?

 4        A.   That is correct.

 5        Q.   Okay.  So NaviStone basically agreed to   12:41:52PM

 6   collect web browser behavior on Moosejaw.com all the

 7   time, not just some of the time?

 8        A.   As long as they kept the tag up, yes.

 9        Q.   Does NaviStone have certain clients that it

10   refers to as, quote/unquote, "always-on clients"?   12:42:19PM

11        A.   Yes.

12        Q.   What does that term mean?  What's an

13   always-on client?

14        A.   When a client begins working with us -- and

15   in Moosejaw's case this was the case, so I can use    12:42:41PM

16   Moosejaw as an example -- they typically agree to

17   test NaviStone's program for a set period of time.

18        Q.   Uh-huh.

19        A.   You know, two months, three months,

20   something like that.                                  12:42:54PM

21             Then our typical progression is that a

22   client will see the results and agree to a longer

23   test that might be more like -- and when I say

24   "number of months," it's usually actually a number

25   of pieces, number of postcards sent, that might      12:43:11PM
```

                                              Page 163

```
 1    translate into a number of months, but it -- you     12:43:15PM

 2    know, the first test might be 50,000 postcards, the

 3    second test might be a hundred thousand postcards,

 4    and it might be two months for the first one and

 5    four months for the second.                          12:43:25PM

 6            Then provided that we are producing results

 7    that make economic sense to the client, they will

 8    then often move into where Moosejaw was, a situation

 9    we call "always on," where they have given us sort

10    of a set monthly budget, they have given us a set of 12:43:41PM

11    KPIs, and there's no -- you know, there's no

12    specific, "Hey, we just mailed a hundred thousand

13    over this period of time.  We can mail this many a

14    month, or up to this many a month on an ongoing

15    basis until we say stop."                            12:43:59PM

16            Does that make sense?

17        Q.  It does.

18            Are you aware of any disruptions in service

19    that occurred during the contract period between

20    NaviStone and Moosejaw that would have prevented     12:44:13PM

21    NaviStone from providing its services for any

22    significant period of time?

23        A.  When you say "significant," tell me what

24    you mean by "significant."

25        Q.  More than a day.                             12:44:27PM
```

Page 164

1        A.   I'm not -- I'm not aware of any disruption      12:44:28PM

2   that would have prevented us for more than a day.

3        Q.   Are you aware of any specific disruptions

4   in service that occurred?

5        A.   Actually, I'm not aware of any specific      12:44:47PM

6   ones, either, but I just wanted to -- you know, I'm

7   sure there -- I mean, it's the web.  There's always,

8   you know, 5-minute outage here, a 10-minute outage

9   there.  That's why I wanted to know what you meant

10  by "significant."                                        12:44:59PM

11       Q.   Yeah, yeah.

12            If there had been a significant disruption

13  of service, you know, of a day or more, do you think

14  there would likely be some documentation of it?

15            MR. BERTONI:  Objection.  Calls for      12:45:07PM

16  speculation.

17            You can answer.

18            THE WITNESS:  I'm not aware that we've had

19  anything like that in our history.

20  BY MR. SMITH:                                            12:45:22PM

21       Q.   Have you ever heard of a company called

22  Aggregate Knowledge?

23       A.   I have heard of it.

24       Q.   Is this relationship between the Aggregate

25  Knowledge and NaviStone?                                 12:45:32PM

Page 165

```
 1    their computer?                           12:49:26PM
 2        A.  That's not what you said.  You said could
 3    NaviStone provide the service that it provides if
 4    the agkn cookie is not there.
 5            And the answer is no because we can't  12:49:35PM
 6    cookie-sync with Neustar.  And if we can't
 7    cookie-sync with Neustar, we can't produce down the
 8    line a mailing address.
 9        Q.  Is NaviStone able to -- strike that.
10            Is it correct that NaviStone analyzes  12:49:58PM
11    browsing behavior?
12        A.  Yes.
13        Q.  Can NaviStone analyze browsing behavior if
14    someone does not have the agkn cookie on their
15    computer?                                   12:50:26PM
16        A.  Yes.
17        Q.  Can NaviStone facilitate or arrange for the
18    sending of a postcard to someone if they do not have
19    the agkn cookie on their computer?
20        A.  Not through Neustar, no, you could not.  12:50:40PM
21            If the client -- if the website owner had
22    provided us with a list of their own customers that
23    they wanted to mail a postcard to, then in that
24    scenario we could without the presence of the agkn
25    cookie.                                     12:51:02PM
```

Page 169

```
 1        A.  Yes.                                          1:03:18PM

 2        Q.  What was the purpose of this boilerplate

 3   language?

 4        A.  It's a while ago.  My -- the way I -- the

 5   way I read it today is that Rick was trying to, you    1:03:34PM

 6   know, come up with sort of like -- well, I think he

 7   was trying to come up with an elevator pitch, as you

 8   had asked for earlier.

 9        Q.  Uh-huh.  The boilerplate states, at least

10   in part:                                               1:03:52PM

11             "NaviStone's software allows unidentifiable

12             website visitors to be matched with postal

13             names and addresses, in a privacy-compliant

14             manager, so companies can send an

15             individualized marketing message via direct  1:04:06PM

16             mail."

17        Do you see that?

18        A.  I do, right.

19             MR. BERTONI:  Can you just tell me what

20   page you're on?  I can't find the language.            1:04:13PM

21             MR. SMITH:  Page 3 of Exhibit 13.

22             MR. BERTONI:  At the very top?

23             MR. SMITH:  Yes.

24             THE WITNESS:  2358.

25             MR. BERTONI:  Okay.                           1:04:22PM
```

Page 177

```
1                    ■   ■                           2:02:55PM

2              (Pause in the proceedings.)

3              MR. SMITH:  I've just marked a document as

4    Exhibit 19.

5              (Exhibit 19 was marked for identification   2:04:00PM

6              and is attached hereto.)

7    BY MR. SMITH:

8         Q.  Mr. Kavanagh, do you have Exhibit 19 in

9    front of you?

10        A.  Yes.                                     2:04:25PM

11        Q.  Okay.  And have you seen Exhibit 19 before?

12        A.  Yes.

13        Q.  What is Exhibit 19?

14        A.  It is an article that appeared in -- well,

15   it doesn't show that here -- Gizmodo about -- about   2:04:42PM

16   a company called AcurianHealth that -- let me reread

17   it before I characterize it here.  Have a moment.

18        Q.  Actually, before you do that let me just

19   ask you this question.

20        A.  Sure.                                    2:05:07PM

21        Q.  Are you able to say, based on memory alone,

22   that Exhibit 19 is a Gizmodo article that references

23   NaviStone?

24        A.  Yes.

25        Q.  Okay.                                    2:05:19PM
```

Page 216

```
 1              (Exhibit 20 was marked for identification    2:05:56PM

 2              and is attached hereto.)

 3     BY MR. SMITH:

 4          Q.  Okay.  I've just marked Exhibit 20.

 5              Do you have Exhibit 20 in front of you?       2:06:13PM

 6          A.  Yes.

 7          Q.  Okay.  And based on -- this question is

 8     based on your memory alone, do you recall whether or

 9     not Exhibit 20 is a Gizmodo article that discusses

10     NaviStone?                                             2:06:34PM

11          A.  Yes.

12          Q.  Okay.  Were there -- is it correct that

13     there was a grand total of two Gizmodo articles

14     discussing NaviStone, as far as you know?

15          A.  That's my recollection.                       2:06:51PM

16          Q.  And those two articles are marked as

17     Exhibit 19 to 20?

18          A.  That's my recollection.

19          Q.  Okay.  Again, I'm not going to ask you to

20     read through either of these articles.  I'm just       2:07:02PM

21     going to ask you if you remember whether either of

22     the articles marked as Exhibit 19 or 20 mentioned

23     Moosejaw.com?

24          A.  I don't recall --

25          Q.  Okay.                                         2:07:24PM
```

                                             Page 217

1      I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4      That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath; that

8   a record of the proceedings was made by me using

9   machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing transcript is

11  a true record of the testimony given.

12     Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings review of

15  the transcript { } was { } was not requested.

16     I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or any party to this action.

19     IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21  Dated:  July 16, 2020

22

23

24  *Joanne M. Farrell*

25      Joanne M. Farrell, CSR No. 4838

                                        Page 250

**EXHIBIT 2**

CONFIDENTIAL

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                       ---oOo---
 4

 5    JEREMIAH REVITCH,
      individually and on
 6    behalf of all others
      similarly situated

 7
                      Plaintiff,
 8
      vs.                             No. 3:18-cv-06827-VC
 9

      NEW MOOSEJAW, LLC and
10    NAVISTONE, INC.,
11              Defendants.
      _____/
12

13

14      CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
15      REMOTE VIDEOTAPED DEPOSITION OF LARRY KAVANAGH
16                  CINCINNATI, OHIO
17              MONDAY, AUGUST 24, 2020
18

19

20

21    Stenographically Reported by:
22    ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR
23    California CSR No. 9830
24    Job No. 4228212
25
```

Page 1

| | | |
|---|---|---|
| 1 | that was the right thing to do. | 12:08 |
| 2 | Q   So prior to January 2020, the e-mail address | 12:08 |
| 3 | was among other pieces of data that were sent to the | 12:08 |
| 4 | data ingestion API servers; right? | 12:08 |
| 5 | A   Yes. | 12:08 |
| 6 | Q   And that data would also -- including the | 12:08 |
| 7 | e-mail address, would be sent to Redshift as well, | 12:08 |
| 8 | correct, prior to January 2020? | 12:08 |
| 9 | A   Yes. | 12:08 |
| 10 | Q   Okay.  Now, you also said that NaviStone does | 12:08 |
| 11 | not collect IP; right? | 12:09 |
| 12 | A   IP address, yes. | 12:09 |
| 13 | Q   Right. | 12:09 |
| 14 | Did -- did NaviStone ever collect IP? | 12:09 |
| 15 | Or -- or was this a more recent change, like | 12:09 |
| 16 | the e-mail address? | 12:09 |
| 17 | A   No.  This was a long time -- I was trying to | 12:09 |
| 18 | determine the exact date, but it's perhaps even prior | 12:09 |
| 19 | to beginning to work with Moosejaw. | 12:09 |
| 20 | IP address was not -- IP address was not | 12:09 |
| 21 | passed from the API into S3.  We can't prevent the | 12:09 |
| 22 | website from sending us IP address.  It comes | 12:09 |
| 23 | automatically with the submission from the website to | 12:09 |
| 24 | our API.  But we sheared it off at the API so that it | 12:09 |
| 25 | never went into the -- through the ingestion process. | 12:09 |

Page 32

| | | |
|---|---|---|
| 1 | Q   So you're saying through the web request to | 12:09 |
| 2 | the API, IP address might be a component of that | 12:10 |
| 3 | request, but it was not, say, collected by the API; | 12:10 |
| 4 | right? | 12:10 |
| 5 | A   Actually, we don't -- there's nothing in | 12:10 |
| 6 | NaviStone's code that requests it.  Website browsers | 12:10 |
| 7 | will automatically send it.  And we're not aware of | 12:10 |
| 8 | any way of stopping the website browser from making | 12:10 |
| 9 | that automatic send. | 12:10 |
| 10 | Q   Okay.  But the IP address was not collected | 12:10 |
| 11 | by the -- by the API servers and sent to Redshift; | 12:10 |
| 12 | correct? | 12:10 |
| 13 | A   Correct. | 12:10 |
| 14 | Q   And that is the case for the entirety of when | 12:10 |
| 15 | Moosejaw was a NaviStone client; correct? | 12:10 |
| 16 | A   We -- we believe that's the case.  We | 12:10 |
| 17 | couldn't get an exact date, though, of when we began | 12:10 |
| 18 | to shear off IP address.  But we think it's at least | 12:10 |
| 19 | that old, if not older.  So a longer time when we did | 12:10 |
| 20 | it. | 12:10 |
| 21 | MR. BERTONI:  I'm wondering if -- I would | 12:10 |
| 22 | like to just have a standing -- this is David | 12:11 |
| 23 | Bertoni -- standing objection to questions that seek | 12:11 |
| 24 | information about back-end activities and code.  If we | 12:11 |
| 25 | can just have that standing objection, I'd appreciate | 12:11 |

Page 33

| | | |
|---|---|---|
| 1 | into what we call the raw data table. | 12:19 |
| 2 | Q   And that raw data table also existed on the | 12:19 |
| 3 | SQL database as well; right? | 12:19 |
| 4 | A   Yes, in pretty much the same format that you | 12:19 |
| 5 | see. | 12:19 |
| 6 | Q   And we're not sure whether -- whether that | 12:19 |
| 7 | functionality was in place before or after Moosejaw | 12:19 |
| 8 | was on-boarded; right? | 12:19 |
| 9 | A   What functionality? | 12:19 |
| 10 | Q   To -- to move the IP address to the -- to the | 12:19 |
| 11 | SQL database along with raw data. | 12:19 |
| 12 | A   We don't know -- we could not figure out at | 12:20 |
| 13 | what point in time we began shearing it off of the | 12:20 |
| 14 | API.  It might have been 2015.  It might have been | 12:20 |
| 15 | 2016.  We're not sure. | 12:20 |
| 16 | Q   Okay.  And when -- when data is pulled from | 12:20 |
| 17 | Redshift to the SQL database, did you call those, I | 12:20 |
| 18 | believe, summaries? | 12:20 |
| 19 | A   I'm sorry.  When Redshift is -- can you say | 12:20 |
| 20 | that question again, please? | 12:20 |
| 21 | Q   You used the term -- the term "data | 12:20 |
| 22 | summaries," I believe. | 12:20 |
| 23 | A   Yes. | 12:20 |
| 24 | Q   What does that refer to? | 12:20 |
| 25 | A   So in our -- in our process, once data moves | 12:20 |

Page 39

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | into the -- the raw data, or data moves from the | 12:20 |
| 2 | website to the API, then from the API into S3, then | 12:20 |
| 3 | from S3 into a table -- a raw data page load ingestion | 12:20 |
| 4 | table, then nightly, that data is moved -- it's | 12:20 |
| 5 | actually deleted from the raw data ingestion table and | 12:21 |
| 6 | moved into just a straight raw data page load table, | 12:21 |
| 7 | and it is summarized. | 12:21 |
| 8 | The -- the -- we summarize the elements of | 12:21 |
| 9 | a -- by title ID, by, you know, website, by visitor, | 12:21 |
| 10 | and by day, for the purpose of creating the model | 12:21 |
| 11 | score that you saw in Interrogatory 11, creating the | 12:21 |
| 12 | targeting, sort of which -- which categories of | 12:21 |
| 13 | products might have -- might have -- might a client | 12:21 |
| 14 | want to send a postcard to, creating the versioning | 12:21 |
| 15 | with the graphic image that might be shown. | 12:21 |
| 16 | And we also collect data on what -- we track | 12:21 |
| 17 | data about transactions that we use in our reporting. | 12:22 |
| 18 | Q   Okay.  So those -- those summaries, after the | 12:22 |
| 19 | data is -- is analyzed and then pulled from -- from | 12:22 |
| 20 | Redshift or SQL, that includes, you said, website, | 12:22 |
| 21 | visitor, and the day; correct? | 12:22 |
| 22 | A   And the -- the -- the rollup is on -- what | 12:22 |
| 23 | the -- what the rollup is on is a website, the -- the | 12:22 |
| 24 | anonymous visitor ID, and the actual day.  So it's | 12:22 |
| 25 | totaling the -- the very first rollup totals what the | 12:22 |

Page 40

| | | |
|---|---|---|
| 1 | A   Yes.   They're -- they're summaries of the raw | 12:28 |
| 2 | data -- actually, summaries of some aspects of the raw | 12:28 |
| 3 | data.   A number of aspects are never summarized. | 12:28 |
| 4 | Q   I see. | 12:28 |
| 5 | So I -- I was a little confused, actually, in | 12:28 |
| 6 | that the Cybersecurity Questionnaire says -- and I can | 12:28 |
| 7 | show you where this is written.   It's on page '4827. | 12:28 |
| 8 | But it says: | 12:28 |
| 9 | "While the OneTag collects over 200 different | 12:28 |
| 10 | data elements, only a subset is summarized." | 12:29 |
| 11 | A   Correct. | 12:29 |
| 12 | Okay.   I'm sorry.   Go ahead, please. | 12:29 |
| 13 | Q   And then we're seeing on the response to | 12:29 |
| 14 | Interrogatory 11, it says: | 12:29 |
| 15 | "NaviStone uses the following 18 anonymous | 12:29 |
| 16 | data points." | 12:29 |
| 17 | So to reconcile these, my understanding is | 12:29 |
| 18 | the OneTag library collects 200 different data | 12:29 |
| 19 | elements, which is the raw data, and then that's later | 12:29 |
| 20 | processed and analyzed into 18 higher-level data | 12:29 |
| 21 | points; correct? | 12:29 |
| 22 | A   Yeah, these are the -- yes.   And these are | 12:29 |
| 23 | the data points we use for scoring. | 12:29 |
| 24 | Q   Right. | 12:29 |
| 25 | And scoring is this process of where you | 12:29 |

Page 45

| | | |
|---|---|---|
| 1 | determine if -- if a particular individual is likely | 12:29 |
| 2 | to respond favorably to -- to a contact; correct? | 12:29 |
| 3 |     MR. BERTONI:  Objection to form.  It -- it -- | 12:29 |
| 4 | undefined terms. | 12:29 |
| 5 |     You can answer. | 12:30 |
| 6 |     THE WITNESS:  Yes. | 12:30 |
| 7 |     MR. DECKANT:  Q.  So taking a look at | 12:30 |
| 8 | Interrogatory No. 11, it says right there on page 6: | 12:30 |
| 9 |     "Beginning on February 2nd, 2017, NaviStone | 12:30 |
| 10 | used the following 18 anonymous data points." | 12:30 |
| 11 |     Do you see that? | 12:30 |
| 12 |   A  Yes. | 12:30 |
| 13 |   Q  And then it says: | 12:30 |
| 14 |     "Prior to February 2nd, 2017, NaviStone used | 12:30 |
| 15 | four anonymous data points." | 12:30 |
| 16 |     Do you see that? | 12:30 |
| 17 |   A  Yes. | 12:30 |
| 18 |   Q  Okay.  So on or about February 2nd, 2017, the | 12:30 |
| 19 | number of data points was expanded from four to 18; | 12:30 |
| 20 | correct? | 12:30 |
| 21 |   A  Yes.  The number -- the -- the number of data | 12:30 |
| 22 | points used in the model scoring was expanded. | 12:30 |
| 23 |   Q  Excellent. | 12:30 |
| 24 |     (Cell phone ringing.) | 12:30 |
| 25 |     MR. DECKANT:  Hold on just one second. | 12:30 |

Page 46

| | | |
|---|---|---|
| 1 | A   So it's -- it's line 1981 of the -- of the | 13:18 |
| 2 | file that we sent that has the date in the file name | 13:18 |
| 3 | is December 22nd, 2016. | 13:18 |
| 4 | Q   Okay.  And -- and what -- what does that code | 13:18 |
| 5 | describe exactly? | 13:18 |
| 6 | A   You asked for what are the client-specific | 13:18 |
| 7 | data elements -- | 13:18 |
| 8 | Q   Yeah. | 13:18 |
| 9 | A   -- that are -- that are collected. | 13:18 |
| 10 | So this is that part of the code.  It starts | 13:18 |
| 11 | with definition.  And this is the client-specific | 13:19 |
| 12 | definitions that I'm just reading from the -- from the | 13:19 |
| 13 | code that we sent you. | 13:19 |
| 14 | Q   So we can determine those -- which of those | 13:19 |
| 15 | 200 data elements were collected by looking at the | 13:19 |
| 16 | client-specific definitions in the -- in the | 13:19 |
| 17 | beautified code; right? | 13:19 |
| 18 | A   Well, you can determine the client-specific | 13:19 |
| 19 | ones for sure, yes. | 13:19 |
| 20 | Q   Indeed.  Right.  Okay. | 13:19 |
| 21 | So which ones are you seeing? | 13:19 |
| 22 | A   So homepage was the first one. | 13:19 |
| 23 | Do you want me to describe that one again | 13:19 |
| 24 | or -- | 13:19 |
| 25 | Q   Yes, please. | 13:19 |

Page 58

| | | |
|---|---|---|
| 1 | A   So homepage, the -- you -- you will see in | 13:19 |
| 2 | the code that it's looking for in the -- in the path | 13:19 |
| 3 | name of the page that's being displayed to the -- to | 13:19 |
| 4 | the -- really, to the browser -- and by "browser," I | 13:19 |
| 5 | mean the browser software -- anything that contains | 13:19 |
| 6 | /shop/home, that if it -- if the URL contains that, | 13:19 |
| 7 | then it is labeling that page as a homepage and | 13:19 |
| 8 | recording the -- the category name as homepage. | 13:20 |
| 9 | And it's also getting -- asking the -- the | 13:20 |
| 10 | web browser for what is the canonical URL of that -- | 13:20 |
| 11 | of that page. | 13:20 |
| 12 | The second data element is category.  It is | 13:20 |
| 13 | asking for -- so first, it's -- it's looking for, in | 13:20 |
| 14 | the URL, /shop/content_LP-AM.  And if it finds that, | 13:20 |
| 15 | then it is classifying that as a -- as a -- as a | 13:20 |
| 16 | category page. | 13:20 |
| 17 | It is getting the -- the category name, and | 13:20 |
| 18 | it's getting the category name from using something | 13:20 |
| 19 | that Moosejaw would have defined as the category | 13:20 |
| 20 | title, the H1 tag for the category title.  It's also | 13:20 |
| 21 | getting the -- the conical URL. | 13:21 |
| 22 | The third data element is product, and | 13:21 |
| 23 | it's -- again, it's first checking, does the -- the | 13:21 |
| 24 | URL that the browser is displaying contain | 13:21 |
| 25 | .product-page-container?  And if so, it's labeling it | 13:21 |

Page 59

1       "product."                                          13:21

2            It's reading from the page the -- the         13:21

3       Moosejaw site contains meta tags that -- that have  13:21

4       different elements of the page on it.  One of them  13:21

5       they call item prop, which is the SKU number.  And so  13:21

6       we're reading that into -- into SKU.               13:21

7            We are getting the product name, and we're    13:21

8       looking on the -- again, looking on the -- on the page  13:22

9       that's displayed for product name.  We're getting the  13:22

10      image path of whatever product image is shown on the  13:22

11      page, and also getting the canonical URL.          13:22

12           Q   Got it.                                    13:22

13           A   Next one is part, and we're looking for    13:22

14      something in the URL that is /orderitemdisplay, and we  13:22

15      are getting the -- the -- the Moosejaw ID associated  13:22

16      with that card.                                    13:22

17           Then we have -- the next thing that we're --   13:22

18      the next data element we're collecting is cart items,  13:22

19      and we're looking for something that               13:22

20      has.cart-column-info in it in order to determine   13:23

21      that's what that is.                               13:23

22           Then we are reading out of -- you know, from   13:23

23      what the -- the -- the website is displaying, we're  13:23

24      reading out a data element that Moosejaw calls      13:23

25      section-table-prod-name.  And inside of that array,  13:23

Page 60

| | | |
|---|---|---|
| 1 | we're reading product ID, product name, quantity, unit | 13:23 |
| 2 | price, image path.  We're reading a field called | 13:23 |
| 3 | details that is really indicating whether something is | 13:23 |
| 4 | in stock or out of stock. | 13:23 |
| 5 | Oh, I'm sorry.  Details indicates -- my | 13:23 |
| 6 | bad -- details indicates, like, power.  So it's an | 13:23 |
| 7 | attribute associated. | 13:24 |
| 8 | And then we're also reading in stock versus | 13:24 |
| 9 | out of stock.  And we're reading what the -- the -- | 13:24 |
| 10 | the order total that is being displayed on that -- on | 13:24 |
| 11 | that card is. | 13:24 |
| 12 | Next one is checkout visit.  And we're | 13:24 |
| 13 | looking for something in the URL that says | 13:24 |
| 14 | ordershippingbillingview -- /ordershippingbillingview. | 13:24 |
| 15 | We are, from inside the -- the array, getting -- | 13:24 |
| 16 | reading in a shipping cost and reading in order total. | 13:24 |
| 17 | And as -- you know, as you may be able to | 13:24 |
| 18 | tell, these are things that don't appear in the | 13:24 |
| 19 | summary.  So you're asking, for example, the data | 13:24 |
| 20 | elements that are in raw data, but -- but not in the | 13:24 |
| 21 | summaries. | 13:24 |
| 22 | Q   Indeed.  Please continue, yes. | 13:24 |
| 23 | A   Checkout complete.  We're looking for | 13:24 |
| 24 | something that has order shipping billing confirmation | 13:25 |
| 25 | view in the URL.  We're getting the order total and | 13:25 |

Page 61

1    the -- the Moosejaw designated order ID associated          13:25

2    with that order.  We are looking to see if a -- if a         13:25

3    page is the result of -- is a -- is a search results         13:25

4    page.                                                         13:25

5         So we're looking for something that has                 13:25

6    /searchdisplay in it, and also has the parameter that        13:25

7    Moosejaw would have put on that page that says -- that       13:25

8    is called search term, and determining that search          13:25

9    term is not blank.  Then provided that -- that a page        13:25

10   shows that, we are recording the -- we are putting in        13:25

11   the search phrase field, search term.                        13:26

12        We're also putting -- we're looking for                 13:26

13   something called search total count.  That's a field        13:26

14   that they combine a search total count, which would be       13:26

15   the number of different items that the particular            13:26

16   search returned on a search results page.                    13:26

17        The next -- the next thing that we're looking           13:26

18   for in the raw data is any page load that has                13:26

19   /content_privacy in it, and recording that as a page         13:26

20   load page type privacy policy.                               13:26

21        We're looking for opt out or a -- or the data           13:26

22   element that the label is opt out, and the URL              13:26

23   includes unsubscribe.  So this would be like the --          13:26

24   the results page that come up -- comes up after              13:26

25   somebody opts out.  And we're getting from what that         13:26

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | page display was the e-mail address. | 13:27 |
| 2 | Then we're just getting -- for anything that | 13:27 |
| 3 | we can't categorize, we're getting a generic page load | 13:27 |
| 4 | and asking for what the page title is of that page. | 13:27 |
| 5 | That's a page title. | 13:27 |
| 6 | Next thing is, we're looking for -- so | 13:27 |
| 7 | everything that I've said up 'til now happens on page | 13:27 |
| 8 | load.  So it's after the Moosejaw website has -- has | 13:27 |
| 9 | displayed a page, and it's static in that respect. | 13:27 |
| 10 | The next -- the next one is contact event. | 13:27 |
| 11 | That occurs on a change when a -- when a change has | 13:27 |
| 12 | occurred in a field.  And so it's recording contact | 13:27 |
| 13 | data when there's a change in a field. | 13:27 |
| 14 | Then as part of that, as a part of that is | 13:27 |
| 15 | any page that we had previously categorized as home, | 13:28 |
| 16 | product, or category.  If there was a click event on | 13:28 |
| 17 | that page, then we are essentially checking to see if | 13:28 |
| 18 | that was a click to add something to cart, and if so, | 13:28 |
| 19 | recording it as a -- an add to cart event. | 13:28 |
| 20 | And you may recall that was a -- one of | 13:28 |
| 21 | the -- the first elements in the model was, did a | 13:28 |
| 22 | visitor place an item into their cart on the Moosejaw | 13:28 |
| 23 | website? | 13:28 |
| 24 | Going back a minute, you know, where we get | 13:28 |
| 25 | the count for how many category pages, how many | 13:28 |

Page 63

| | | |
|---|---|---|
| 1 | elements in here that are not used in any summaries, | 14:10 |
| 2 | but they are elements that are passed from the website | 14:10 |
| 3 | to the API. | 14:10 |
| 4 | Q   I see. | 14:10 |
| 5 | So search -- search strings are passed to the | 14:10 |
| 6 | API server and then S3, but they may not be -- strike | 14:10 |
| 7 | that. | 14:10 |
| 8 | Let me -- let me do this piece by piece. | 14:10 |
| 9 | Search strings are passed to the API and then | 14:10 |
| 10 | S3; correct? | 14:10 |
| 11 | A   Whatever the -- the -- the -- the search -- | 14:10 |
| 12 | essentially, yes.  The -- the -- whatever -- on the | 14:10 |
| 13 | search results page, whatever the Moosejaw website | 14:11 |
| 14 | displays as the -- the phrase that it is producing a | 14:11 |
| 15 | result for, that phrase is passed through -- is passed | 14:11 |
| 16 | from the website to the API to S3, but is not included | 14:11 |
| 17 | in any summaries and not used in any summaries. | 14:11 |
| 18 | Q   Understood.  Thank you. | 14:11 |
| 19 | Okay.  Let's take a quick look at Exhibit 34. | 14:11 |
| 20 | A   Okay. | 14:11 |
| 21 | Q   And just let me know when you have that up. | 14:11 |
| 22 | A   Okay. | 14:11 |
| 23 | Q   Okay.  And I don't recall if you mentioned | 14:11 |
| 24 | this earlier, but is -- on the Moosejaw website, is | 14:11 |
| 25 | one of the data elements collected the duration of -- | 14:11 |

Page 85

CONFIDENTIAL

1         I, ANDREA M. IGNACIO, hereby certify that the

2    witness in the foregoing remote deposition was by me

3    duly remotely sworn to tell the truth, the whole

4    truth, and nothing but the truth in the

5    within-entitled cause;

6         That said remote deposition was taken in

7    shorthand by me, a disinterested person, at the time

8    and means therein stated, and that the testimony of

9    the said witness was thereafter reduced to

10   typewriting, by computer, under my direction and

11   supervision;

12        That before completion of the deposition,

13   review of the transcript [x] was [ ] was not

14   requested.  If requested, any changes made by the

15   deponent (and provided to the reporter) during the

16   period allowed are appended hereto.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22   Dated:  August 26, 2020

23

24   _____

25   ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830

                                          Page 183

**EXHIBIT 3**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                       ---oOo---
 4
 5    JEREMIAH REVITCH,
      individually and on
 6    behalf of all others
      similarly situated
 7
                    Plaintiff,
 8
      vs.                          No. 3:18-cv-06827-VC
 9
      NEW MOOSEJAW, LLC and
10    NAVISTONE, INC.,
11              Defendants.
      _____/
12
13
14        HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
15     REMOTE VIDEOTAPED DEPOSITION OF THOMAS E. WHITE
16                  NEWPORT, KENTUCKY
17               THURSDAY, JULY 16, 2020
18
19
20
21    Stenographically Reported by:
22    ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR
23    California CSR No. 9830
24    Job No. 4159796
25    Pages 1-240
```

                                            Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. HART:  Objection; form. | 08:26 |
| 2 | You can answer. | 08:26 |
| 3 | THE WITNESS:  Okay.  I don't think it's | 08:26 |
| 4 | currently running on Moosejaw's website. | 08:26 |
| 5 | MR. DECKANT:  Q.  Do you know the date that | 08:26 |
| 6 | the -- the code was -- the NaviStone code was taken | 08:26 |
| 7 | off the Moosejaw website? | 08:26 |
| 8 | A   I don't know the date. | 08:26 |
| 9 | Q   Okay.  So when we talk of the NaviStone code, | 08:26 |
| 10 | you -- you -- you mentioned JavaScript; right? | 08:26 |
| 11 | A   Yes. | 08:26 |
| 12 | Q   And does this JavaScript constitute, in your | 08:26 |
| 13 | view, a portion of the NaviStone code? | 08:26 |
| 14 | A   It is the -- the code that -- that | 08:26 |
| 15 | interfaces -- yes.  Simpler. | 08:26 |
| 16 | Q   So in addition to the JavaScript code, | 08:26 |
| 17 | NaviStone is also operating in Amazon AWS server; | 08:27 |
| 18 | correct? | 08:27 |
| 19 | A   Yes.  We -- we operate out of Amazon AWS | 08:27 |
| 20 | services. | 08:27 |
| 21 | Q   And -- | 08:27 |
| 22 | A   There are many servers, just not one. | 08:27 |
| 23 | Q   And is there -- is there code programmed by | 08:27 |
| 24 | NaviStone that is deployed to this Amazon AWS server? | 08:27 |
| 25 | A   Yes. | 08:27 |

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q    And what programming language is that code        08:27

2    written in?                                             08:27

3    A    Well, there's multiple things that are            08:27

4    deployed to our AWS servers.  If you're referring --   08:27

5    are you referring specifically to the API, the thing   08:27

6    that actually catches the data from the JavaScript?    08:27

7    Q    I'd actually just like to go over this at a       08:27

8    very high level.  But before we continue, you said     08:28

9    API.                                                    08:28

10        What do you mean by API?                           08:28

11   A    The API is a specific application that's          08:28

12   listening for requests from -- from our JavaScript.    08:28

13   We just refer to it as the API, the JavaScript, you    08:28

14   know, that collects the data, sends the data           08:28

15   somewhere.  It's the -- in the pitcher/catcher         08:28

16   concept, it catches.                                    08:28

17   Q    And -- and what language was the API written      08:28

18   in?                                                     08:28

19   A    It's written in C#.                               08:28

20   Q    So in your pitcher and catcher analogy, is it     08:28

21   correct to say that the JavaScript handles pitching    08:28

22   data, and the API running C# on Amazon AWS server      08:28

23   handles catching the data?                             08:29

24        Is that accurate under your knowledge?            08:29

25   A    That's accurate.                                   08:29

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q    And -- and hand in hand, these components,    08:29

2  and potentially other components as well, constitute    08:29

3  the NaviStone software; right?    08:29

4    A    They are parts of it, yes.    08:29

5    Q    So what other -- at a high level, what other    08:29

6  parts are there to the NaviStone software in addition    08:29

7  to the -- the JavaScript and the C# API?    08:29

8    A    There are databases.  We have a large data    08:29

9  warehouse running on Amazon Redshift, and there are a    08:29

10  lot of data aggregation jobs that run from that system  08:29

11  to do data modeling.    08:29

12        And then we have servers that -- that    08:29

13  automate processes for, you know, building files and    08:29

14  moving files from us to various third parties.    08:30

15    Q    All right.    08:30

16    A    And just in -- oh, I was just going to say in    08:30

17  addition, there are reporting servers.    08:30

18    Q    Did you say reporting servers or recording    08:30

19  servers?    08:30

20    A    Reporting with a P.    08:30

21    Q    Reporting servers.  That's -- that's what I    08:30

22  thought.    08:30

23    A    Yeah.    08:30

24    Q    So aside from the JavaScript, the C# API, the    08:30

25  databases on Amazon Redshift, servers that build and    08:30

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | |
|---|---|
| 1 | move data, and reporting servers, do any other major | 08:30 |
| 2 | components of the NaviStone software come to mind? | 08:30 |
| 3 | A   They don't come to mind.   That -- that covers | 08:30 |
| 4 | everything. | 08:30 |
| 5 | Q   Is Amazon Redshift -- is that part of the | 08:30 |
| 6 | Amazon AWS basket of services? | 08:31 |
| 7 | A   Yes. | 08:31 |
| 8 | Q   And what's the nature of Amazon Redshift? | 08:31 |
| 9 | A   You really can think of it as a -- as a | 08:31 |
| 10 | database server.   It -- it -- it acts like a Postgres, | 08:31 |
| 11 | which is a particular brand of relational database. | 08:31 |
| 12 | But it is tuned to deal with very large datasets. | 08:31 |
| 13 | Q   So PostgreSQL is a type of database; right? | 08:31 |
| 14 | A   It's a type of database server, yes. | 08:31 |
| 15 | Q   And what's hosted on the -- on this | 08:31 |
| 16 | PostgreSQL server on Amazon Redshift? | 08:31 |
| 17 | What kind of data does NaviStone store there? | 08:31 |
| 18 | MR. HART:   Object to form. | 08:32 |
| 19 | THE WITNESS:   Well, I -- I was giving -- I | 08:32 |
| 20 | was saying that Redshift is tuned to be -- to act like | 08:32 |
| 21 | a Postgres.   It's the way you, you know, can send | 08:32 |
| 22 | and -- you know, send queries to and code against it. | 08:32 |
| 23 | But -- but I assume that you mean what is on | 08:32 |
| 24 | the Redshift server? | 08:32 |
| 25 | MR. DECKANT:   Yes, please. | 08:32 |

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. DECKANT:  Q.  You know what? | 09:00 |
| 2 | Actually, I -- I was going to transition to a | 09:00 |
| 3 | new line of questioning, just about how you prepared | 09:00 |
| 4 | for this deposition.  But quite honestly, I actually | 09:00 |
| 5 | see there's a couple of more tech questions first | 09:01 |
| 6 | before I transition. | 09:01 |
| 7 | So you know what? | 09:01 |
| 8 | I will revisit that. | 09:01 |
| 9 | It occurred to me that when I was asking | 09:01 |
| 10 | about AWS -- excuse me.  Strike that. | 09:01 |
| 11 | When I asked you previously in this | 09:01 |
| 12 | deposition about what bodies of code constituted the | 09:01 |
| 13 | NaviStone software, in your view, do you recall | 09:01 |
| 14 | responding with the JavaScript code, the C# API, you | 09:01 |
| 15 | named S3, Amazon Redshift, servers that build and move | 09:01 |
| 16 | the data, and reporting servers?  Right? | 09:01 |
| 17 | MR. HART:  Object to form. | 09:01 |
| 18 | You can answer. | 09:01 |
| 19 | THE WITNESS:  Yes. | 09:01 |
| 20 | MR. DECKANT:  Okay. | 09:01 |
| 21 | Q   So I'd actually not yet discussed the servers | 09:01 |
| 22 | that build and move data and the reporting servers. | 09:01 |
| 23 | So what do you mean by servers that build and | 09:01 |
| 24 | move data? | 09:01 |
| 25 | A   There are automated processes for the | 09:02 |

Page 55

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1          MR. DECKANT:  Q.  Who designed the privacy          10:29

2     protections?                                              10:29

3          MR. HART:  Objection to form.                        10:29

4          THE WITNESS:  They were based on discussions         10:29

5     that -- you know, that we've had as a -- you know,        10:29

6     somebody -- I mean, Larry was involved.  I'm involved.    10:29

7     That's really kind of the primary, you know, inventors    10:29

8     of those -- that.                                         10:29

9          MR. DECKANT:  Q.  Does anyone else come to           10:29

10    mind?                                                     10:29

11    A    Jude comes to mind.  He's the product...             10:29

12    Q    Anyone else?                                         10:30

13    A    Not really.                                          10:30

14    Q    All right.                                           10:30

15         I'd like to refer back to Exhibit 23.                10:30

16    A    Okay.                                                10:30

17    Q    Do you see the third sentence of I.B. says           10:30

18    "he," meaning Tom White:                                  10:30

19         "Also has information about what information,         10:30

20    if any, NaviStone received from the devices of users      10:30

21    of the Moosejaw website."                                 10:30

22         Do you see that?                                     10:30

23    A    Yes.                                                 10:30

24    Q    Okay.  If I wanted to determine what types of        10:30

25    information, if any, NaviStone received from the          10:30

                                                     Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | devices of users of the Moosejaw website, where would | 10:30 |
| 2 | I look? | 10:30 |
| 3 | MR. HART:  Object to form. | 10:30 |
| 4 | THE WITNESS:  I -- I don't know where you -- | 10:30 |
| 5 | where you would look.  I -- you know... | 10:30 |
| 6 | MR. DECKANT:  Q.  Is that functionality | 10:31 |
| 7 | implemented in any particular body of code? | 10:31 |
| 8 | MR. HART:  Object to the form. | 10:31 |
| 9 | THE WITNESS:  You could see that in the | 10:31 |
| 10 | JavaScript, I suppose, if you could read through the | 10:31 |
| 11 | JavaScript and understand what is being collected. | 10:31 |
| 12 | MR. DECKANT:  Q.  So that's -- per your | 10:31 |
| 13 | analogy earlier today, that's the pitcher portion of | 10:31 |
| 14 | the code.  It's the -- the JavaScript -- | 10:31 |
| 15 | A   Right. | 10:31 |
| 16 | Q   -- pitcher that determines what is collected; | 10:31 |
| 17 | correct? | 10:31 |
| 18 | A   Yes. | 10:31 |
| 19 | Q   And the API running C# does not determine | 10:31 |
| 20 | what's collected.  That's the JavaScript portion? | 10:31 |
| 21 | A   Yes.  The JavaScript portion is -- is what | 10:31 |
| 22 | determines what is collected. | 10:31 |
| 23 | Q   Okay.  All right. | 10:31 |
| 24 | MR. DECKANT:  I'm going to introduce another | 10:31 |
| 25 | exhibit.  Bear with me a minute. | 10:31 |

Page 81

```
 1    please let me know when you have that loaded up.        10:36

 2        A    Okay.  It's loaded.                            10:36

 3        Q    Okay.  So I'd like you to load up              10:36

 4    "Cybersecurity Questionnaire."                          10:36

 5        A    Uh-huh.                                        10:36

 6        Q    And just take a minute with it as you'd like.  10:36

 7    I am going to be going through various sections and     10:36

 8    asking you some questions about that.                   10:36

 9        A    Okay.                                          10:36

10        Q    I intend -- I intend to ask you questions      10:36

11    about Appendices A, B, and C, but not D.  So if you     10:36

12    just need a minute, you know, please take your time.    10:36

13    Let me -- let me know.                                  10:36

14        A    Yeah, I -- I'll need to consume this.          10:36

15        Q    Sure.                                          10:36

16        A    Did you say A, B, and C, but not D?            10:38

17        Q    Correct.                                       10:39

18        A    Okay.                                          10:39

19        Q    What is Exhibit 25?                            10:39

20        A    Exhibit 25 is a -- a document prepared that    10:39

21    outlines our business, really, highlights of our        10:39

22    security and process.                                   10:39

23             And just judging by the other e-mail, this     10:39

24    was provided to the third party to begin the process    10:39

25    of assessing our security.                              10:39
```

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        Q    Was this part of a security audit?        10:39

 2        A    It was a -- I -- assessment, I think, is   10:39

 3   the -- the more appropriate term than audit.  We -- we 10:39

 4   went through a security assessment sort of on the way  10:40

 5   to our journey towards becoming -- doing an audit.     10:40

 6        Q    Was an audit ultimately conducted, a security 10:40

 7   audit?                                                 10:40

 8        A    It had not yet been conducted.             10:40

 9        Q    Do you know if there is a more current copy 10:40

10   of the Cybersecurity Questionnaire?                    10:40

11        A    I don't know that there is a more current   10:40

12   copy than this.  There -- yeah.                        10:40

13        Q    Okay.  In this --                           10:41

14        A    I don't know if there is.                   10:40

15        Q    -- in this one, we see the -- this e-mail is 10:40

16   dated September 26, 2017, right, Exhibit 24?           10:40

17        A    Is there a way for me to have both items    10:40

18   open?                                                  10:40

19             I -- I mean, I can go back to the e-mail.    10:40

20        Q    There might be a functionality to download  10:41

21   and open the PDF.  And if so, you might be able to     10:41

22   open two PDFs at a time.                               10:41

23        A    Oh, wait, I see next file.  That's what     10:41

24   I'm -- yes, the e-mail is dated September 26, 2017.    10:41

25        Q    So the Cybersecurity Questionnaire was      10:41
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   created on or before that date; right?                10:41

2        A    It must have been before that date.          10:41

3        Q    And have you seen the Cybersecurity          10:41

4   Questionnaire before on Exhibit 25?                    10:41

5        A    All of the stuff in here looks familiar.  I  10:41

6   don't -- you know, I don't have a specific memory of   10:41

7   it, but...                                             10:41

8        Q    Did reviewing the document help you one way  10:41

9   or the other to refresh your recollection as to        10:41

10  whether you were consulted on it?                      10:41

11       A    I'm sure I was consulted on it.  I -- I don't 10:41

12  have a specific recollection of it.  I was involved in 10:41

13  the process of working with that third party.          10:42

14       Q    I think I already covered this, but you're   10:42

15  unaware of any -- any prior or later copies of the     10:42

16  questionnaire; right?                                  10:42

17       A    Yeah, I'm not -- I just don't -- I'm not     10:42

18  sure.                                                  10:42

19       Q    Were any changes made as a result of        10:42

20  compiling the cyber- -- Cybersecurity Questionnaire    10:42

21  for AZORCA?                                            10:42

22            MR. HART:  Object to form.                   10:42

23            You can answer.                              10:42

24            THE WITNESS:  Not that I can recall as -- as 10:42

25  to this specific questionnaire.                        10:42

                                          Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Is that a proprietary name? | 12:09 |
| 2 | MR. HART:  Object to the form. | 12:09 |
| 3 | You may answer. | 12:09 |
| 4 | THE WITNESS:  It is a -- I would say an | 12:09 |
| 5 | internal name.  I -- I don't know if it was ever | 12:09 |
| 6 | branded as a, you know, specific mar- -- marketing | 12:09 |
| 7 | tool or anything. | 12:09 |
| 8 | MR. DECKANT:  Q.  But it's an internal name | 12:09 |
| 9 | to NaviStone, right, OneTag? | 12:09 |
| 10 | A   Yes. | 12:09 |
| 11 | Q   What -- what does the word "tag" mean in -- | 12:10 |
| 12 | in this context? | 12:10 |
| 13 | A   Tag is -- is short for the -- like, the | 12:10 |
| 14 | JavaScript tag.  In HTML, you know, there is a thing | 12:10 |
| 15 | called a tag, and one of them is script tag.  That's | 12:10 |
| 16 | what loads this JavaScript to the page. | 12:10 |
| 17 | Q   It's called OneTag because through applying | 12:10 |
| 18 | one JavaScript tag, clients are able to deploy the | 12:10 |
| 19 | NaviStone software; is that it? | 12:10 |
| 20 | MR. HART:  Object to the form. | 12:10 |
| 21 | You may answer. | 12:10 |
| 22 | THE WITNESS:  Yes. | 12:10 |
| 23 | MR. DECKANT:  Q.  And where it says "the | 12:10 |
| 24 | OneTag is customized to map client-specific web data | 12:10 |
| 25 | elements into a multi-tenant database environment," | 12:10 |

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1    that's referring to the process of the -- what we      12:11

2    described earlier where the JavaScript acts -- acts as  12:11

3    the pitcher, and then the -- the API on the Amazon AWS   12:11

4    server acts as a catcher for various data elements;     12:11

5    right?                                                   12:11

6        A    It -- yes.  It specifically is talking about   12:11

7    the JavaScript piece of this, the JSON definition in    12:11

8    particular.                                              12:11

9        Q    And that's what's meant by "map               12:11

10   client-specific web data elements"; right?              12:11

11            Which is to use JavaScript to essentially      12:11

12   transfer information into a database; right?            12:11

13            MR. HART:  Object to the form.                 12:11

14            You may answer.                                12:11

15            THE WITNESS:  Yes.  We are mapping             12:11

16   client-specific web data elements to essentially our    12:11

17   data structure.                                         12:11

18            MR. DECKANT:  All right.                       12:12

19       Q    So the paragraph below the second paragraph,   12:12

20   it says:                                                12:12

21            "The OneTag javascript executes an             12:12

22   application that interprets the page types, urls and    12:12

23   actions from a particular website and maps" --          12:12

24   those -- excuse me -- "these to the appropriate data    12:12

25   tables and fields in our data warehouse."               12:12

Page 137

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Do you see that? | 12:12 |
| 2 | A   Yes. | 12:12 |
| 3 | Q   So that's what we were discussing earlier; | 12:12 |
| 4 | right? | 12:12 |
| 5 | The -- the JavaScript will interpret various | 12:12 |
| 6 | page types, URLs, and user actions, and then send | 12:12 |
| 7 | those to the API; right? | 12:12 |
| 8 | MR. HART:  Object to the form. | 12:12 |
| 9 | You may answer. | 12:12 |
| 10 | THE WITNESS:  Yes. | 12:12 |
| 11 | MR. DECKANT:  Okay. | 12:13 |
| 12 | Q   Let me move down.  Do you see where it says: | 12:13 |
| 13 | "Many tagging applications rely on the client | 12:13 |
| 14 | to map data to a data scheme.  This is a laborious and | 12:13 |
| 15 | involved process that requires skilled IT resources. | 12:13 |
| 16 | OneTag solves this complexity problem with a server | 12:13 |
| 17 | side process that generates JavaScript code on the fly | 12:13 |
| 18 | customized to the client's web site.  The code uses | 12:13 |
| 19 | Regex to search for patterns in the page text." | 12:13 |
| 20 | Do you see that? | 12:13 |
| 21 | A   Yes. | 12:13 |
| 22 | Q   So when this is referring to "a server side | 12:13 |
| 23 | process that generates JavaScript code on the fly," | 12:13 |
| 24 | that's this process we're discussing where the | 12:13 |
| 25 | universal code is run through a C# program that pulls | 12:13 |

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | associated web queries, while a portion is associated | 12:30 |
| 2 | with the JavaScript code and regular expression | 12:30 |
| 3 | matching?  Is that right? | 12:30 |
| 4 | A   I apologize.  Can you repeat that? | 12:30 |
| 5 | I just -- | 12:30 |
| 6 | Q   Yeah, yeah. | 12:30 |
| 7 | So -- so is it accurate to say that certain | 12:30 |
| 8 | categories of data collection, like IP address, are | 12:30 |
| 9 | determined through web queries, while other categories | 12:30 |
| 10 | of data collection, like e-mail address, are found | 12:30 |
| 11 | through regular expression matching in the JavaScript | 12:30 |
| 12 | code? | 12:31 |
| 13 | A   Yes. | 12:31 |
| 14 | Q   Would you say that most categories of data | 12:31 |
| 15 | are from the regular expression matching in the | 12:31 |
| 16 | JavaScript? | 12:31 |
| 17 | Or are most categories resulting from data | 12:31 |
| 18 | associated with -- with web queries? | 12:31 |
| 19 | A   Most of the work happens in the JavaScript. | 12:31 |
| 20 | There are a handful of bits of data that come along, | 12:31 |
| 21 | you know, as a standard part of web requests. | 12:31 |
| 22 | Q   What do -- what does this paragraph mean by | 12:31 |
| 23 | the word "conversions"? | 12:31 |
| 24 | A   Generally, it means someone has placed an | 12:31 |
| 25 | order on, like, an eCom website.  A conversion could | 12:31 |

Page 150

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1    ever omitted or excerpted for certain websites?        13:07

 2        A    I -- I'm not -- I don't understand the         13:08

 3    question.                                               13:08

 4        Q    Certainly.                                     13:08

 5             So the OneTag software, it says, collects      13:08

 6    over 200 different data elements; right?                13:08

 7        A    Yes.                                           13:08

 8        Q    Okay.  So in the process of creating the       13:08

 9    site-specific JavaScript, does the client have the      13:08

10    ability to customize which tags will be included in     13:08

11    the site-specific JavaScript code?                      13:08

12        A    What do you mean by "the client"?              13:08

13        Q    Moosejaw.                                      13:08

14        A    Does Moosejaw determine which variables are    13:08

15    stored, you mean?                                       13:08

16        Q    Yes.                                           13:08

17        A    That's generally not our -- our practice.  It  13:09

18    wouldn't be denied to them if they had something        13:09

19    specific, but...                                        13:09

20             MR. DECKANT:  Now, let -- let's -- let's --    13:09

21    Eamonn, I'm still asking questions about this           13:09

22    document, so object to form, you know, still applies.   13:09

23        Q    But if we're -- just going back a sec to the   13:09

24    C# code we were talking about earlier, that -- that --  13:09

25    that converts the universal JavaScript to the           13:09
```

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
1              CERTIFICATE OF REPORTER
2         I, ANDREA M. IGNACIO, hereby certify that the
3    witness in the foregoing remote deposition was by me
4    duly remotely sworn to tell the truth, the whole
5    truth, and nothing but the truth in the
6    within-entitled cause;
7         That said remote deposition was taken in
8    shorthand by me, a disinterested person, at the time
9    and means therein stated, and that the testimony of
10   the said witness was thereafter reduced to
11   typewriting, by computer, under my direction and
12   supervision;
13        That before completion of the deposition,
14   review of the transcript [x] was [ ] was not
15   requested.  If requested, any changes made by the
16   deponent (and provided to the reporter) during the
17   period allowed are appended hereto.
18        I further certify that I am not of counsel or
19   attorney for either or any of the parties to the said
20   deposition, nor in any way interested in the event of
21   this cause, and that I am not related to any of the
22   parties thereto.
23   Dated: July 20, 2020
24
25   ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830
```

Page 240

**EXHIBIT 4**

Page 1

1                              VOLUME:    I

                              PAGES:    1-333

2                              EXHIBITS:  40-63

3              UNITED STATES DISTRICT COURT

4            NORTHERN DISTRICT OF CALIFORNIA

5                SAN FRANCISCO DIVISION

6                CASE NO. 3:18-cv-06827-VC

7      _____

8      JEREMIAH REVITCH, individually and on     )

9      behalf of all others similarly situated, )

10                      Plaintiff,               )

11                    vs.                         )

12     NEW MOOSEJAW, LLC and NAVISTONE, INC.,    )

13                   Defendants.                 )

14     _____)

15

16                  VIDEOCONFERENCED AND VIDEOTAPED

17     DEPOSITION OF JEREMIA D. REVITCH, called as a

18     witness by and on behalf of the Defendants,

19     pursuant to the applicable provisions of the

20     Federal Rules of Civil Procedure, before P. Jodi

21     Ohnemus, (remotely) RPR, RMR, CRR, CA-CSR #13192,

22     NH-LSR #91, and MA-CSR #123193, at Mill Valley,

23     California, on Friday, July 17, 2020, commencing at

24     9:07 a.m. (PDT)

25

Page 64

1      Q.   And do you know if you're bringing any

2   Constitutional claims under the Constitution of

3   California?

4      A.   I rely on counsel to -- to understand and

5   navigate the specific claims.

6      Q.   Do you know what conduct is prohibited

7   under the California Constitution with respect to

8   your claims here?

9           MR. SMITH:  Objection.  Calls for a legal

10   conclusion.

11      Q.   You may answer.

12      A.   I rely on counsel.

13      Q.   Do you know if you have any common law

14   claims that you're bringing in this lawsuit?

15      A.   Again, same answer.  I rely on counsel to

16   understand the specific claims.

17      Q.   When did you first learn that your visits

18   to the Moosejaw website have -- were allegedly

19   wiretapped?

20      A.   My understanding of that was -- was gained

21   in a privileged conversation with counsel.

22      Q.   Do you know when that -- I don't want to

23   know the contents of the conversation; I just

24   wanted to know when that occurred.

25      A.   I don't remember the specific date, but --

```
                                                   Page 65
 1   but I could -- I could review my records, if
 2   necessary.
 3        Q.   Do you know if it was in December of 2017?
 4        A.   That sounds accurate.
 5             But, again, I'd have to review my records
 6   to know for certain.
 7        Q.   Did you learn about this alleged conduct
 8   through conversations other than with counsel?
 9        A.   No.
10        Q.   And did you reach out to counsel, or did
11   counsel reach out to you?
12        A.   That -- that discussion was part of a -- a
13   privileged matter that was brought up in -- in the
14   discussion of another privileged matter.
15        Q.   So I'm just asking whether -- who -- who
16   brought up the -- the alleged conduct.
17             Did you bring it up to counsel, or did
18   counsel bring it up to you?
19             MR. SMITH:  Just hold it.
20             Mr. Revitch, I'm going to instruct you not
21   to answer.  That's requesting disclosure of the
22   content of communications between you and I.
23             MR. WONG:  I'm trying to understand the
24   basis of his knowledge for this.  Are you saying
25   that I can't even ask as to that?
```

Page 98

1      Q.   Mr. Revitch, you probably need to refresh
2   your exhibit list, and then it should appear as
3   Exhibit 41.  Unfortunately the exhibit sticker is
4   gigantic.
5           Is there a way to move that sticker off of
6   the actual page itself?  Or is that not --
7           MR. YOUNG:  I don't believe that's
8   possible.
9           MR. WONG:  Okay.  That is quite
10  unfortunate.  All right.  We'll try to deal with
11  it.
12          (Exhibit 41, PLF 00001, one-page
13          spreadsheet screenshot.)
14     Q.   Mr. Revitch, do you have that document in
15  front of you?
16     A.   I do.
17     Q.   Do you recognize that document?
18     A.   I do.
19     Q.   Actually, hold on.  I'm sorry.
20          MR. WONG:  Just for the record, I've
21  introduced Exhibit 41, which is marked PLF 00001.
22     Q.   Mr. Revitch, what is this document?
23     A.   This appears to be the first screenshot of
24  the -- or a screenshot of all of my visits to
25  Moosejaw.com that I presented to my counsel when --

1    shortly after we had initially discussed the -- the

2    claim.

3        Q.    Okay.  And did you, yourself, take this

4    screenshot?

5        A.    I did.

6        Q.    Do you know when you did that?

7        A.    I do not.  I'd have to look at my records

8    to -- to see that.

9        Q.    And what records would you look at?

10       A.    I'd look at my -- to determine this, I'd

11   look at ostensibly the email that I sent to -- to

12   the counsel as I captured and sent it -- to my

13   recollection, I captured it and immediately sent

14   it.

15       Q.    So, for instance, when you see, like, line

16   5 it says "Last Visited Today," do you see that?

17            Sort of in the middle column of "Date

18   Visited."

19            You have to magnify it a lot.

20       A.    Yeah, I -- even -- even when you magnify

21   it, it's -- it's still a little hard to read.  But

22   yes, I -- I see the "Crescent Moon EVA all foam

23   snowshoe."

24       Q.    Okay.

25            MR. WONG:  Counsel, obviously I don't want

Page 118

1    including your lawyer, while you're being deposed;

2    and obviously if you need to speak with Joel, you

3    can -- you know, you can do so at the break.  So if

4    you -- you need to, you can request a break, but

5    you shouldn't be in, sort of, any sort of text

6    communication with him or any other email or

7    anything else.

8         A.   I have gotten numerous text messages from

9    my son, but I put him on do not disturb.

10        Q.   All right.  Thank you.

11             And do you have any materials in front of

12   you that you've printed out that are related to the

13   deposition?

14        A.   My desk is clear.

15        Q.   Okay.  Great.

16             So we were talking a bit about Moosejaw's

17   website.  So have you ever reviewed the Moosejaw

18   privacy policy?

19        A.   I have not.

20        Q.   Okay.  And that includes the time frame in

21   which you were alleged to have browsed in the

22   2016-2017 time frame?

23        A.   Correct.

24        Q.   And did you -- have you ever reviewed the

25   Moosejaw terms and conditions since 2016?

Page 120

1    to have to go back to -- actually, I think I -- I'm
2    pretty sure -- I think it's Veritext.  All right.
3    I'm watching a spinning wheel.  All right.  I'm now
4    in the marked exhibits folder.
5        Q.   Great.  Exhibit 41.
6        A.   Which document?  41.
7        Q.   41.
8        A.   All right.  I have 41 in front of me.
9        Q.   Great.
10            So do you see the earliest date there for
11   -- under the "Date Visited" column?  Does that
12   appear to be March 1st, 2017?
13       A.   Well, these don't appear to be in
14   chronological order, but --
15       Q.   Oh, I'm sorry.  Actually, there's a
16   January 8th.
17       A.   Yeah, there's a January 8th.  That -- that
18   appears to be the -- Sunday, January 8th, 2017.
19       Q.   And your understanding of this page is
20   that this recorded when you visited certain web
21   pages; is that correct?
22       A.   That's -- the column header "Date Visited"
23   would lead me to believe so.
24       Q.   And do you know if you -- were you able to
25   get more granular information on any individual

1   entry on this screenshot?  Are you aware --

2        A.    No.

3        Q.    -- of whether or not you can do that?

4        A.    I am not aware of whether or not I can do

5   that.

6        Q.    Do you know, for instance, if you can get

7   a -- a time visited, not just the date?

8        A.    I am not specifically aware, no.

9        Q.    And do you know why this isn't

10  alphabetized?  It just comes up in a, sort of,

11  random order?

12       A.    Well, I -- I do not know why -- I mean, it

13  doesn't say -- none of the column headers appear to

14  indicate that they're being sorted by that specific

15  column.  So I do not know how or why Safari orders

16  its search history results.

17       Q.    Okay.  So does it appear from this history

18  that January 8th, 2017, is your earliest visit

19  within the history that's been recorded?

20       A.    It does.

21       Q.    And do you believe that was the first time

22  you visited the Moosejaw website?

23       A.    I'm not certain -- I have no reason to

24  believe otherwise.

25       Q.    And what do you mean by that?

1      A.    That -- that means that -- that I don't

2  have any specific recollection of visiting the --

3  the Moosejaw website prior to that, but I don't --

4  I don't -- that -- that would seem to -- to be the

5  indication here.

6      Q.    Okay.  So you don't believe that you

7  visited the website in 2016.

8            MR. SMITH:  Objection.  Misstates

9  testimony.

10            Go ahead.

11      A.    I -- I couldn't -- I couldn't say with any

12  level of certainty.  As I mentioned previously, I

13  -- I think my awareness of -- of Moosejaw preceded

14  2017 -- 2017.  So it -- it certainly -- it's

15  certainly possible.

16      Q.    Do you know why it wouldn't have been

17  recorded within your history if -- if you had

18  viewed it in 2016?

19      A.    I'm -- I'm -- I can't say with any level

20  of certainty why it wouldn't have been.

21      Q.    Okay.  And for this January 8th visit --

22  oh, unfortunately the name has been blocked out by

23  the exhibit.  I'll let you know that the pages

24  visited were titled, "Icebreaker Sale" and

25  "Icebreaker Men's Pursuit Legless."

Page 124

1    or --

2              MR. WONG:  Yes, that date.

3        Q.    I'm sorry, January 8th.

4              MR. WONG:  Thank you.

5        A.    With a fair level of certainty, I did --

6    I did visit other websites on that day.

7        Q.    And did you visit any other pages on the

8    Moosejaw website?

9        A.    The -- the document presented here would

10   lead me to believe that I did not.

11       Q.    And that's because you don't see any other

12   entries for January 8th?

13       A.    That's correct.

14       Q.    Now, I think the next time reflected in

15   this exhibit is -- for a visit to the Moosejaw

16   website is March 1st, 2017; is that correct?

17       A.    That appears to be correct.

18       Q.    And in that you visited a number of pages,

19   it seems like.

20             Do you see the "My Cart"?

21       A.    I do.

22       Q.    And "Sign in" several times?

23       A.    I see that as well.

24       Q.    "My Account"?

25       A.    I see that.

Page 147

1      Q.   Yes.

2      A.   Okay.

3           MR. SMITH:  Sorry to interrupt.  Going

4    back to your proposed stipulation, I just wanted to

5    see the Bates number to make sure we're -- have a

6    clear record.

7           So the proposed stipulation is that Bates

8    Nos. 1 through -- what was it -- 31? -- are what?

9    True and accurate representations of what?

10          MR. WONG:  Of what he purports them to be.

11          MR. SMITH:  Yeah.  Okay.  Great.  So

12   stipulated.

13          MR. WONG:  All right.  Thank you.

14     Q.   All right.  Mr. Revitch, I'm introducing

15   as Exhibit 44 a document.  If you could refresh

16   your browser.

17          (Exhibit 44, MJ-Revitch 0026.)

18     Q.   This is a document produced in this

19   litigation.  It bears the Bates number MJ-Revitch

20   26476.

21          Do you see the document, Mr. Revitch?

22     A.   I do.

23     Q.   This is a customer record from

24   Moosejaw.com.

25          Do you see about a quarter of the way down

Page 213

1    Why is it important that you are unaware?

2            MR. SMITH:  Objection.  Calls for a legal

3    conclusion.

4        Q.   Is it important that -- let me -- I'll

5    strike that question.

6            Is it important that you were unaware of

7    this activity?

8        A.   It is exceedingly important in that it's a

9    statutory violation.

10       Q.   And -- and at the time that this activity

11   occurred without your awareness, I think your

12   testimony earlier was that you had not read the

13   Moosejaw privacy policy; is that right?

14       A.   That -- that is correct.

15       Q.   In fact, you've never read that privacy

16   policy; right?

17       A.   That is incorrect.  As I stated earlier,

18   it was presented to me recently as a document for

19   review.

20       Q.   Okay.  I'm sorry.  I -- I -- apart from

21   what you might have looked at in connection with

22   prosecuting your case, you never went to read the

23   Moosejaw privacy policy; right?

24       A.   That is correct.

25       Q.   And your earlier testimony is that you

Page 227

1      A.    On which tab?  "Safari History"?

2      Q.    It's on the "Safari History" tab.

3      A.    4892.  Okay.

4      Q.    Yeah.  What is Gizmodo?

5      A.    Gizmodo is a technology website.

6      Q.    And is Gizmodo a website that you've ever

7   received emails from?

8      A.    I couldn't -- I couldn't say -- I couldn't

9   say specifically whether I've ever received direct

10  email marketing or emails of any type from Gizmodo.

11     Q.    Did you visit Gizmodo's website prior to

12  filing this lawsuit?

13     A.    Absolutely.

14     Q.    Did you visit Gizmodo prior to your

15  counsel talking to you about this lawsuit, whenever

16  they first did so?

17     A.    Absolutely.

18     Q.    Did you ever see in Gizmodo or in any

19  emails reference to NaviStone or Moosejaw?

20     A.    No.

21     Q.    Now, this appears to be a subset of

22  browsing line items.

23           Is that fair to say -- if you look at

24  the -- go ahead.

25     A.    Sure.  Absolutely.  There are -- there are

Page 319

```
 1        Q.   Well, let me ask you this question:  It
 2   says, "Plaintiff alleges that he browsed
 3   defendant's Moosejaw website at Moosejaw.com while
 4   shopping for outerwear."
 5             Do you see that in paragraph 3?
 6        A.   I do.
 7        Q.   And that's not a legal statement; right?
 8   That's a factual statement; correct?
 9        A.   Sure.  I can --
10        Q.   And was that true -- was that true when it
11   was made?
12        A.   It is.
13        Q.   And was it true that you were unaware at
14   the time of browsing the website, quote, that your
15   "keystrokes, mouse clicks and other electronic
16   communications were being intercepted and disclosed
17   to a third party"?
18             Is that also true?
19        A.   That is true.
20        Q.   Is it also true that if you had -- it says
21   "Plaintiff alleges that in all reasonable
22   probability he would not have browsed or visited
23   Moosejaw's website at Moosejaw.com, or would have
24   visited the site on materially different terms, had
25   he known the truth about defendant's wiretaps."
```

Page 320

1           Is that also true?

2       A.   That's true.

3       Q.   Now, it says in paragraph 4, "Plaintiff

4   alleges that defendants' omissions concerning its

5   wiretaps played a substantial part, and so had been

6   a substantial factor, in his decisions to browse

7   and visit Moosejaw's website at Moosejaw.com."

8           Do you see that?

9       A.   I do.

10      Q.   Is that true?

11      A.   I -- I believe it to be true, yes.

12      Q.   What omissions?

13      A.   Well, their -- their -- I guess their

14  actively notifying me of the fact that -- that they

15  were sharing data.

16      Q.   How could you determine whether Moosejaw

17  had omitted information concerning its activities

18  on its website without reviewing its privacy

19  policy?

20      A.   I don't necessarily think that -- that

21  sharing information should be limited to disclosure

22  in a privacy policy.  But if it's your practice to

23  -- to share information at a granular level and

24  then -- and then target customers at a specific

25  level, including targeting them via other -- other

Page 331

```
 1   Commonwealth of Massachusetts
 2   Middlesex, ss.
 3
 4
             I, P. Jodi Ohnemus, Notary Public
 5   in and for the Commonwealth of Massachusetts,
     do hereby certify that there came before me
 6   (remotely) on the 17th day of July, 2020, the
     deponent herein, who was duly sworn by me; that the
 7   ensuing examination upon oath of the said deponent
     was reported stenographically by me and transcribed
 8   into typewriting under my direction and control;
     and that the within transcript is a true record of
 9   the questions asked and answers given at said
     deposition.
10
11           I FURTHER CERTIFY that I am neither
     attorney nor counsel for, nor related to or
12   employed by any of the parties to the action
     in which this deposition is taken; and, further,
13   that I am not a relative or employee of any
     attorney or financially interested in the outcome
14   of the action.
15
             IN WITNESS WHEREOF I have hereunto set my
16   hand and affixed my seal of office this
     24th day of July, 2020, at Waltham.
17
18
19
20           P. Jodi Ohnemus, RPR, RMR, CRR
             CSR, Notary Public,
21           Commonwealth of Massachusetts
             My Commission Expires:
22           3/14/2021
23
24
25
```

**EXHIBIT 5**

Page 1

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5       JEREMIAH REVITCH,            )
                                     )
6                  PLAINTIFF,        )
                                     ) CASE NO. 3:18-CV-06827-VC
7                                    )
                   V.                )
8                                    )
        NEW MOOSEJAW, LLC, AND       )
9       NAVISTONE, INC.,             )
                                     )
10                 DEFENDANTS.       )
        _____ )

11

12

13

14

15       VIDEOTAPED DEPOSITION OF JEREMIAH REVITCH

16              FRIDAY, SEPTEMBER 18, 2020

17

18

19

20

21

22

23

         FILE NO.  NE 4259017
24

         REPORTED BY  MARK McCLURE, CRR
25              CAL CSR 12203

1          THE WITNESS:  I can't answer that question as

2    it has the potential for revealing privileged

3    communication.

4    BY MR. BERTONI:

5        Q.   I'm not asking you to reveal privileged

6    communications.  I'm asking if you recall any

7    communications, irrespective of what was disclosed, with

8    your counsel, involving or relating to this dispute

9    that's now the subject of litigation.

10       A.   I think any such communications would be

11   privileged and their mere existence or the fact that

12   they existed would be privileged as well.

13       Q.   I'm not going to -- I don't want to quibble

14   with you, Mr. Revitch.

15           The question is -- we have been provided a

16   privilege log that is supposed to disclose those

17   communications with you withheld on the grounds of

18   privilege.

19           And my simple question is:  Do you recall any

20   documents that should be on this list prior to December

21   14 through 18, 2017?

22       A.   I have no specific recollection of any

23   documents prior to that date.

24       Q.   Did you browse the Moosejaw website after

25   December 18, 2017?

1        A.   I don't believe that I did, no.

2        Q.   Do you consider your family members to be

3   experienced web browsers?

4             MR. SMITH:  Objection.  Vague.

5             THE WITNESS:  What constitutes an experienced

6   web browser?

7   BY MR. BERTONI:

8        Q.   Well, are they more experienced or less

9   experienced than you in terms of web browsing?

10        A.   I would suggest less.

11        Q.   Have you ever taken any steps to verify

12   whether Moosejaw or NaviStone cookies were on the device

13   you used to browse the Moosejaw website?

14        A.   I'm sorry, can you repeat?

15        Q.   Have you ever taken any steps to determine

16   whether Moosejaw or NaviStone cookies were on the device

17   you used to browse the Moosejaw website?

18             MR. SMITH:  Objection.  Vague.

19             THE WITNESS:  I've been requested by counsel

20   to perform a number of searches for a number of

21   criteria, which I believe were related to the existence

22   of cookies related to browsing the Moosejaw website.

23   BY MR. BERTONI:

24        Q.   Would you have a claim against any company

25   that used NaviStone's technology if you visited their

Page 40

1       A.    That does indeed appear to be correct.

2       Q.    And then again on December 8th, 2017, you

3  looked at one product, correct?

4       A.    I have no specific recollection of that, but I

5  can see here, yes.  I see the "Hestra Juniors' Heli Ski

6  3-Finger Glove."

7       Q.    That sounds like quite a glove.

8       A.    My daughter tends to think so.

9       Q.    Then there's also "Last Visited Today," do you

10  see that?

11       A.    Yes.

12       Q.    As the dates visited, maybe two times there?

13       A.    Yes.

14       Q.    Now, you testified that you cannot remember

15  the date that that was, but that it was the same date

16  that you learned of the facts alleged in the complaint

17  from your counsel, is that correct?

18       A.    I believe it was the same day that he

19  requested that I search my browser history.

20            MR. SMITH:  I'm going to object that we're

21  still on topics that were definitely covered at the last

22  deposition, so this line of questioning violates the

23  September 9th order.  I'm reserving the right to move to

24  strike and to shut down the line of questioning.

25            Go ahead.

```
                                                    Page 41
```

1    BY MR. WONG:

2        Q.   Have you been to Moosejaw.com since December

3    15th, 2017?

4        A.   I don't believe so.  I made -- I've made a

5    concerted effort to not do so.  However, I can say that

6    I am served up and leveraged advertisements for numerous

7    outdoor outfitters.  If they happen to serve me with a

8    product that I was particularly interested in, I may or

9    may not have noticed that it was Moosejaw, depending on

10   how prevalent the branding was on the link that they

11   produced, so I can't say conclusively that I haven't,

12   but I can say that if I had, that I probably would have

13   closed the browser, you know.  I wouldn't have gone past

14   whatever the link was.

15       Q.   That browsing history would have been recorded

16   in your -- in your history folder, right?

17       A.   It would have.  Yeah, it would have, and I

18   think we've performed searches since, so I think I can

19   say that, no, I haven't.

20            MR. WONG:  If we can take a five-minute break.

21   I think we might be done, but I'd just like to quickly

22   go back over my outline.

23            MR. SMITH:  Okay.

24            VIDEOGRAPHER:  We are off the record at

25   10:44 a.m.

Page 44

1    STATE OF CALIFORNIA       )

2    COUNTY OF SANTA BARBARA  )   ss.

3

4              I, Mark McClure, C.S.R. No. 12203, in and for

5    the State of California, do hereby certify:

6         That prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify to the truth, the whole truth, and nothing but

9    the truth;

10             That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction,

13   and the same is a true, correct, and complete transcript

14   of said proceedings;

15             That if the foregoing pertains to the

16   original transcript of a deposition in a Federal Case,

17   before completion of the proceedings, review of the

18   transcript { } was { } was not required.

19        I further certify that I am not interested in the

20   event of the action.

21        Witness my hand this 21st day of September, 2020.

22

23

24             _____
                Certified Shorthand Reporter

               State of California

25              CSR No. 12203

**EXHIBIT 6**

**From:** Allen Abbott <aabbott@navistone.com>
**To:** Larry Kavanagh <lkavanagh@navistone.com>, Efrain Torres <etorres@navistone.com>
**Subject:** FW: Media training on Wednesday
**Date:** Mon, 30 Oct 2017 01:52:29 +0000
**Importance:** Normal
**Attachments:** NaviStone_Plan_v10.29.17_-_FINAL.docx; NaviStone_Key_Messages.docx; NaviStone_Boilerplate.docx
**Inline-Images:** image001.png

---

Prep Materials for Wednesday's media training…

**Allen Abbott**
Chief Operating Officer



610.360.9904
aabbott@navistone.com
navistone.com

Read our blog. See the future. http://hubs.ly/H07MTp00

---

**From:** Joe Shields [mailto:joe@rokconsulting.net]
**Sent:** Sunday, October 29, 2017 9:07 AM
**To:** Allen Abbott <aabbott@navistone.com>
**Subject:** Media training on Wednesday

Good morning, Allen.

Looking forward to our media training on Wednesday. Here are some items related to that…
- Attached is the crisis plan, updated with your input.
- Key messages for you to practice. These are drawn from the plan, and I've created an acronym – "TIDES" – to help you remember and recall the points.
- The NaviStone boilerplate paragraph for you to practice. This, too, is drawn from the plan.
- We'll be sticking to print mock interviews only, to ensure we can do as many as possible. If you want to do some TV mock interviews, we can schedule that, too.

And a couple of questions…
- The media training will be facilitated by a PowerPoint presentation, which I'll bring on my laptop as well as a flash drive. Do you have a monitor we can hook into? I'll get there around 8 or 8:15 to make sure everything gets loaded correctly.
- Who, besides you, will be participating?

Thanks, Allen.
Joe

Joe Shields, Principal
Room of Knowledge Consulting
513-403-7222



NAVISTONE_002356

joe@rokconsulting.net
www.rokconsulting.net

CONFIDENTIAL

NAVISTONE_002357



## NaviStone Boilerplate

NaviStone is a Cincinnati-based company that helps clients leverage website traffic to improve their direct mail efficiency. NaviStone's software allows unidentifiable website visitors to be matched with postal names and addresses, in a privacy-compliant manner, so companies can send an individualized marketing message via direct mail.

NAVISTONE_002358



# NaviStone Key Messages:

# T.I.D.E.S

### "T" stands for "Tell."

We insist our clients **TELL** website visitors their browsing behavior is being tracked.

### "I" stands for "Intent."

Mail is only sent to those website visitors who show a clear **INTENT** to purchase.

### "D" stands for "Double-blind."

Our process features a **DOUBLE-BLIND** system. NaviStone has the browser information but no names and addresses. The direct mail vendor has names and addresses but no browser information. Client doesn't know who is mailed they are unless they buy something, submit a form or identify themselves in another way.

### "E" stands for "Everyone's Compliant."

NaviStone is **COMPLIANT** with all privacy laws. We insist **OUR CLIENTS ARE COMPLIANT** with all privacy laws, too.

### "S" stands for "Seriously."

NaviStone takes privacy issues extremely **SERIOUSLY**.

NAVISTONE_002359



# NaviStone Crisis Communications Plan
*v10.29.17 - FINAL*

**Background**

NaviStone is a Cincinnati-based company that helps clients leverage website traffic to improve their direct mail efficiency. NaviStone's software allows unidentifiable website visitors to be matched with postal names and addresses, in a privacy-compliant manner, so companies can send an individualized marketing message via direct mail.

NaviStone has built a "double blind" system to ensure neither it nor the direct mail provider knows the names and addresses of prospects gathered by the NaviStone system. The company never knows this information unless the prospect acts on the direct mail outreach.

In June 2017, NaviStone was featured in a Gizmodo article ("How a Company You've Never Heard of Sends You Letters about Your Medical Condition") about its client, AcurianHealth. Specifically, the article talked about how information entered into forms was gathered on website visitors by the NaviStone software, even before the visitor ever actually hit "submit." This article (it was rerun in several other publications) and a follow-on article ("Before You Hit 'Submit', This Company Has Already Logged Your Personal Data", which featured a deeper dive on the NaviStone software) triggered an investigation by the Federal Trade Commission, with which NaviStone is fully cooperating.

This plan is designed to prepare NaviStone should its products or behavior create a crisis communications situation.

**Landscape**

Personal privacy – specifically as it relates to personal information – is a growing concern in the United States and globally. While high-profile security breaches like the recent Equifax situation bring the issue to the fore, the reality is individuals are becoming more "known" with each passing day. Facebook can deliver advertisements directly to our feed that are uncomfortably accurate. Emails and cell numbers are routinely required for everyday transactions. Our online habits are tracked. Movies illustrate the awesome power of governments and "bad actors" to use technology against us. The internet of things represents incredible opportunities – and frightening exposure. Politicians know how to tailor messages to us. The Russians are meddling in our campaigns.

It would be a mistake to think people aren't concerned. It's just that, if they want to participate in this world, a certain amount of privacy risk must be taken. The loss of personal privacy – actual or feared – is simply a reality in today's uber-connected world. We accept the risks because the rewards are so great. But the trust we bestow in companies with whom we share information is broken at the company's peril. And we are vigilant in spotting companies we feel are using information improperly, or guarding it incorrectly.

NaviStone lives on the outer edges of this issue. Its customers understand and value its software and seem confident in its practices. In many ways, the NaviStone product is simply an improvement in the long-standing direct mail industry. But to the everyday person, NaviStone's ability to match online behavior to a specific individual is a bit of a scary prospect – made even more so because it's hard to understand.

NAVISTONE_002360

**Critical Messages**
What NaviStone's products do isn't magic, and isn't nefarious, though they can seem so. In virtually any crisis situation, NaviStone will need to get the following messages across:
- We take privacy issues extremely seriously.
- We are compliant with all privacy laws. We insist our clients be complaint with all privacy laws, too, and that they clearly tell website visitors that their browsing behavior is being tracked.
- Our process features a double-blind system:
  - NaviStone has the browser information but no names and addresses.
  - The direct mail vendor has names and addresses but no browser information.
  - Client doesn't know who is mailed they are unless they buy something, submit a form or identify themselves in another way.
- Mail is only sent to those website visitors who show a clear intent to purchase.

**Potential Scenarios**
The most likely sources for NaviStone crises to emerge include the following:

- **Follow-on or boilerplated stories from the June 2017 Gizmodo article.**
In many ways, there was no "conclusion" – as in exoneration – from the Gizmodo articles. They were simply positioned as a cautionary tale of the brave new world of personal privacy and the technology designed to leverage it. A reporter may well reference issues from that article in a new, possibly even unrelated story – which would then perpetuate the original issue. NaviStone has largely addressed the central point of this article: it no longer gathers information before the person hits "submit" – but that doesn't mean this issue won't reemerge.

- **FTC inquiry becomes a complaint.**
The FTC could, of course, decide to lodge a formal complaint against NaviStone. This could take many forms, and the company has already done much that could be used to mitigate the fall-out, including removing the offending process, cooperating fully from the beginning and hiring attorneys with deep FTC knowledge and relationships.

- **A customer or vendor behaving badly.**
Even if NaviStone never does anything improper, a vendor or customer could. This could take many forms as well. NaviStone would then be guilty by association.

- **The usual suspects…**
Crises aren't always related to what a company does for a living. The simple fact of being a company brings its own set of threats. NaviStone would be wise to ensure it is in "good and proper stead" on the following list of potential threats:
  - Age, gender, ethnic discrimination
  - Sexual misconduct, sexual assault
  - Workplace violence

**Threat Assessment**

**#1: Lack of a clear, concise, easy-to-understand definition of what NaviStone does.**
The more difficult it is for NaviStone to explain what it does *specific to privacy* in terms the lay person can understand, the greater the chances the company could look evasive. Here is some "boilerplate paragraph" language for discussion:

NAVISTONE_002361

**Page Three**

*While we gather data on every site visitor, we mail only to those who demonstrate intent to respond. We do not share the browsing information with any third party. Rather, we use a cookie ID swap to identify those visitors who are data partner has an address for. We then send the IDs back to that vendor when we are ready to ship, and the vendor sends the names and addresses to our third-party data services bureau.*

*We take consumer privacy extremely seriously. We are compliant with all privacy laws. We insist our clients be compliant with all privacy laws, too, and that they clearly tell website visitors that their browsing behavior is being tracked.*

**#2: Lack of media-trained spokespeople.**
Having one or two properly trained spokespeople will be critical for NaviStone in the event of a crisis. At least two members of the management team should be trained.

NAVISTONE_002362

**EXHIBIT 7**



EXHIBIT
0041

PLF00001

52 matches    moosejaw.com

| | History | | | |
|---|---|---|---|---|
| | Register | Wednesday, March 1, 2017 | Address | https://www.moosejaw.com/moosejaw/sho...&deleteCartCookie%3Dtrue&storeId=10208 |
| | Patagonia Men's R0 Sun Hoody - at Moosejaw.com | Thursday, April 13, 2017 | | https://www.moosejaw.com/moosejaw/sho...Sun-Hoody_10300432_10208_10000001_-1 |
| | Patagonia Men's Insulated Fjord Flannel Jacket - at Moosejaw.com | Thursday, August 10, 2017 | | https://www.moosejaw.com/moosejaw/sho...nnel-Jacket_10312705_10208_10000001_-1 |
| | patagonia bandana blue fjord insulated - Google Search | Thursday, August 10, 2017 | | https://www.google.com/search?q=...-7IN-Short_10267649_10208_10000001_-1 |
| | Hestra Juniors' Heli Ski 3 Finger Glove - at Moosejaw.com | Friday, December 8, 2017 | | https://www.moosejaw.com/moosejaw/sho...nger-Glove_10234696_10208_10000001_-1 |
| | Crescent Moon EVA The All Foam Snowshoe - at Moosejaw.com | Last Visited Today | | https://www.moosejaw.com/moosejaw/sho...-Snowshoe_10354164_10208_10000001_-1 |
| | Moosejaw - Shipping and Billing Display | Wednesday, April 5, 2017 | | https://www.moosejaw.com/moosejaw/...tps%3AOrderProcessServiceOrderPrepare# |
| | Moosejaw - Shipping and Billing Display | Wednesday, April 5, 2017 | | https://www.moosejaw.com/moosejaw/...ttps%3AOrderProcessServiceOrderPrepare |
| | Moosejaw - Shipping and Billing Display | Wednesday, April 5, 2017 | | https://www.moosejaw.com/moosejaw/...208&catalogId=10000001&showRegTag=T |
| | My Cart | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/...qlRhJNf25bDWItO5MKiJGrN%2F%2BO9vQU |
| | My Cart | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/...5cDtK71USe4HI5SxAx3mdVTHzw%3D%3D |
| | Sign In | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/...i6s2&ddkey=https%3ALogonFormSecure# |
| | Sign In | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/...Gl6s2&ddkey=https%3ALogonFormSecure |
| | Sign In | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/...4R2Z&ddkey=https%3ALogonFormSecure# |
| | Sign In | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/...r4R2Z&ddkey=https%3ALogonFormSecure# |
| | Sign In | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/sho...myAcctMain=1&langId=-1&storeId=10208# |
| | Sign In | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/sho...&myAcctMain=1&langId=-1&storeId=10208 |
| | North Face Jackets | Patagonia Ja...teryx Jackets | Mountain Hardwear | Last Visited Today | | https://www.moosejaw.com/moosejaw/shop/home___ |
| | My Account | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/sho...qln0CvuqmN0fsm14XWcFCgRio5kKE1s%3D |
| | Patagonia Surf Brim Review | OutdoorGearLab | Monday, April 17, 2017 | | http://www.outdoorgearlab.com/Hat-Reviews/Patagonia-Surf-Brim |
| | freerider From Moosejaw | Wednesday, March 1, 2017 | | http://www.moosejaw.com/moosejaw/shop...hSource=Q&pageView=&isFreeSearch=true |
| | Icebreaker Sale | Icebreaker Clearance - Moosejaw.com | Sunday, January 8, 2017 | | http://www.moosejaw.com/moosejaw/shop/search_Icebreaker-Sale___#addedFilters |
| | Icebreaker Sale | Icebreaker Clearance - Moosejaw.com | Sunday, January 8, 2017 | | http://www.moosejaw.com/moosejaw/shop/search_Icebreaker-Sale___ |
| | Patagonia Men's Tropic Comfort Hoody II - at Moosejaw.com | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/sho...2y2lkB0249rUtBP4B2Plc-5UuBoCX-Jw_wc8 |
| | Patagonia Men's R0 Long-Sleeved Sun Tee - at Moosejaw.com | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/sho...d-Sun-Tee_10267844_10208_10000001_-1 |
| | Icebreaker Men's Pursuit Legless - at Moosejaw.com | Sunday, January 8, 2017 | | https://www.moosejaw.com/moosejaw/sho...uit-Legless_10253922_10208_10000001_-1 |
| | Five Ten Men's Freerider Shoe - at Moosejaw.com | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/sho...rider-Shoe_10246346_10208_10000001_-1 |
| | Five Ten Men's Freerider Contact Shoe - at Moosejaw.com | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/sho...ntact-Shoe_10283876_10208_10000001_-1 |
| | Five Ten Kids' Freerider Shoe - at Moosejaw.com | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/sho...rider-Shoe_10246345_10208_10000001_-1 |
| | Moosejaw Return and Exchange Policy | Wednesday, March 1, 2017 | | https://www.moosejaw.com/moosejaw/shop/content_returns___ |

**EXHIBIT 8**

EXHIBIT
B

PRIVACY AND SECURITY

# How a Company You've Never Heard of Sends You Letters about Your Medical Condition



Kashmir Hill and Surya Mattu
6/19/17 2:41pm Filed to: PRIVACY



Image by Jim Cooke

In the summer of 2015, Alexandra Franco got a letter in the mail from a company she had never heard of called AcurianHealth. The letter, addressed to Franco personally, invited her to participate in a study of people with psoriasis, a condition that causes dry, itchy patches on the skin.



EXHIBIT
0019

1

Franco did not have psoriasis. But the year before, she remembered, she had searched for information about it online, when a friend was dealing with the condition. And a few months prior to getting the letter, she had also turned to the internet with a question about a skin fungus. It was the sort of browsing anyone might do, on the assumption it was private and anonymous.

Now there was a letter, with her name and home address on it, targeting her as a potential skin-disease patient. Acurian is in the business of recruiting people to take part in clinical trials for drug companies. How had it identified her? She had done nothing that would publicly associate her with having a skin condition.

When she Googled the company, she found lots of people who shared her bewilderment, complaining that they had been contacted by Acurian about their various medical conditions. Particularly troubling was a parent who said her young son had received a letter from Acurian accurately identifying his medical condition and soliciting him for a drug trial—the first piece of mail he'd had addressed to him besides birthday cards from family members.

Acurian has attributed its uncanny insights to powerful guesswork, based on sophisticated analysis of public information and "lifestyle data" purchased from data brokers. What may appear intrusive, by the company's account, is merely testimony to the power of patterns revealed by big data.

"We are now at a point where, based on your credit-card history, and whether you drive an American automobile and several other lifestyle factors, we can get a very, very close bead on whether or not you have the disease state we're looking at," Acurian's senior vice president of operations told the Wall Street Journal in 2013.

2

NAVISTONE_007284

Yet there's some medical information that Acurian doesn't have to guess about: The company pays Walgreens, which uses a privacy exemption for research, to send recruitment letters to its pharmacy customers on Acurian's behalf, based on the medications they're using. Under this arrangement, Acurian notes that it doesn't access the medical information directly; the customers' identities remain private until they respond to the invitations.

And that is not the entire story. An investigation by the Special Projects Desk has found that Acurian may also be pursuing people's medical information more directly, using the services of a startup that advertises its ability to unmask anonymous website visitors. This could allow it harvest the identities of people seeking information about particular conditions online, before they've consented to anything.

3

NAVISTONE_007285





June 21, 2013



Thank you for choosing Walgreens for your prescriptions. We're writing to share some information about a clinical research study that may be of interest to you.

Research studies contribute greatly to the overall progress in understanding and treating diseases and Walgreens supports that mission. AcurianHealth, a research organization that provides services related to clinical studies, is currently seeking people to participate in a study pertaining to a treatment for Chronic Obstructive Pulmonary Disease (COPD).

Qualifying participants may receive at no cost:

- Investigational study drug for COPD
- Up to 1 year of study-related care and monitoring from a local doctor experienced in respiratory diseases (health insurance is not required.)
- Possible compensation up to $550

For more information, please visit www.TrialForCOPD.com or call us toll-free at 1-866-449-8948 anytime - 24 hours a day, 7 days a week.

You are under no obligation to participate in this study – the decision to participate is entirely yours. Walgreens does not share your personal information with AcurianHealth. Your privacy is strictly guarded. If you decide to qualify for the study, then at that time you can choose whether to provide your personal information.

Sincerely,

Your Walgreens Pharmacy

AcurianHealth funded the cost of mailing this letter and paid a fee to Walgreens. The research study is sponsored by AcurianHealth and is not being conducted by Walgreens. This letter and study should not be construed as a recommendation or endorsement by Walgreens. No information about you has been provided to AcurianHealth. Call Walgreens toll free at 888-208-1853 if you do not want to receive further mailings about research studies from Walgreens.

©2013 Walgreen Co. All rights reserved.
11RX0175-0613    ACOPD3

A letter sent out to a Walgreens customer in Connecticut on Acurian's behalf. It invited her to visit a generic sounding website for people with pulmonary disease. At the time, she had a prescription from Walgreens for asthma.

4

NAVISTONE_007286

If you're suddenly thinking back on all of the things you've browsed for online in your life and feeling horrified, you're not alone.

AcurianHealth has created dozens and dozens of generic sounding websites for the trials they're recruiting for: www.trialforCOPD.com,www.studiesforyourarthritis.com, and www.kidsdepressionstudy.com are a few examples of the many websites they own. The sites all feature stock images of people in distress, sometimes include AcurianHealth's logo, and include promises of up to $1,000 for participating, depending on the study.



An example of one of the Acurian sites, www.sleepapneastudies.com

Out of view, some of these sites include something else: code from a company called NaviStone—which bills itself as a specialist in matching "anonymous website visitors to postal names and addresses." So if a person is curious about one of those letters from Walgreens, or follows one of Acurian's online ads, and visits one of Acurian's generic disease-specific sites, their identity could be discovered and associated with the relevant condition.

5

NAVISTONE_007287

## Take Your Retargeting Offline.

Until today, your ability to retarget anonymous website shoppers was limited to low-impact, low-response digital display ads.

With the NaviStone® turn-key Postcard program, you can:

- ⊘ Reach out directly to anonymous website shoppers.
- ⊘ Tailor your marketing to the individual shopper based on their website behavior.
- ⊘ Mail personalized postcards within 24-48 hours after a site visit.

Fill out the form to get in touch with a NaviStone® team member who will work with you develop strategy tailored to **your specific needs**.

### See How NaviStone® Will Work for You

First Name

Last Name

Email*

SUBMIT

NaviStone says it can send personalized mail to anonymous website visitors with a day or two of their visit.

This tracking function undermines what's supposedly a formal separation between Walgreens customer data and Acurian's recruitment. If Walgreens sends out a bunch of letters to customers taking certain medications, and those customers then visit the generic website controlled by Acurian provided in the letter, Acurian can infer its wave of new visitors are taking those medications— and, if NaviStone delivers on its promise to identify visitors, Acurian can see who they are.

Walgreens gives itself permission to use customers' health information for "research" purposes, which would include clinical trials, in its privacy policy. It's been working with Acurian since at least 2013, and in 2015, Walgreens announced it was "leveraging" its 100 million customer database to recruit patients directly for five major drug companies.

6

NAVISTONE_007288

When asked about its partnership with Acurian, Walgreens spokesperson Scott Goldberg pointed me to a Walgreens FAQ page about clinical trials. It states that Walgreens doesn't share health information with third parties without permission, but that a third party may "receive your information if you contact the web-site and/or toll-free number in the letter to seek more information about the clinical trial."

The question is whether users will know that one of Acurian's websites has received their information—even if they haven't necessarily agreed to submit it. NaviStone, an Ohio-based business spun out from the marketing firm CohereOne last year, claims to be able to identify between 60 and 70 percent of anonymous visitors to the websites that use its services.

When we contacted the firm last month to ask how it does this, Allen Abbott, NaviStone's chief operating officer, said by phone that talking about how its technology works is "problematic."

"A lot of our competitors would love to know how we made it work," Abbott said. "We have an advantage that we would be silly to reveal."

We asked whether the company had thought about the privacy implications involved in identifying people visiting a website for sensitive reasons, and whether there were certain customers the company wouldn't work with.

"Our business is almost entirely e-commerce, helping retailers sell to their customers," he said. "There was one site that came into our radar that was adult-related material that we decided not to pursue."

We then described what Acurian does.

7

NAVISTONE_007289

"We don't work with anyone like that," he said.

We explained that the call was because we'd found NaviStone's code on AcurianHealth sites.

"It's possible," he then said. "We have a lot of customers."

But Abbott insisted that NaviStone had found a "privacy compliant way" to identify anonymous website visitors—again saying he couldn't describe it because it was a proprietary technology.

When we analyzed the NaviStone code on Acurian's sites, we found one way that NaviStone's technology works: It collects information as soon as it is entered into the text boxes on forms, before the person actually agrees to submit it. When we typed a test email address in the "Join Us" page on Acurian's site, it was immediately captured and sent to the company's servers, even if we later chose to close the page without hitting the "Send" button on the form.

In fact, the information was collected before we got to the part of the form that said, "Your privacy is important to us. By selecting this box, you agree to our Privacy Policy and Terms of Use, and agree that we contact you by phone using automated technology or other means using the information you provided above regarding research studies."

"If I haven't hit send, what they seem to be doing almost seems like hacking," said Lori Andrews, a law professor at the Chicago-Kent School of Law. "It's similar to a keystroke tracker. That could be problematic for them."

8

NAVISTONE_007290

Ryan Calo, a law professor at the University of Washington, said this clearly violates a user's expectation of what will happen based on the design of the site. "It's not that they lied to you with words, but they've created an impression and violated that impression," said Calo who suggested it could violate a federal law against unfair and deceptive practices, as well as laws against deceptive trade practices in California and Massachusetts. A complaint on those grounds, Calo said, "would not be laughed out of court."

When we followed up with NaviStone's Abbott by email, he insisted that the company doesn't send any data to Acurian.

"We don't send any email for Acurian, or pass along any email addresses to them or use their email addresses in any way or manner," said Abbott by email. "If we are indeed inadvertently collecting email addresses, we will fix immediately. It's not what we do."

But when the Special Projects Desk reviewed dozens of other companies' websites that were using NaviStone's code, they were also collecting email addresses. After a month of repeated inquiries to NaviStone and to many of the sites using its code, NaviStone last week stopped collecting information on the site of Acurian and most of its other clients before the "Submit" button was pressed.

"Rather than use email addresses to generate advertising communications, we actually use the presence of an email address as a suppression factor, since it indicates that email, and not direct mail, is their preferred method of receiving advertising messages," said Abbott by email. "While we believe our technology has been appropriately used, we have decided to change the system operation

9

NAVISTONE_007291

such that email addresses are not captured until the visitor hits the 'submit' button."

Asked about its partnerships with Walgreens and NaviStone, Acurian declined to be interviewed.

"As a general policy based on our confidentiality agreements with our business partners, I hope you will understand that Acurian does not discuss its proprietary business strategies," said Randy Buckwalter, a spokesperson for PPD, the corporate parent of Acurian, by email.

Buckwalter told us Acurian would provide a fuller response to what is reported here, but never provided it.

Kirk Nahra, a partner at the law firm Wiley Rein who specializes in health privacy law, said there's nothing really wrong with Walgreens sending out letters to customers on Acurian's behalf. "But that second situation, where I go to look at the website and at that point they have some way of tracking me down, their ability to track me down at that point is troubling," Nahra said.

Nahra said there was a potential legal issue if the company fails to disclose this in its privacy policy, and that it could lead to a class action lawsuit. Acurian's privacy policy only talks about getting information from "data partners" and collecting expected information from website visitors, such as IP addresses—which can be used to track someone from website to website, which is why it's a good idea to use technology that obscures your IP address, such as Tor or a VPN.

10

NAVISTONE_007292

The ability to identify who is sick in America is lucrative. Acurian offers a collection of case studies to potential customers in which it discloses what it bills: $4.5 million for recruiting 591 people with diabetes; $11 million for 924 people with opioid-induced constipation; $1.4 million for 173 teens with ADHD; and $6 million for 428 kids with depression.

Acurian claims to have a database of 100 million people with medical conditions that could be of interest to drug companies, and it says that all of those people have "opted-in" to be contacted about trials. In addition to internet complaints suggesting otherwise, the Federal Trade Commission has received more than 1,000 complaints over the last 5 years from consumers who say the company has contacted them without consent; some complainants also wanted to know how the company had found out about their medical conditions.

Acurian has also faced a slew of class-action lawsuits in Florida, Texas, and California from plaintiffs who say the company had illegally robocalled them about clinical trials, placing multiple automated calls to their home without getting their permission first, a violation of federal law. Acurian denied wrongdoing in court filings, saying its calls are not commercial in nature and that the plaintiffs had opted in, but settled all the suits out of court.

Alexandra Franco certainly didn't opt in to be contacted for clinical trials. She doesn't have psoriasis or any prescriptions for a skin condition. When she looked back at her browsing history, it appeared that the only website she visited as part of her search was the mobile version of WebMD.com.

CONFIDENTIAL

NAVISTONE_007293

"While Acurian had purchased display advertising from WebMD in 2010, we have never hosted a program for them in which personal information was collected or shared," said WebMD in a statement. "Under our Privacy Policy we do not share personal information that we collect with third parties for their marketing activities without the specific consent of the user. In this case, it appears that the user did not even provide any personal information to WebMD."

"Doing a search on your mobile device means you are incredibly re-identifiable," said Pam Dixon of the World Privacy Forum, referring to the fact that a mobile device provides more unique identifiers than a computer typically does.

Franco doesn't understand exactly how Acurian got her information, but said that the letter was sent to her home addressed to "Alex Franco," a version of her name that she only uses when doing online shopping. When she sent an inquiry to Acurian, the company told her it got her name from Epsilon, a data broker, "based on general demographic search criteria."

"Epsilon specializes in compiling mailing lists based on generally available demographic information like age, gender, proximity to a local clinical site and expressed interests," said the company in an email. "We sincerely regret any distress you may have experienced in thinking your privacy may have been compromised, and we hope this letter has assured you that nothing of the kind has occurred."

Franco didn't feel particularly assured. Epsilon lets consumers make a request to find out what information the data broker has on them; in response to her request, Epsilon told Franco by letter that it has her home address and information about her likely income, age, education level, and length of

12

NAVISTONE_007294

residence, as well as whether she has kids—none of which would seem to indicate dermatological issues.

At the end of our investigation, we still don't know exactly how Franco was identified as possibly having a skin condition. Given the many players involved and the fact that we can't see into their corporate databases means we can only make reasonable assumptions based on the outcome.

It's the online privacy nightmare come true: a company you've never heard of scraping up your data trails and online bread crumbs in order to mine some of the most sensitive information about you. Acurian may try to justify the intrusion by saying it's in the public interest to develop new drugs to treat illnesses. But tell that to the person shocked to get a letter in the mail about their irritable bowels.

Yes, we found that person. Bret McCabe complained about it on Facebook. He got the letter in 2012 after regularly buying both anti-diarrhea medicine and laxatives at Walgreens and Rite-Aid for a family member dealing with chronic pain issues.

"The creep factor of the specificity is what I found particularly grating," said McCabe by phone. "It's one thing to get spam about erectile dysfunction or refinancing your car loan but in this case, it seemed like they specifically knew something about me. It was meant for me and me only."

The privacy scholar Paul Ohm has warned that one of the great risks of our data-mined society is a massive "database of ruin" that would contain at least one closely-guarded secret for us all, "a secret about a medical condition, family history, or personal preference... that, if revealed, would cause more than embarrassment or shame; it would lead to serious, concrete, devastating harm."

13

NAVISTONE_007295

Acurian has assembled one of those databases. As with all big databases, the information doesn't even have to be accurate. So long as it gets enough of its letters to the right people, the recruitment company doesn't need to care if its collection efforts misidentify Franco as a psoriasis patient or otherwise incorrectly link people, by name, to medical conditions they don't have.

This is the hidden underside of the browsing experience. When you're surfing the web, sitting alone at your computer or with your smartphone clutched in your hand, it feels private and ephemeral. You feel freed to look for the things that you're too embarrassed or ashamed to ask another person. But increasingly, there is digital machinery at work turning your fleeting search whims into hard data trails.

The mining of secrets for profit is done invisibly, shrouded in the mystery of "confidential partnerships," "big data," and "proprietary technology." People in databases don't know that dossiers are being compiled on them, let alone have the chance to correct any mistakes in them.

*This story was produced by Gizmodo Media Group's Special Projects Desk. Email senior reporter Kashmir Hill at kashmir.hill@gizmodomedia.com and data reporter Surya Mattu at surya.mattu@gizmodomedia.com.*

14

NAVISTONE_007296



# Before You Hit 'Submit,' This Company Has Already Logged Your Personal Data



Kashmir Hill and Surya Mattu

6/20/17 2:23pm



Image by Jim Cooke



EXHIBIT
0020

1

If you're daydreaming about buying a home or need to lower the payment on the one you already have, you might pay a visit to the Quicken Loans mortgage calculator. You'll be asked a quick succession of questions that reveal how much cash you have on hand or how much your home is worth and how close you are to paying it off. Then Quicken will tell you how much you'd owe per month if you got a loan from them and asks for your name, email address, and phone number.

You might fill in the contact form, but then have second thoughts. Do you really want to tell this company how much you're worth or how in debt you are? You change your mind and close the page before clicking the Submit button and agreeing to Quicken's privacy policy.

But it's too late. Your email address and phone number have already been sent to a server at "murdoog.com," which is owned by NaviStone, a company that advertises its ability to unmask anonymous website visitors and figure out their home addresses. NaviStone's code on Quicken's site invisibly grabbed each piece of your information as you filled it out, before you could hit the "Submit" button.

During a recent investigation into how a drug-trial recruitment company called Acurian Health tracks down people who look online for information about their medical conditions, we discovered NaviStone's code on sites run by Acurian, Quicken Loans, a continuing education center, a clothing store for plus-sized women, and a host of other retailers. Using Javascript, those sites were transmitting information from people as soon as they typed or auto-filled it into an online form. That way, the company would have it even if those people immediately changed their minds and closed the page. (It's yet another way auto-fill can compromise your privacy.)

2

NAVISTONE_007298



NaviStone is an Ohio-based startup in the business of identifying "ready to engage" customers and matching "previously anonymous website visitors to postal names and addresses." It says it can send postcards to the homes of anonymous website shoppers within a day or two of their visit, and that it's capable of matching "60-70% of your anonymous site traffic to Postal names and addresses."

In yesterday's report on Acurian Health, University of Washington law professor Ryan Calo told Gizmodo that giving users a "send" or "submit" button, but then sending the entered information regardless of whether the button is pressed or not, clearly violates a user's expectation of what will happen. Calo said it could violate a federal law against unfair and deceptive practices, as well as laws against deceptive trade practices in California and Massachusetts. A complaint on those grounds, Calo said, "would not be laughed out of court."

3

NAVISTONE_007299



## How a Company You've Never Heard of Sends You Letters about Your Medical Condition

In the summer of 2015, Alexandra Franco got a letter in the mail from a company she had never heard ...

Read more

There are at least 100 sites using NaviStone's code according to Builtwith.com, a service that tells you what technologies sites employ. We visited dozens of them to see the code in action. The majority of sites captured visitors' email addresses only, but some sites also captured their home addresses and other entered information.

(To see it in action for yourself, check out our tutorial at the end of this post.)

Only one site of the dozens we reviewed, Gardeners.com, explicitly revealed in its privacy policy what it was doing. It read, "Information you enter is collected even if you cancel or do not complete an order." The rest of the sites had the usual legalese in their policies about using standard tracking tech such as cookies and Web beacons, which did not describe the way this particular information capture works.

We sent media inquiries to dozens of sites about why and how they are using the information they're capturing. Two responded. Quicken Loans did not respond to multiple media inquires.

Road Scholar, a non-profit that arranges educational travel and had NaviStone's code on its site collecting email addresses before users hit "submit," told us it

4

NAVISTONE_007300

uses the NaviStone tool on its website "primarily to re-activate inquirers who have already expressed an interest in Road Scholar and are already on our mailing list."

A spokesperson for home goods company Wayfair, which was using the Navistone tool on its clothing site JossandMain.com to collect email addresses, told us that the company is "committed to upholding the highest standards for responsible marketing practices across all channels."

"We do not email users who have not formally submitted their email address to our site," Wayfair spokesperson Susan Frechette wrote in an email. "We work with NaviStone to support our direct mail programs."

We asked whether email addresses are collected in order to identify the person and try to find out their home address in order to send them direct mail. Email addresses, after all, much like mobile phone numbers and social security numbers, have become a unique identifier that can be used as a key to unlock other information about us. Frechette declined further comment and referred us to NaviStone.

NaviStone wasn't keen to reveal how it unmasks anonymous website visitors, saying that its technology is proprietary and awaiting a patent. Allen Abbott, NaviStone's chief operating officer, wrote via email that NaviStone doesn't "use email addresses in any way to link with postal addresses or any other form of PII." He said the company's primary business is helping their clients send personalized direct mail.

"Rather than use email addresses to generate advertising communications, we actually use the presence of an email address as a suppression factor, since it

5

indicates that email, and not direct mail, is their preferred method of receiving advertising messages," Abbott wrote.

At least one other company is known to monitor the things you don't send: Facebook takes note of the existence of status messages that you compose but don't post. But this goes beyond that. In some cases, the companies using NaviStone code didn't have an existing relationship with their visitors and were collecting contact information those consumers had ultimately decided not to give them.

We decided to test how the code works by pretending to shop on sites that use it and then browsing away without finalizing the purchase. Three sites—hardware site Rockler.com, gift site CollectionsEtc.com, and clothing site BostonProper.com—sent us emails about items we'd left in our shopping carts using the email addresses we'd typed onto the site but had not formally submitted. Although Gizmodo was able to see the email address information being sent to Navistone, the company said that it was not responsible for those emails.

Businesses seem to be doing all they can to strip away consumers' ability to anonymously browse the Web, sacrificing privacy at the altar of commerce. And it's illustrative of the way your sense of control online can be an illusion, the "submit" feature becoming just another placebo button.

As a result of our reporting, though, NaviStone says it will no longer collect email addresses from people this way.

6

CONFIDENTIAL                                                                      NAVISTONE_007302

"While we believe our technology has been appropriately used, we have decided to change the system operation such that email addresses are not captured until the visitor hits the 'submit' button," Abbott wrote.

Alternatively, if you don't trust sites not to collect your information this way, consider using a tool such as UBlock Origin that prevents invisible claws from descending into the toy chest of data in your browser.

\*\*\*

### *Want to see this happen for yourself?*

Web browsers have developer tools that let you see what information a website is transmitting and receiving—both the visible and invisible stuff. You can use these developer tools to see this trick. These instructions are for Chrome but the same basic technique should work on Firefox and Safari too, with small differences in the interface.

7

1. In the Chrome menu, go to "View," then "Developer," and select "Developer Tools."





CONFIDENTIAL                                                    NAVISTONE_007304

2. The developer tools should pop up either from the bottom of your browser or the side. To see all the data coming and going from the browser, select the Network tab. You just want to monitor the traffic between the browser and murdoog.com, a website affiliated with NaviStone, to which it is sending the captured information. In the filter in developer tools, type "murdoog."



CONFIDENTIAL                                                                 NAVISTONE_007305

3. After our reporting, NaviStone stopped collecting information pre-Submit on most of the sites it was working with. But as of publication time, it was still active on the Quicken Loans mortgage calculator contact page, so head there to check it out.



10

NAVISTONE_007306

4. You have to choose "Refinance" or "Purchase" and then hand over some financial information. If you qualify, you'll get to a contact page and need to fill in the requested information: name, phone number, and email address. Be creative because this information is going to be captured. Each time you hit the tab button, or move to a new field, you should see data being sent to murdoog.com. (If not, you may have a blocker enabled.)



CONFIDENTIAL

NAVISTONE_007307

5. Click on the data just sent, click "Headers," and scroll down to "Query String Parameters," which are the specific pieces of information your browser is sending to the server. To view these parameters, make sure you're on the Headers tab and scroll all the way to the bottom. There will be separate, seemingly random strings listed under the labels v, m, se, and d. The longest of these, labeled d, is the one you want. It will look something like this:

eyJ2IjoiZjZkOTlhYjUtYzdkMy00MGZmLTljN2EtMGEwZDRlM2U4OGEyIiwibSI6IjAwNDE4NDk5LTc3NDAtNDkwYy1hZWMzLTYzN2RhYWY3ZTY4MCIsImNzaSI6MzE1MTAzMjI0OSwic2UiOiIyYWZkOGIzMS0xOGY1LTQzNmMtYjgxZS03MGVjZTg4M2QxNDEiLCJwIjoiOTkyYjE4MGItNGU1Ny00YzZiLWFmOWUtODAlOTYyMTJiMjg2IiwidSI6Imh0dHBzOi8vd3d3LnFhWNrZW5sb2Fucy5jb20vbXktW9ydGdhZ2UvY2FsY3VsYXRvcj9xbHNvdXJjZT1uYXYjIS9wdXJjaGFzZS9xdWVzdGlvbi9kb2duLXBheW1lbnQiLCJwbiI6Ii9teS1tb3J0Z0Z2FnZS9jYWxjdWxhdG9yIiwidCI6Ik15IEEvcnRnYWdlIENhbGN1bGF0b3IgfCBRdWlja2VuIExvYW5zIiwiYYI6Imh0dHBzOi8vd3d3LnFhWNrZW5sb2Fucy5jb20vbXktW9ydGdhZ2UvY2FsY3VsYXRvciIsInByIjoiQ0Q0MTQzIiwiZWlkIjoibNfc2VnXXzAwMCIsInMiOjMsInZziIjoxLCJsIjoiQWN0aW9uIiwidWidjAxIjoiRm9ybUluHV0IiwidjAIjoiYW5zd2Vyc1twdXJjaGFzZVByaWNlXXxwdXJjaGFzZVByaWNlIiwidjA0IjoiMTUwLDAwMCJ9

NAVISTONE_007308

6. That incomprehensible-looking block of text is encoded using a common web technique called Base64 encoding. Usually it's used to convert binary data like images into strings of text, making them easier to send. Copy the text after the "d:" as shown below and paste it into this <u>online converter</u>.



13

NAVISTONE_007309

7. What you should see amid everything else is the information you just typed into the form. It was sent to murdoog.com, a site registered to NaviStone.

*This story was produced by Gizmodo Media Group's* <u>*Special Projects Desk*</u>*. Email senior reporter Kashmir Hill at* <u>*kashmir.hill@gizmodomedia.com*</u> *and data reporter Surya Mattu at* <u>*surya.mattu@gizmodomedia.com*</u>*.*

14

CONFIDENTIAL

**EXHIBIT 9**

# BURSOR & FISHER
P.A.

1990 NORTH CALIFORNIA BLVD.
SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

NEAL J. DECKANT
Tel: 925.300.4455
Fax: 925.407.2700
ndeckant@bursor.com

July 29, 2020

*Via ECF*

Re: *Revitch v. New Moosejaw, LLC et al.*, N.D. Cal. Case No. 3:18-cv-06827-VC

Dear Magistrate Judge Ryu,

We write pursuant to Section 13 of Your Honor's Standing Order concerning Defendant NaviStone, Inc.'s ("NaviStone") responses to Plaintiff's Requests for Inspection ("RFI") Nos. 1, 2, and 4, as well as Plaintiff's Second Set of Requests for Production of Documents ("RFP") Nos. 21-37, together with NaviStone's resulting production of source code and related materials. *See* **Exhibits A-B** (Plaintiff's RFIs and RFPs); *see also* **Exhibit C-D** (NaviStone's responses). Counsel met and conferred telephonically on July 22, 2020, but they were at an impasse and unable to resolve their disputes. The relevant case management deadlines are as follows:

| | |
|---|---|
| Close of fact discovery: | August 24, 2020 |
| Plaintiff's disclosure of class certification-based expert reports: | September 8, 2020 |
| Defendants' class certification-based expert reports: | September 22, 2020 |
| Plaintiff's class certification-based rebuttal expert reports: | October 9, 2020 |
| Plaintiff's motion for class certification due: | October 23, 2020 |
| Close of expert discovery re class certification: | October 26, 2020 |
| Defendants' opposition to class certification: | November 20, 2020 |
| Plaintiff's reply in support of class certification: | December 10, 2020 |
| Hearing on motion for class certification: | January 7, 2021 |

## I.    PLAINTIFF'S POSITION

The software at issue here is not contained within a single executable computer file. Rather, NaviStone's software is a sophisticated distributed web application, consisting of (i) "front-end" JavaScript code running on users' web browsers when they visit a NaviStone-enabled website, which collects over 200 user data elements (*e.g.*, e-mail addresses) to send to NaviStone, and (ii) roughly a half-dozen "back-end" servers and applications (*e.g.*, data ingestion servers, relational databases, and statistics and reporting servers, among others), which analyze and process the user data that was sent by the front-end JavaScript code.

Plaintiff's March 26, 2020 RFI's define the term "NAVISTONE SOFTWARE" to be "construed broadly" to include, among other things: (i) "[s]oftware used to associate anonymous visitors to Moosejaw.com with a name and address," (ii) "[s]oftware referenced by NaviStone" in communications with the Federal Trade Commission, (iii) "[s]oftware reasonably at issue" in Plaintiff's operative Complaint, and (iv) "[s]oftware that enables NaviStone to provide the services described in its digital marketing guide" and company website. *See* Ex. A.

On March 26, 2020, NaviStone produced a set of largely unreadable, "minified" JavaScript code (discussed below). On April 20, 2020, NaviStone responded to Plaintiff's RFIs

that it "has already produced **any** source code that operated in real time on visitors to moosejaw.com" (*i.e.*, the "minified" code), and as such "any additional on-site inspection of code is unnecessary." *See* Ex. B (emphasis added). Following discussions with Plaintiff's counsel, NaviStone produced C# code corresponding to one component of the back-end servers, the "data ingestion" servers. On June 26, 2020, pressed by Plaintiff's counsel, NaviStone made a further production of a nearly fully-minified JavaScript file, called the "client-specific" JavaScript code, claiming it was the "least minified" code available. Lastly, on July 13, 2020, after telling us since March it had no non-minified code, NaviStone finally produced non-minified JavaScript code, called the "universal" JavaScript code. However, on July 16, 2020, during the deposition of NaviStone's Chief Technology Officer, Tom White, Plaintiff's counsel learned that NaviStone had still failed to produce *entire bodies* of critical source code. As set forth below, NaviStone should be compelled to produce this source code immediately.

## Issue #1: NaviStone's Failure To Produce Entire Bodies Of Its Back-End Code

During his deposition, NaviStone's CTO explained that the "back-end" "NaviStone software" consists of the following servers and processes: (i) "data ingestion" servers running C# code, which retrieve user data sent by the "front-end" JavaScript code, White Dep. at 39:16-40:25; (ii) intermediate servers on Amazon S3 that queue and batch the data for loading into a database, *id.* at 44:7-20; (iii) a relational database called Amazon Redshift, with its associated tables and data types, *id.* at 43:1-20; (iv) C# code that runs SQL commands to analyze and process the data on Redshift, *id.* at 58:4-14; and (v) C# code that communicates with a third-party data broker, Neustar, and sends data to additional third parties for mailing, *id.* at 41:5-14, 57:11-22. *See* **Exhibit E** (Tom White deposition transcript).

Of these bodies of code, NaviStone has only produced the "data ingestion" code, and a single database table on Redshift. *Id.* at 59:17-60:25. Yet, this code is largely stored in repositories, which can typically be pulled in "less than a day." *Id.* at 60:20-25, 91:13-93:2. And the data types and table information in the Redshift database can be pulled with a simple SQL command. *Id.* at 59:17-60:25, 67:9-68:21. As such, NaviStone should produce these materials immediately. *See eDirect Publ'g, Inc. v. LiveCareer, Ltd.*, 2014 WL 2527401, at *2 (N.D. Cal. June 4, 2014) (overruling objections to request to inspect source code where party presented "[n]o specific or concrete information" backing up their suggestion of an "undue burden," such as the costs involved); *In re Google Litig.*, 2011 WL 286173, at *6 (N.D. Cal. Jan. 27, 2011) (rejecting burden argument because defendant provided "no estimate of the number of hours, business distraction, or cost of production).

During their meet and confer discussion, NaviStone's counsel did not argue burden, but rather claimed the code is irrelevant because (in NaviStone's counsel's view) it was not part of the "real-time" code at issue. But NaviStone never studied the timing of its code, and is not familiar with average execution time. *Id.* at 50:13-51:5 ("Q. And have you endeavored to study the average or typical time it takes for data to move from S3 to Redshift? No. Q. Does the data move faster or slower under heavy loads? A. I – I really don't – I don't know the answer to that."). Plaintiff's experts should have an opportunity to study these issues. NaviStone cannot unilaterally determine relevance. *See eDirect Publ'g, Inc.*, 2014 WL 2527401, at *2; *In re Google Litig.*, 2011 WL 286173, at *6.

On July 28, 2020, when providing its portion of the present joint letter, NaviStone argued for the first time that it "believes [it] would require between 100-160 hours" to prepare this code for production. This is not due to any technical reason – NaviStone concedes that "the code

could be *pulled* quick" – but rather because NaviStone opines that the code may "contain[] confidential business information that requires redactions (*e.g.*, usernames/passwords of NaviStone databases and non-Moosejaw client information)." That concern is groundless. Here, Plaintiff's experts have met the standards of the Court's heightened Protective Order for Litigation Involving Highly Sensitive Confidential Information, and NaviStone raises no specific privacy concerns in connection with Plaintiff's experts. *See WeRide Corp. v. Kun Huang*, 2019 WL 5722620, at *7 (N.D. Cal. Nov. 5, 2019) (requiring production of the "complete source code repositories" and noting that protective order provided adequate protections). Frankly, it is difficult to imagine that Plaintiff's experts would be interested in NaviStone's system logins or unrelated client information, and in any event they are bound by this Court's protective order.

### Issue #2: Discovery Sanctions For Misrepresenting The Availability Of Non-Minified Code

Discovery sanctions should be placed against NaviStone for producing "minified" JavaScript code while repeatedly – and incorrectly – representing that "there is not a general backup that stories prior versions of non-minified javascript" and "we have produced the 'least minified' version of the JavaScript code located by our client."

The source code NaviStone produced on March 26, 2020 was "minified" and not reasonably subject to analysis. During his deposition, NaviStone's CTO explained that the minification process removes "whitespace," changes "variable" names, changes "function" names, and removes developer comments that "help future developers understand how the code works." *Id.* at 98:24-99:7; 100:15-102:23; 104:5-105:5. Minifying code "makes the code harder to read" and "help[s] keep [Navistone's] competitors from understanding what we are doing." *Id.* at 102:12-23. The CTO could not recall ever seeing any developer work with minified code. *Id.* at 102:24-104:3 ("Q: Do you recall any times [at] NaviStone where the developers made a material edit to a minified portion of code? A: I – I don't have a recollection of – of that."). During this time, NaviStone claimed that it did not retain historical copies of its JavaScript code, it had produced the "'least minified' version" of its code, and that "there is not a general backup" with non-minified JavaScript. Yet, on July 13, 2020, NaviStone produced exactly that: a repository of non-minified code, which was created on November 19, 2020 (just ten days after Plaintiff filed his complaint).

As a result of these misrepresentations, Plaintiff's counsel incurred out-of-pocket costs to their experts in the amount of $17,708, accounting for 45.52 hours to analyze the code and to discuss production issues with counsel over the course of several months. NaviStone should be made to compensate Plaintiff's counsel for this expenditure. Plaintiff's counsel also incurred attorney time to analyze this nonsensical code, discuss with their experts, and prepare this motion – when non-minified code was available the whole time. Based on a preliminary review, this time is expected to be no more than $27,000, and likely less. Upon approval from the Court, Bursor & Fisher will provide all itemized fees and expenses pursuant to Local Rule 37-4(b)(3).

## II.     DEFENDANT NAVISTONE, INC.'S POSITION

### Issue #1: NaviStone Produced Source Code Alleged to Violate Plaintiff's Rights.

Plaintiff has accused NaviStone and co-Defendant New Moosejaw LLC of invading his privacy through the use of a "wiretap" installed on the pages of Moosejaw's website. *See* ECF No. 43, ¶¶ 15-18. This "wiretap" allegedly sends personally identifying information (PII) to

BURSOR & FISHER
P.A.

NaviStone "in real-time," and "also scans the visitor's computer for data files that could reveal the visitor's identity." *Id.* ¶ 17. These (disputed) allegations do not depend on the subsequent use of data, *e.g.*, linking such data to names and addresses, but on the alleged *interception* of communications "in real-time." Thus, code written by NaviStone can be grouped into two buckets: "front end," which interacts in real-time with a Moosejaw web visitor; and "back end," code that later analyzes the collected data, generates reports, and uses those reports to assess the likelihood of visitor responding favorably to a postcard.

**The "Front End" Code.** The front end code consists of JavaScript which the client (Moosejaw) includes in the code of the pages of its website. It also includes a "data-ingestion" API (Application Programming Interface) which receives transmissions from that JavaScript.[1] This completes the transmission of information to NaviStone. Documents describing this general operational breakdown have been produced since February; NaviStone produced both of these sets of code beginning in March; and NaviStone responded diligently and in good faith when Plaintiff's counsel has sought clarification or additional information. At any time NaviStone's counsel has learned of additional responsive code that falls into these categories, it has produced it promptly.

**The "Back End" Code.** Plaintiff's counsel did not raise the issue of unproduced "back end" code until an email sent on July 20, 2020, despite it being clear for months that (1) NaviStone's processes involved a front-end data collection side and a back-end analysis side unrelated to Plaintiff's claims; (2) NaviStone expressly objected to producing the "back end" code; and (3) since at least April 30, 2020, NaviStone has been explicit that it was willing to meet and confer if Plaintiff believed such code was necessary to make his case.

Plaintiff asserts "NaviStone's counsel did not argue burden." NaviStone's counsel was not aware of the exact burden to produce the entirety of NaviStone's code. While Mr. White testified that code could be *pulled* quickly, *producing* it requires extensive review and inspection of current and prior code to determine what code is pertinent to Moosejaw, what code was running when, and what code and information relates to non-Moosejaw clients, (requiring redaction of, *e.g.*, usernames, passwords, and non-Moosejaw client information). NaviStone has determined this would require between 120-160 hours of employee time, no small matter for a small start-up. Plaintiff contends that these hours are unnecessary because its experts have signed the protective order. In *WeRide v. Kun Huang*, 2019 WL 5722620, *7, (N.D. Cal. Nov 5, 2019), the Court ordered the production of complete source code repositories to cure the violation of a preliminary injunction. Here, Plaintiff has not articulated a specific need for this code, let alone made a timely request; and Plaintiff cannot absolve NaviStone of its obligations to review and protect confidential information of or relating to third parties.

Nor is the back end code relevant for certification or damages purposes. *See Synopsis, Inc. v. ATopTech, Inc.*, 2015 WL 1197705, *4 (N.D. Cal. Mar. 16, 2015) (denying motion to compel source code duplicative of information already provided and unrelated to damages). To the extent Plaintiff is seeking to certify a class of individuals who received mailings from Moosejaw, they have already received that information through a third-party subpoena. Back end code that scores website visitors' receptivity to a postcard is not necessary to ascertain a

---

[1] Plaintiff claims that NaviStone does not understand the timing of its own code's operation. Presumably that refers to deposition testimony where NaviStone employees testified that they did not know the exact timing of operations on a host website; that is, they could not say in what order NaviStone's code would execute in relation to other code hosted on a page. This red herring is not relevant to the front end/back end distinction, which depends not on the timing of the execution of the JavaScript and API, but on whether the code is operating as a visitor visits the website or later analyzes previously aggregated data.

class of individuals who received mail because that code provides no information about who received one. Plaintiff is seeking statutory damages for the California Invasion of Privacy Act claim; and he conceded in his deposition that he could not quantify actual damages for his common law claims.

NaviStone has agreed to online sessions with Plaintiff's experts to help them understand the operation of its software. It initially agreed to do so at Plaintiff's request on June 30, 2020, but Plaintiff withdrew that request the same day. Subsequently, NaviStone proposed such a session, which will take place on Wednesday, July 29, 2020. If Plaintiff's experts come away believing limited sets of additional code are necessary to complete their work, NaviStone will accommodate reasonable requests. The current *unreasonable* request amounts to a demand for essentially all code NaviStone has ever written, which has nothing to do with the alleged interception of communications asserted by Plaintiff. Producing it would require significant employee time. And Plaintiff failed to raise the issue until months after NaviStone's initial discovery objections were lodged. Plaintiff's case law from this District is either inapposite or proves that NaviStone has diligently produced *relevant* code. *See WeRide*, 2019 WL 5722620 at *7 (violation of preliminary injunction); *Delphix Corp. v. Actifio, Inc.*, 2015 WL 5693722 (N.D. Cal. Sept. 21, 2015) (patent rules dispute); *eDirect Publ'g, Inc. v. LiveCareer, Ltd.*, 2014 WL 2527401 (N.D. Cal. June 4, 2014) (code relevant to patent invalidity); *In re Google Litig.*, 2011 WL 286173 (N.D. Cal. Jan. 27, 2011) (code relevant to patent infringement).

## Issue #2: Sanctions Are Unwarranted and Unsubstantiated.

Plaintiff appears to be arguing that NaviStone should be sanctioned under Fed. R. Civ. P. 37(b)(2)(A), for failure to comply with a discovery order, although he provides no ground or authority. The record does not support sanctions. *See Fortinet, Inc. v. Sophos, Inc.*, 2015 WL 12856457, *10-*11 (N.D. Cal. Sept. 12, 2015) (Ryu, J.). NaviStone has been prompt to produce requested source code, and responded diligently and in good faith when Plaintiff's counsel has raised questions or NaviStone has discovered new information.

NaviStone first produced the JavaScript on March 26, 2020. Plaintiff's counsel did not raise the "minification" issue for 74 days. If Plaintiff believed the code unreadable, he should have raised the issue immediately. When he did so, NaviStone's counsel produced additional code. On learning of additional JavaScript code, NaviStone produced it promptly. NaviStone agreed to facilitate counsel-monitored, non-testimonial direct calls between Plaintiff's experts and NaviStone engineers. Plaintiff did not schedule one until this week.

Plaintiff misstates the alleged harm. Minified code is not "nonsensical." Minification is a common practice to remove unnecessary elements in code without changing its operations. Free de-minifiers exist. While these tools would not restore certain variable definitions shortened in the minification process, the code would present as readable, and Mr. White's testimony that minification would make it harder for *competitors* to analyze the code is of no moment because NaviStone has offered to answer Plaintiff's experts' questions directly. NaviStone has no interest in hindering Plaintiff's experts' analysis; it believes such analysis will be exculpatory. Plaintiff's position is also internally contradictory; if the code was deemed "unreadable"—which NaviStone contests—it was not reasonable to incur nearly *$45,000* in fees to analyze it, without even asking for assistance from NaviStone's engineers. If, as NaviStone believes, it was relevant and readable, Plaintiff's experts would need to take the time to review it. Moreover, fully non-minified code has been produced with ample time before expert reports are due. In sum, NaviStone has acted promptly, with diligence, and in good faith, throughout.

Dated: July 29, 2020

**BURSOR & FISHER, P.A.**

By:  */s/ Neal J. Deckant*
                Neal J. Deckant

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Frederick J. Klorczyk III (State Bar. No. 320783)
Neal J. Deckant (State Bar No. 322946)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
        jsmith@bursor.com
        fklorczyk@bursor.com
        ndeckant@bursor.com

*Attorneys for Plaintiff*

  */s/ David W. Bertoni*
David W. Bertoni (*pro hac vice*)
dbertoni@brannlaw.com
David Swetnam-Burland (226216)
dsb@brannlaw.com
Eamonn R.C. Hart (*pro hac vice*)
ehart@brannlaw.com
BRANN & ISAACSON
184 Main Street, 4th Floor
P.O. Box 3070
Lewiston, ME 04243-3070
Tel.: (207) 786-3566
 Fax: (207) 783-9325

Richard Pachter (120069)
richard@pachterlaw.com
LAW OFFICES OF RICHARD PACHTER
555 University Avenue, Suite 200
Sacramento CA 95825
Tel.: (916) 485-1617
Fax: (916) 379-7838

*Attorneys for NaviStone, Inc.*

BURSOR & FISHER
P.A.

ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1

I, Neal J. Deckant, attest that concurrence in the filing of this document has been obtained from each of the other signatories.  Executed on July 29, 2020 in Walnut Creek, California.

*/s/ Neal J. Deckant*
Neal J. Deckant

**EXHIBIT 10**

**BRANN & ISAACSON**
DAVID W. BERTONI (admitted *pro hac vice*)
dbertoni@brannlaw.com
DAVID SWETNAM-BURLAND (State Bar No. 226216)
dsb@brannlaw.com
EAMONN R.C. HART (admitted *pro hac vice*)
ehart@brannlaw.com
184 Main Street
P.O. Box 3070
Lewiston, ME 04243-3070
Tel.: (207) 786-3566
Fax: (207) 783-9325

**LAW OFFICES OF RICHARD PACHTER**
RICHARD PACHTER (State Bar No. 120069)
richard@pachterlaw.com
500 Capitol Mall, Suite 2200
Sacramento, CA 95814
Tel.: (916) 485-1617
Fax: (916) 379-7838

Attorneys for Defendant NaviStone, Inc.


# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION


| | |
|---|---|
| JEREMIAH REVITCH, individually and on behalf of all others similarly situated, <br><br> v. <br><br> NEW MOOSEJAW, LLC and NAVISTONE, INC., <br><br> DEFENDANTS. | Case No.  3:18-cv-06827-VC |


NaviStone, Inc.'s Objections and Responses to
Plaintiff's First Set of Requests for Inspection
3:18-cv-06827-VC

## RESPONSES

**REQUEST FOR INSPECTION No. 1:** The source code repository or repositories and all source code stored therein used in the development of the NAVISTONE SOFTWARE (including any associated applications and/or technologies including but not limited to all website(s), mobile app(s), backend(s)/server(s) and/or any related system(s) or program(s)). The source code repository or repositories should include all current and previous versions of the program's source code, branches, tags, releases, distributions, bundles, archives, internally-tested products or programs, commercially-released products or programs, and associated historical developer comments, metadata, and timestamps relating to or associated with the development of the software and any related applications or technologies.

**OBJECTIONS:** NaviStone incorporates each of its general objections by reference. NaviStone objects to this request as vague, overbroad, unduly burdensome, and disproportionate to the needs of the case to the extent it requests inspection of one or more repositories of "all source code stored therein" without regard to whether such software relates to the claims and defenses asserted in this action. NaviStone further objects to this request as duplicative or redundant to the extent it requests the inspection of information already produced by NaviStone. NaviStone further objects to this request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not relevant to any party's claim or defense to the extent that it seeks source code that did not operate on the www.moosejaw.com website during the class period. Other code—for example, code used on websites of other NaviStone clients, or draft code never deployed—is not relevant to the claims and defenses in this case and its production for inspection would be unduly burdensome and disproportionate to the needs of the case.

**RESPONSE:** Subject to and without waiving its general and specific objections,

4  NaviStone, Inc.'s Objections and Responses to
Plaintiff's First Set of Requests for Inspection
3:18-cv-06827-VC

NaviStone responds that it has already produced any source code that operated in real time on visitors to www.moosejaw.com. NaviStone accordingly believes that any additional on-site inspection of this code is unnecessary. However, if Plaintiff disagrees, NaviStone will meet and confer to discuss (a) the basis of the disagreement and (b) if the parties can resolve this disagreement. If Plaintiff similarly believes that review of code not already produced is necessary to his case, NaviStone is similarly willing to meet and confer to (a) discuss the basis of this contention and (b) if any disagreement can be resolved.

**REQUEST FOR INSPECTION No. 2:** In connection with Request #1, all database schemas describing all tables, all database views, all stored procedures or triggers used, all scripts that load startup values for data (including seed data, dummy info, sample users, example sets, lookup tables, or dictionary files), and all scripts or programs used to instantiate the database (including any/all README or HOWTO files/documentation) if no dump file is provided.

**OBJECTIONS:** NaviStone incorporates each of its general objections and each of its specific objections to Request for Inspection No. 1 by reference.

**RESPONSE:** Subject to and without waiving its general and specific objections, NaviStone refers Plaintiff to its response to Request No. 1, which it incorporates by reference.

**REQUEST FOR INSPECTION No. 3:** In connection with Request #1, all production data associated with the Plaintiff recorded by and/or logged from the live service during the RELEVANT TIME PERIOD, including but not limited to ALL website(s), mobile app(s), backend(s)/server(s) and/or any related system(s) or program(s).

**OBJECTIONS:** NaviStone incorporates each of its general objections and each of its specific objections to Request for Inspection No. 1 by reference.

**RESPONSE:** Subject to and without waiving its general and specific objections,

5  NaviStone, Inc.'s Objections and Responses to
Plaintiff's First Set of Requests for Inspection
3:18-cv-06827-VC

NaviStone refers Plaintiff to its response to Request No. 1, which it incorporates by reference.

**REQUEST FOR INSPECTION No. 4:** All scripts, recipes, tools, configuration files, programs, documentation, AND instructions detailing the operation, preparation, installation, deployment, upgrade, patching, maintenance, OR repair of the NAVISTONE SOFTWARE. In connection with this Request, please provide any logs or records for each software deployment/release.

**OBJECTIONS:** NaviStone incorporates each of its general objections by reference. NaviStone objects to this request as vague, overbroad, unduly burdensome, and disproportionate to the needs of the case to the extent it requests inspection of "[a]ll scripts, recipes, tools, configuration files, programs, documentation, AND instructions" without regard to whether such information relates to the claims and defenses asserted in this action. NaviStone further objects to this request as duplicative or redundant to the extent it requests the inspection of information already produced by NaviStone. NaviStone further objects to this request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not relevant to any party's claim or defense to the extent that it seeks information relating to source code that did not operate on the www.moosejaw.com website during the class period. Materials relating to other code—for example, code used on websites of other NaviStone clients, or draft code never deployed—is not relevant to the claims and defenses in this case and the production for inspection of information relating to such code would be unduly burdensome and disproportionate to the needs of the case.

**RESPONSE:** Subject to and without waiving its general and specific objections, NaviStone refers Plaintiff to its response to Request No. 1, which it incorporates by reference.

**REQUEST FOR INSPECTION No. 5:** All current and past records or tickets detailing all bugs, errors, problems, faults, misconfigurations, and performance issues associated with the

6   NaviStone, Inc.'s Objections and Responses to
Plaintiff's First Set of Requests for Inspection
3:18-cv-06827-VC

development of the NAVISTONE SOFTWARE. Include all correspondence, discussions, comments, notes, and metadata associated with the foregoing.

**OBJECTIONS:** NaviStone incorporates each of its general objections by reference. NaviStone objects to this request as vague, overbroad, unduly burdensome, and disproportionate to the needs of the case to the extent it requests inspection of "[a]ll current and past records or tickets" without regard to whether such information relates to the claims and defenses asserted in this action. NaviStone further objects to this request as duplicative or redundant to the extent it requests the inspection of information already produced by NaviStone. NaviStone further objects to this request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not relevant to any party's claim or defense to the extent that it seeks information relating to source code that did not operate on the www.moosejaw.com website during the class period. Materials relating to other code—for example, code used on websites of other NaviStone clients, or draft code never deployed—is not relevant to the claims and defenses in this case and the production for inspection of information relating to such code would be unduly burdensome and disproportionate to the needs of the case.

**RESPONSE:** Subject to and without waiving its general and specific objections, NaviStone refers Plaintiff to its response to Request No. 1, which it incorporates by reference.

7  NaviStone, Inc.'s Objections and Responses to
Plaintiff's First Set of Requests for Inspection
3:18-cv-06827-VC

Dated: April 20, 2020

/s/ David W. Bertoni
David W. Bertoni (pro hac vice)
dbertoni@brannlaw.com
David Swetnam-Burland (226216)
dsb@brannlaw.com
Eamonn R.C. Hart (pro hac vice)
ehart@brannlaw.com
BRANN & ISAACSON
184 Main Street, 4th Floor
P.O. Box 3070
Lewiston, ME 04243-3070
Tel.: (207) 786-3566
Fax: (207) 783-9325

Richard Pachter (120069)
richard@pachterlaw.com
LAW OFFICES OF RICHARD PACHTER
555 University Avenue, Suite 200
Sacramento, CA 95825
Tel.: (916) 485-1617
Fax: (916) 379-7838

*Attorneys for NaviStone, Inc.*

8  NaviStone, Inc.'s Objections and Responses to
Plaintiff's First Set of Requests for Inspection
3:18-cv-06827-VC

**EXHIBIT 11**

PROPRIETARY AND CONFIDENTIAL INFORMATION

**Cybersecurity Questionnaire**

**Data Collection Phase**

- **Technology**

    - **Change Control**

        - We use GitHub for code repository. Releases are managed by a single admin.

        - AWS account has limited access (3 possible admins)

        - Databases are managed through user permissions.

    - **System Patching**

        - Applied manually on servers

        - Desktops are managed by third party

    - **Mobile Device Management**

        - none

    - **WAP. Network Architecture and Control**

        - Outsourced and managed by third party

    - **Application Security Process & Documentation**

        - none

    - **Coding Standards**

        - Beginning to use test driven design

        - Follow XP principles

        - Use kanban to manage software development following lean/agile principles

    - **Secure Code Review**

        - Not currently

    - **System Hardening Standards**

        - Not currently

**EXHIBIT**

25

NAVISTONE_004818

PROPRIETARY AND CONFIDENTIAL INFORMATION

- **Governance & Policy**

  - **Risk Policy, Security Policy, Privacy Policy**

    - Risk Policy – we do not have a written or expressed Risk Policy

    - Security Policy – Refer to Appendix A

    - Privacy Policy – Refer to Appendix B

  - **Business Continuity Governance**

    - NaviStone does not have a written Business Continuity Governance policy.  However, we build redundancy within our systems whenever possible or necessary.  For example, we keep our OneTag Java Scrip Libraries deployed across a CacheFly infrastructure and we have redundancy in the servers running the data ingestion API.

    - We monitor our data acquisition by client on a real-time basis.  We have established monitoring and alarms where we can tell within a reasonable time window (1 hour max) if a particular client has stopped collecting data.  When an event is triggered we have a loosely articulated procedure for troubleshooting and escalation within our team.

  - **Disaster Recovery**

    - NaviStone does not have a written Disaster Recovery Policy.  NaviStone relies on AWS back-ups if recovery is necessary.  Regardless, the data NaviStone collects from its client is not mission critical so data losses are not of significant consequences to the business.

    - One key and critical component of how we operate is with a "First Do No Harm" policy and approach to our data acquisition.  So, if our systems were to totally fail, we want to make sure there are no implications or consequences to our client systems serving our tag.

  - **Information Security Incident Management Policy / Procedure**

    - NaviStone currently does not have a written policy or procedure.  We are not actively monitoring logs or events so we would not know if a security incident has happened.

  - **Privacy Governance**

    - We do not have a written Privacy Governance policy.  However, we are very sensitive to possible issues that may violate the tenet of our current Privacy Policy as stated in Appendix B.  When in doubt, we consult with

NAVISTONE_004819

PROPRIETARY AND CONFIDENTIAL INFORMATION

outside counsel at a boutique law firm specializing in privacy matters for direct marketers. We also engage in detail discussions with our partner Neustar. Numerous times we have taken ideas and/or issues up to their internal Privacy Officer for scrutiny and approval.

- **Privacy Data flow**

  - Refer to Appendix C diagram and description.

- **Privacy incident notification**

  - NaviStone does not have an incident notification policy or procedure.

- **Training - Security Awareness, Privacy Awareness, Acceptable use, Confidentiality, Code of Conduct.**

  - Security Awareness – we follow common sense and procedures to support our policy as outline in Appendix A. However, we do not have written training materials or procedures.

  - Privacy Awareness – similarly with the policy as outlined in Appendix B.

  - Acceptable use – nothing here.

  - Confidentiality – We have written employee contracts with confidentiality clauses and expectations and have confidentiality included in our Statement of Works signed with clients. When evaluating or considering resellers or suppliers we always execute mutual Non-Disclosure Agreements.

  - Code of Conduct – Refer to Appendix D.

- **Supply Chain and Third Party Partners**

  - **SLA's and Cloud Provider Agreements**

    - Refer to Appendix E for Amazon's Cloud Customer Service Agreement

  - **Supplier Selection and Risk Assessment Process**

    - We continuously evaluate vendor and supplier relationships from the perspective of enhancing our business and delivering better customer value. We currently do not have a Risk Assessment Process used during the evaluation or selection of clients.

  - **Risk Monitoring, Reporting and Tracking**

    - We do not have a current Risk Monitoring, Reporting and Tracking policy, process and/or procure in place.

NAVISTONE_004820

*PROPRIETARY AND CONFIDENTIAL INFORMATION*

- **Contract Clauses**

  - We have various contracts in place with vendors and/or suppliers so it is particularly hard to generalize terms on contract clauses.  However, as a matter of policy and risk management, we will always look to include confidentiality, mutual indemnification and limitation of liability clauses in every contract.

- **Third Party Privacy Agreements**

  - We currently do not have Third Party Privacy Agreements in place, although we are in current discussions and negotiations with Neustar for a separate privacy agreement from our current commercial agreement.

- **Insurance**

  - Currently, we only have a General Liability insurance policy in place with a $1 M limit per incident and a $2 M aggregate.

  - We have evaluated E&O insurance policies which include cybersecurity riders but have not yet purchased any such policy.

NAVISTONE_004821

PROPRIETARY AND CONFIDENTIAL INFORMATION

**Appendix A**

**NaviStone Security Highlights**

Purpose:

The purpose of this document is to provide high-level bullet point highlights of NaviStone's security practices and safeguards implemented with our Amazon Web Services (AWS) infrastructure.

NaviStone's Cloud Infrastructure:

- NaviStone uses AWS to collect, store and process the browsing data collected from client's websites.
- AWS provides built-in security protections for their infrastructure as part of their service.  NaviStone relies on AWS Shared Responsibility security model where AWS provides the security "OF" the Cloud while NaviStone controls security "IN" the Cloud.
- Navistone's AWS systems and data reside inside a Virtual Private Cloud (VPC) which is not open to or accessible via the Internet.  Refer to VPC diagram below.

NaviStone Access Control:

- Access to NaviStone's VPC in AWS is tightly controlled with a range of private IP addresses accessible only via a Virtual Private Network (VPN) client installed in the users' computers.
- The VPN software logins are authenticated with passwords controlled server-side.
- In addition to VPN access, access to databases within the VPC are password protected at the individual user level to provide an additional layer of data security.

NaviStone Access Privileges:

- NaviStone uses identity and access management controls to ensure that only authorized and authenticated users are able to access the VPC, and only in a manner that is intended.
- NaviStone use the principle of "least privilege" to ensure that authenticated identities are only permitted to perform the most minimal set of functions necessary to fulfill a specific task, while balancing usability and efficiency.  This principle limits the blast radius - or potential impact - of inappropriate use of valid credentials.

NAVISTONE_004822

*PROPRIETARY AND CONFIDENTIAL INFORMATION*

**NaviStone's VPC Diagram**
**(*Confidential)*



PROPRIETARY AND CONFIDENTIAL INFORMATION

**Appendix B**

**Privacy Policy Highlights**

- The majority of NaviStone's clients use the company to send physical mail advertisements—catalogs or postcards—to consumers who are not on their mailing lists, but who have visited their websites.  NaviStone does so while keeping the identities of those persons secret from both NaviStone and its retailer clients. It is up to consumers, if they decided to respond to the mailing, to provide their personal information, including their names and addresses, to the retailer.  If not, they remain anonymous.

- The information NaviStone collects on behalf of a client relates only to the behavior of visitors to that client's own websites. At NaviStone, browsing data is segregated by client website and is not combined with any information about other retailers and their websites.  Nor does NaviStone use data obtained in connection with its work for one client in its work for any other client.  The data it collects is not available for sale or for use by any party other than the client for which it was collected.

- Under the Services Agreement with NaviStone, a client must warrant and represent that it is "in full compliance with all applicable laws and marketing regulations regarding the privacy of its customers and the collection, use and disclosure of its customers' information," and that it has "procured all necessary approvals required for the performance of this Agreement, including NaviStone's use of Client data." In addition, NaviStone's retailer clients warrant that their website "includes a clear and conspicuous link to its privacy policy," and each agree to include in that policy an accurate disclosure of the collection and use of information in connection with NaviStone's direct mail program—which disclosure must give visitors the right to opt-out of receiving direct mail promotions.

- NaviStone maintains consumer anonymity through an arrangement with an unrelated third-party company, Neustar, Inc. ("Neustar"). Neustar maintains a database of individuals who voluntarily provided their names and mailing addresses after being advised via privacy policies that (1) this information would be shared with third parties for marketing purposes; and (2) they could opt out of receiving such third-party marketing.  Only website visitors who satisfy both of these conditions are eligible to be sent a direct mail promotion under NaviStone's program.  Neustar keeps these names and addresses secret from both NaviStone and its clients.  It assembles the mailing list for each promotion and sends that list, on a confidential basis, to the third-party mailing house responsible for sending the promotion.

- NaviStone's scoring system helps keep unproductive catalogs and postcards out of the marketing ecosystem by anticipating which visitors are more likely to welcome and respond to a direct mail promotion from the retailer they visited. This goal is furthered

NAVISTONE_004824

*PROPRIETARY AND CONFIDENTIAL INFORMATION*

by the removal from all mailing lists of individuals appearing on either the retailer's own "do not mail" list or the industry-wide "do not mail" list maintained by the Data & Marketing Association ("DMA"). Finally, lists generated under the NaviStone program are further scrubbed against an industry-standard, third-party compilation of names and addresses warranted as eligible for direct mail promotion.  Persons not appearing on this list are removed.

NAVISTONE_004825

PROPRIETARY AND CONFIDENTIAL INFORMATION

**Appendix C**

**High-Level Data Process Flow**



Two anonymous browsers (points A and B) connect to a website over the internet (point C). The website has installed the NaviStone single line of JavaScript code called OneTag.  The OneTag is customized to map client-specific web data elements into a multi-tenant database environment.

The OneTag javascript executes an application that interprets the page types, urls and actions from a particular website and maps these to the appropriate data tables and fields in our data warehouse.

Many tagging applications rely on the client to map data to a data scheme.  This is a laborious and involved process that requires skilled IT resources.  OneTag solves this complexity problem with a server side process that generates JavaScript code on the fly customized to the client's web site. The code uses Regex to search for patterns in the page text. When it matches a

NAVISTONE_004826

PROPRIETARY AND CONFIDENTIAL INFORMATION

pattern, the tag maps data into the appropriate data fields.  For fields where no patters are found, the tag allows for custom pattern definition.

When OneTag code executes (point D) it first check for prior site activity by looking the NaviStone first party cookie.  If it does not exist, it creates the cookie and logs the new Visitor ID.  If it does exist, we read the Visitor ID from the cookie.

In cases where a single site uses more than one domain, all first party cookies created are distinctively different so they look like two different visitors.  In order to link these two first party cookies to the same visitor session, we first perform a look-up to our Universal ID.  If not found, we create a temporary match key that is a combination of IP address, user agent and various browser-specific variables and is also time specific.

At this time, we begin collecting the website data based on the visitor activity.  Sample data collected from the visitor session include browser type, URL, user agent, IP address, email address, land address, pages visited and visit actions.  Some of these actions could include button clicks, form submissions, conversions and collection of conversion data.

During this data collection process, the tag makes a call to our data partner networks (point F) to check whether or not the data network has a mailing address (postal or email).

The data collected is encoded and sent to our API.  The API decodes and saves data to our data warehouse for storage and analysis (point E).

When the API executes (point E) it first check for prior cross-site activity by looking the NaviStone third party cookie.  If it does not exist, it creates the cookie and logs the new Universal Visitor ID.  If it does exist, we read the Universal Visitor ID from the cookie.

Nightly, the raw data collected in the multi-tenant database, is aggregated first by Visitor ID and by client web site.  While the OneTag collects over 200 different data elements, only a subset is summarized.

The dependent variable of the multi-variate regression model is response to a direct mail piece.  The variables used to-date are months since last visit, number of products visited, number of carts started, total number of visits in the last twelve months and mail order activity in the last 36 month [in the future we will include other variables that will model activity for retail and non-retail sectors more accurately].

[In addition to web browsing data we will include data from other sources in the model such as demographics, purchase data and social media activity].

Score results are separated into two audiences:  records known to be already on a client's CRM file (house file) and the balance (prospecting).  The prospecting audience is filtered by our ability to find a name and address of the visitor, either through our own data or through the data partner network.

NAVISTONE_004827

PROPRIETARY AND CONFIDENTIAL INFORMATION

Following modeling results and in consultation with the clients, we recommend the audience to be mailed down to a specific model score (aggregated by segments).  Browser A is selected because it has a very high score while browser B is not selected because the score is below a threshold determined by the client.  The score of browser B indicates that it will not respond at a sufficient rate to justify the expense of a direct mail piece.

For example, browser A started a cart, viewed six different products across three visits, the last at which occurred within the last week.  Browser B did not start a cart, never viewed a product, visited only once seven months ago.

For the prospect audience segments selected by the client we fulfill first from our own datasets, then cascade through different data partner networks based on cost to acquire the name and mailing address (point I).

The prospect name and mailing address is then sent to a third party data processor (point J) for merging with other audiences being mailed by the client.  The third party data processor supplies a de-duplicated list of all audiences being mailed by a client to a printer so that the name and addresses can be applied to a direct mail piece (point K).  The printer enters the addressed direct mail pieces into the postal system for delivery (point L).

At no point in this process are the names and addresses from anonymous browsers provided to the client.

NAVISTONE_004828

PROPRIETARY AND CONFIDENTIAL INFORMATION

**Appendix D**

**Code of Conduct as stated in our Employee Handbook**

<u>Standards of Performance and Conduct</u>

Like other organizations, we require order and discipline to succeed and to promote efficiency, productivity, and cooperation among employees. For this reason, we think it is helpful to identify some examples of types of conduct that are impermissible and that may therefore lead to disciplinary action, possibly including immediate discharge:

- Refusing to accept appropriate work assignments or refusing to perform tasks assigned by a supervisor in the appropriate manner.
- Refusing to follow your manager's work instructions or directions, or engaging in insubordination.
- Conducting personal business, including outside employment, on working time or with company equipment, supplies, materials, or products, without management approval.
- Possessing or using weapons, dangerous or unauthorized materials, liquor (unless authorized), or illicit drugs in the workplace. (This is not to be read as interfering with a legal right, in those states that recognize such a right, to store lawfully possessed firearms in one's vehicle while it is in an employer- provided parking area.)
- Sleeping or being impaired by alcohol, illegal drugs, or intoxicants while on company property, while on duty, or while operating a vehicle or potentially dangerous equipment leased or owned by the company.
- Falsifying information, including time or expense reports; intentionally "punching" another employee's time card; removing or destroying any time-keeping record without authorization.
- Damaging, destroying, removing without authority, or failing to return any property (physical or intellectual) belonging to the company, fellow employees, customers, or anyone on company property.
- Fighting, horseplay, practical jokes, or other unsafe conduct that could endanger any employee, contractor, customer, or vendor of or visitor to the company.
- Violence, threats of violence or intimidation, bullying, or coercing any employee, contractor, customer, or vendor of or visitor to your company, including by use of abusive or vulgar language.
- Engaging in any unlawful harassment or discrimination against a co-worker, customer, or vendor.
- Engaging in illegal activities or conduct that poses a health or safety hazard, including smoking in non-smoking areas.

NAVISTONE_004829

PROPRIETARY AND CONFIDENTIAL INFORMATION

- Soliciting or accepting gratuities from customers or vendors.
- Holding unauthorized gatherings in work areas during working time, or admitting unauthorized persons into the work place, unless allowed to do so by law.
- Releasing without authorization Confidential Information as defined in this handbook.
- Violation of any company rule, practice, or policy, including any policy in this handbook.
- Unsatisfactory performance of job duties.

As already noted, the above is not a comprehensive list of all types of impermissible conduct and performance, and nothing in this handbook (including this policy) alters the at-will employment policy.

Code of Business Ethics and Conduct (Code)

This Code applies to you only if you are a worksite employee whose company does not have its own such Code. TriNet corporate colleagues are subject to a different Code which they may access via the TriNet platform.

Your company has a responsibility to conduct its business in strict compliance with all applicable laws and regulations, and it is the company's policy to do so. Your company therefore expects employees to act in accordance with the highest standards of business ethics both on and off company premises, to avoid any appearance of impropriety, and to observe all applicable laws and regulations while conducting business on the company's behalf.

You are expected to abide by the spirit as well as the letter of this Code. You are also expected to cooperate with any inquiries or investigations concerning a possible or suspected violation of this Code, unless you are informed at the time of the investigation that your participation is voluntary. Any employee's failure to fulfill his or her responsibilities under this Code may result in disciplinary action, up to and including immediate termination of employment.

Ethical Standards

Your company is committed to conducting business in a fair and open manner within the spirit and letter of the law, with the highest regard for customers, the community, and employees. Your company's success depends not only on the knowledge, skills, and abilities of employees, but also on their performance of work with sound judgment, self-discipline, common sense, and integrity. As such, all employees are required to maintain and uphold the following common ethical standards, in all aspects of their work:

- To pursue company objectives in all of your work in a manner that does not conflict with the integrity of the company or the public interest;
- To be truthful and accurate in performing job functions;
- To protect Confidential Information as defined in this handbook;
- To observe all laws, regulations, ordinances, and rules applicable to the operation of the business;

PROPRIETARY AND CONFIDENTIAL INFORMATION

- To maintain honest and fair relationships with all company vendors;
- To ensure quality and value in the company's products/services and relationships with customers and vendors; and
- To avoid, during the course of your employment, any situations that may engender any conflict between the personal interests of employees and the exercise of discretionary decisions on behalf of the company.

Conflicts of Interest

Your company insists on the undivided loyalty of all employees, including management and non- management staff, in the performance of all job functions. Therefore, employees must not engage in any conduct, and must avoid situations, that would create an actual or potential conflict of interest in performing your job or create the appearance of such a conflict.

Conflicts of interest arise in work situations when an employee's personal activity or personal interest is contrary to the interests of the company. These personal activities or interests may influence the employee's judgment, causing the employee to make decisions on behalf of the company based upon the potential for personal gain, rather than in the best interests of the company.

To prevent conflicts of interest, the following behavior is deemed unacceptable and unethical, except to the extent the law provides otherwise:

- Receiving or giving of merchandise, money, services, travel, accommodations, or lavish entertainment that might appear to have been given to influence a business decision. Gifts offered or received at any time in your capacity as an employee or representative of the company that are of more than minimal or token value shall not be accepted and shall be returned to the sender with an appropriate explanatory note or letter.
- Maintaining personal, business, or financial relationships with a customer or vendor where the employee has control or influence over the company's relationship with that customer or vendor. For example, employees should not borrow from or lend personal funds to a customer or vendor of the employee's division.
- Using information developed or learned on the job for personal or familial benefit. This includes the use of company databases, financial information, and intellectual property.
- Maintaining outside directorship, employment, or political office that might appear to or actually conflict or compete with an employee's responsibilities.
- Conducting company business with, or using position or authority to influence the company to conduct business with, family members.
- Unauthorized sharing of Confidential Information, as defined in this handbook, or proprietary company-related information with business associates or representatives of other companies.

PROPRIETARY AND CONFIDENTIAL INFORMATION

The list above serves only to illustrate sources of possible conflicts of interest and does not constitute a complete list of all the situations that may result in a conflict of interest.

Ultimately, it is the responsibility of each employee to avoid any situation that could affect his/her ability to judge situations independently and objectively on behalf of the company, and any situation that could even appear to be a conflict of interest. It is important to note that under certain circumstances, conflicts of interest can amount to violations of criminal law.  Any doubts should be resolved in a discussion with your manager, TriNet HR or your company's legal counsel.

NAVISTONE_004832

PROPRIETARY AND CONFIDENTIAL INFORMATION

**Appendix E**

**AWS Cloud Customer Agreement**

# AWS Customer Agreement

This AWS Customer Agreement (this **"Agreement"**) contains the terms and conditions that govern your access to and use of the Service Offerings (as defined below) and is an agreement between Amazon Web Services, Inc. (**"AWS," "we," "us,"** or **"our"**) and you or the entity you represent (**"you"**). This Agreement takes effect when you click an "I Accept" button or check box presented with these terms or, if earlier, when you use any of the Service Offerings (the **"Effective Date"**). You represent to us that you are lawfully able to enter into contracts (e.g., you are not a minor). If you are entering into this Agreement for an entity, such as the company you work for, you represent to us that you have legal authority to bind that entity. Please see Section 14 for definitions of certain capitalized terms used in this Agreement.

## 1. Use of the Service Offerings.

**1.1 Generally.** You may access and use the Service Offerings in accordance with this Agreement. Service Level Agreements may apply to certain Service Offerings. You will adhere to all laws, rules, and regulations applicable to your use of the Service Offerings, including the Service Terms, the Acceptable Use Policy and the other Policies as defined in Section 14.

**1.2 Your Account.** To access the Services, you must create an AWS account associated with a valid e-mail address. Unless explicitly permitted by the Service Terms, you may only create one account per email address. You are responsible for all activities that occur under your account, regardless of whether the activities are undertaken by you, your employees or a third party (including your contractors or agents) and, except to the extent caused by our breach of this Agreement, we and our affiliates are not responsible for unauthorized access to your account. You will contact us immediately if you believe an unauthorized third party may be using your account or if your account information is lost or stolen. You may terminate your account and this Agreement at any time in accordance with Section 7.

**1.3 Support to You.** If you would like support for the Services other than the support we generally provide to other users of the Services without charge, you may enroll for customer support in accordance with the terms of the AWS Support Guidelines.

**1.4 Third Party Content.** Third Party Content, such as software applications provided by third parties, may be made available directly to you by other companies or individuals under separate terms and conditions, including separate fees and charges. Because we may not have tested or screened the Third Party Content, your use of any Third Party Content is at your sole risk.

## 2. Changes.

NAVISTONE_004833

PROPRIETARY AND CONFIDENTIAL INFORMATION

**2.1 To the Service Offerings.** We may change, discontinue, or deprecate any of the Service Offerings (including the Service Offerings as a whole) or change or remove features or functionality of the Service Offerings from time to time. We will notify you of any material change to or discontinuation of the Service Offerings.

**2.2 To the APIs.** We may change, discontinue or deprecate any APIs for the Services from time to time but will use commercially reasonable efforts to continue supporting the previous version of any API changed, discontinued, or deprecated for 12 months after the change, discontinuation, or deprecation (except if doing so (a) would pose a security or intellectual property issue, (b) is economically or technically burdensome, or (c) is needed to comply with the law or requests of governmental entities).

**2.3 To the Service Level Agreements.** We may change, discontinue or add Service Level Agreements from time to time in accordance with Section 12.

## 3. Security and Data Privacy.

**3.1 AWS Security.** Without limiting Section 10 or your obligations under Section 4.2, we will implement reasonable and appropriate measures designed to help you secure Your Content against accidental or unlawful loss, access or disclosure.

**3.2 Data Privacy.** You may specify the AWS regions in which Your Content will be stored. You consent to the storage of Your Content in, and transfer of Your Content into, the AWS regions you select. We will not access or use Your Content except as necessary to maintain or provide the Service Offerings, or as necessary to comply with the law or a binding order of a governmental body. We will not (a) disclose Your Content to any government or third party or (b) subject to Section 3.3, move Your Content from the AWS regions selected by you; except in each case as necessary to comply with the law or a binding order of a governmental body. Unless it would violate the law or a binding order of a governmental body, we will give you notice of any legal requirement or order referred to in this Section 3.2. We will only use your Account Information in accordance with the Privacy Policy, and you consent to such usage. The Privacy Policy does not apply to Your Content.

**3.3 Service Attributes.** To provide billing and administration services, we may process Service Attributes in the AWS region(s) where you use the Service Offerings and the AWS regions in the United States. To provide you with support services initiated by you and investigate fraud, abuse or violations of this Agreement, we may process Service Attributes where we maintain our support and investigation personnel.

## 4. Your Responsibilities

**4.1 Your Content.** You are solely responsible for the development, content, operation, maintenance, and use of Your Content. For example, you are solely responsible for:

(a) the technical operation of Your Content, including ensuring that calls you make to any Service are compatible with then-current APIs for that Service;

NAVISTONE_004834

PROPRIETARY AND CONFIDENTIAL INFORMATION

(b) compliance of Your Content with the Acceptable Use Policy, the other Policies, and the law;

(c) any claims relating to Your Content; and

(d) properly handling and processing notices sent to you (or any of your affiliates) by any person claiming that Your Content violate such person's rights, including notices pursuant to the Digital Millennium Copyright Act.

**4.2 Other Security and Backup.** You are responsible for properly configuring and using the Service Offerings and taking your own steps to maintain appropriate security, protection and backup of Your Content, which may include the use of encryption technology to protect Your Content from unauthorized access and routine archiving Your Content. AWS log-in credentials and private keys generated by the Services are for your internal use only and you may not sell, transfer or sublicense them to any other entity or person, except that you may disclose your private key to your agents and subcontractors performing work on your behalf.

**4.3 End User Violations.** You will be deemed to have taken any action that you permit, assist or facilitate any person or entity to take related to this Agreement, Your Content or use of the Service Offerings. You are responsible for End Users' use of Your Content and the Service Offerings. You will ensure that all End Users comply with your obligations under this Agreement and that the terms of your agreement with each End User are consistent with this Agreement. If you become aware of any violation of your obligations under this Agreement by an End User, you will immediately terminate such End User's access to Your Content and the Service Offerings.

**4.4 End User Support.** You are responsible for providing customer service (if any) to End Users. We do not provide any support or services to End Users unless we have a separate agreement with you or an End User obligating us to provide support or services.

## 5. Fees and Payment

**5.1. Service Fees.** We calculate and bill fees and charges monthly. We may bill you more frequently for fees accrued if we suspect that your account is fraudulent or at risk of non-payment. You will pay us the applicable fees and charges for use of the Service Offerings as described on the AWS Site using one of the payment methods we support. All amounts payable under this Agreement will be made without setoff or counterclaim, and without any deduction or withholding. Fees and charges for any new Service or new feature of a Service will be effective when we post updated fees and charges on the AWS Site unless we expressly state otherwise in a notice. We may increase or add new fees and charges for any existing Services by giving you at least 30 days' advance notice. We may charge you interest at the rate of 1.5% per month (or the highest rate permitted by law, if less) on all late payments.

**5.2 Taxes.** All fees and charges payable by you are exclusive of applicable taxes and duties, including VAT and applicable sales tax. You will provide us any information we reasonably request to determine whether we are obligated to collect VAT from you, including your VAT identification number. If you are legally entitled to an exemption from any sales, use, or similar

NAVISTONE_004835

PROPRIETARY AND CONFIDENTIAL INFORMATION

transaction tax, you are responsible for providing us with legally-sufficient tax exemption certificates for each taxing jurisdiction. We will apply the tax exemption certificates to charges under your account occurring after the date we receive the tax exemption certificates. If any deduction or withholding is required by law, you will notify us and will pay us any additional amounts necessary to ensure that the net amount that we receive, after any deduction and withholding, equals the amount we would have received if no deduction or withholding had been required. Additionally, you will provide us with documentation showing that the withheld and deducted amounts have been paid to the relevant taxing authority.

## 6. Temporary Suspension

**6.1 Generally.** We may suspend your or any End User's right to access or use any portion or all of the Service Offerings immediately upon notice to you if we determine:

(a) your or an End User's use of or registration for the Service Offerings (i) poses a security risk to the Service Offerings or any third party, (ii) may adversely impact the Service Offerings or the systems or Content of any other AWS customer, (iii) may subject us, our affiliates, or any third party to liability, or (iv) may be fraudulent;

(b) you are, or any End User is, in breach of this Agreement, including if you are delinquent on your payment obligations for more than 15 days; or

(c) you have ceased to operate in the ordinary course, made an assignment for the benefit of creditors or similar disposition of your assets, or become the subject of any bankruptcy, reorganization, liquidation, dissolution or similar proceeding.

**6.2 Effect of Suspension.** If we suspend your right to access or use any portion or all of the Service Offerings:

(a) you remain responsible for all fees and charges you have incurred through the date of suspension;

(b) you remain responsible for any applicable fees and charges for any Service Offerings to which you continue to have access, as well as applicable data storage fees and charges, and fees and charges for in-process tasks completed after the date of suspension;

(c) you will not be entitled to any service credits under the Service Level Agreements for any period of suspension; and

(d) we will not erase any of Your Content as a result of your suspension, except as specified elsewhere in this Agreement.

Our right to suspend your or any End User's right to access or use the Service Offerings is in addition to our right to terminate this Agreement pursuant to Section 7.2.

## 7. Term; Termination

NAVISTONE_004836

PROPRIETARY AND CONFIDENTIAL INFORMATION

**7.1. Term.** The term of this Agreement will commence on the Effective Date and will remain in effect until terminated by you or us in accordance with Section 7.2.

**7.2 Termination.**

(a) Termination for Convenience. You may terminate this Agreement for any reason by: (i) providing us notice and (ii) closing your account for all Services for which we provide an account closing mechanism. We may terminate this Agreement for any reason by providing you 30 days advance notice.

(b) Termination for Cause.

> (i) By Either Party. Either party may terminate this Agreement for cause upon 30 days advance notice to the other party if there is any material default or breach of this Agreement by the other party, unless the defaulting party has cured the material default or breach within the 30 day notice period.

> (ii) By Us. We may also terminate this Agreement immediately upon notice to you (A) for cause, if any act or omission by you or any End User results in a suspension described in Section 6.1, (B) if our relationship with a third party partner who provides software or other technology we use to provide the Service Offerings expires, terminates or requires us to change the way we provide the software or other technology as part of the Services, (c) if we believe providing the Services could create a substantial economic or technical burden or material security risk for us, (D) in order to comply with the law or requests of governmental entities, or (E) if we determine use of the Service Offerings by you or any End Users or our provision of any of the Services to you or any End Users has become impractical or unfeasible for any legal or regulatory reason.

**7.3. Effect of Termination.**

(a) Generally. Upon any termination of this Agreement:

> (i) all your rights under this Agreement immediately terminate;

> (ii) you remain responsible for all fees and charges you have incurred through the date of termination, including fees and charges for in-process tasks completed after the date of termination;

> (iii) you will immediately return or, if instructed by us, destroy all AWS Content in your possession; and

> (iv) Sections 4.1, 5.2, 7.3, 8 (except the license granted to you in Section 8.4), 9, 10, 11, 13 and 14 will continue to apply in accordance with their terms.

(b) Post-Termination Assistance. Unless we terminate your use of the Service Offerings pursuant to Section 7.2(b), during the 30 days following termination:

NAVISTONE_004837

PROPRIETARY AND CONFIDENTIAL INFORMATION

(i) we will not erase any of Your Content as a result of the termination;

(ii) you may retrieve Your Content from the Services only if you have paid any charges for any post-termination use of the Service Offerings and all other amounts due; and

(iii) we will provide you with the same post-termination data retrieval assistance that we generally make available to all customers.

Any additional post-termination assistance from us is subject to mutual agreement by you and us.

## 8. Proprietary Rights

**8.1 Your Content.** As between you and us, you or your licensors own all right, title, and interest in and to Your Content. Except as provided in this Section 8, we obtain no rights under this Agreement from you or your licensors to Your Content, including any related intellectual property rights. You consent to our use of Your Content to provide the Service Offerings to you and any End Users.

**8.2 Your Submissions.** Your Submissions will be governed by the terms of the Apache Software License, unless you specify one of our other supported licenses at the time you submit Your Submission.

**8.3 Adequate Rights.** You represent and warrant to us that: (a) you or your licensors own all right, title, and interest in and to Your Content and Your Submissions; (b) you have all rights in Your Content and Your Submissions necessary to grant the rights contemplated by this Agreement; and (c) none of Your Content, Your Submissions or End Users' use of Your Content, Your Submissions or the Services Offerings will violate the Acceptable Use Policy.

**8.4 Service Offerings License.** As between you and us, we or our affiliates or licensors own and reserve all right, title, and interest in and to the Service Offerings. We grant you a limited, revocable, non-exclusive, non-sublicensable, non-transferrable license to do the following during the Term: (i) access and use the Services solely in accordance with this Agreement; and (ii) copy and use the AWS Content solely in connection with your permitted use of the Services. Except as provided in this Section 8.4, you obtain no rights under this Agreement from us or our licensors to the Service Offerings, including any related intellectual property rights. Some AWS Content may be provided to you under a separate license, such as the Apache Software License or other open source license. In the event of a conflict between this Agreement and any separate license, the separate license will prevail with respect to that AWS Content.

**8.5 License Restrictions.** Neither you nor any End User may use the Service Offerings in any manner or for any purpose other than as expressly permitted by this Agreement. Neither you nor any End User may, or may attempt to, (a) modify, alter, tamper with, repair, or otherwise create derivative works of any software included in the Service Offerings (except to the extent software included in the Service Offerings are provided to you under a separate license that expressly permits the creation of derivative works), (b) reverse engineer, disassemble, or decompile the Service Offerings or apply any other process or procedure to derive the source code of any

NAVISTONE_004838

PROPRIETARY AND CONFIDENTIAL INFORMATION

software included in the Service Offerings, (c) access or use the Service Offerings in a way intended to avoid incurring fees or exceeding usage limits or quotas, or (d) resell or sublicense the Service Offerings. All licenses granted to you in this Agreement are conditional on your continued compliance this Agreement, and will immediately and automatically terminate if you do not comply with any term or condition of this Agreement. During and after the Term, you will not assert, nor will you authorize, assist, or encourage any third party to assert, against us or any of our affiliates, customers, vendors, business partners, or licensors, any patent infringement or other intellectual property infringement claim regarding any Service Offerings you have used. You may only use the AWS Marks in accordance with the Trademark Use Guidelines.

**8.6 Suggestions.** If you provide any Suggestions to us or our affiliates, we will own all right, title, and interest in and to the Suggestions, even if you have designated the Suggestions as confidential. We and our affiliates will be entitled to use the Suggestions without restriction. You hereby irrevocably assign to us all right, title, and interest in and to the Suggestions and agree to provide us any assistance we may require to document, perfect, and maintain our rights in the Suggestions.

## 9. Indemnification.

**9.1. General.** You will defend, indemnify, and hold harmless us, our affiliates and licensors, and each of their respective employees, officers, directors, and representatives from and against any claims, damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees) arising out of or relating to any third party claim concerning: (a) your or any End Users' use of the Service Offerings (including any activities under your AWS account and use by your employees and personnel); (b) breach of this Agreement or violation of applicable law by you or any End User; (c) Your Content or the combination of Your Content with other applications, content or processes, including any claim involving alleged infringement or misappropriation of third-party rights by Your Content or by the use, development, design, production, advertising or marketing of Your Content; or (d) a dispute between you and any End User. If we or our affiliates are obligated to respond to a third party subpoena or other compulsory legal order or process described above, you will also reimburse us for reasonable attorneys' fees, as well as our employees' and contractors' time and materials spent responding to the third party subpoena or other compulsory legal order or process at our then-current hourly rates.

**9.2. Process.** We will promptly notify you of any claim subject to Section 9.1, but our failure to promptly notify you will only affect your obligations under Section 9.1 to the extent that our failure prejudices your ability to defend the claim. You may: (a) use counsel of your own choosing (subject to our written consent) to defend against any claim; and (b) settle the claim as you deem appropriate, provided that you obtain our prior written consent before entering into any settlement. We may also assume control of the defense and settlement of the claim at any time.

## 10. Disclaimers.

THE SERVICE OFFERINGS ARE PROVIDED "AS IS." WE AND OUR AFFILIATES AND LICENSORS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND,

PROPRIETARY AND CONFIDENTIAL INFORMATION

WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE REGARDING THE SERVICE OFFERINGS OR THE THIRD PARTY CONTENT, INCLUDING ANY WARRANTY THAT THE SERVICE OFFERINGS OR THIRD PARTY CONTENT WILL BE UNINTERRUPTED, ERROR FREE OR FREE OF HARMFUL COMPONENTS, OR THAT ANY CONTENT, INCLUDING YOUR CONTENT OR THE THIRD PARTY CONTENT, WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED. EXCEPT TO THE EXTENT PROHIBITED BY LAW, WE AND OUR AFFILIATES AND LICENSORS DISCLAIM ALL WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR QUIET ENJOYMENT, AND ANY WARRANTIES ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE.

## 11. Limitations of Liability.

WE AND OUR AFFILIATES OR LICENSORS WILL NOT BE LIABLE TO YOU FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES (INCLUDING DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, OR DATA), EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, NEITHER WE NOR ANY OF OUR AFFILIATES OR LICENSORS WILL BE RESPONSIBLE FOR ANY COMPENSATION, REIMBURSEMENT, OR DAMAGES ARISING IN CONNECTION WITH: (A) YOUR INABILITY TO USE THE SERVICES, INCLUDING AS A RESULT OF ANY (I) TERMINATION OR SUSPENSION OF THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SERVICE OFFERINGS, (II) OUR DISCONTINUATION OF ANY OR ALL OF THE SERVICE OFFERINGS, OR, (III) WITHOUT LIMITING ANY OBLIGATIONS UNDER THE SLAS, ANY UNANTICIPATED OR UNSCHEDULED DOWNTIME OF ALL OR A PORTION OF THE SERVICES FOR ANY REASON, INCLUDING AS A RESULT OF POWER OUTAGES, SYSTEM FAILURES OR OTHER INTERRUPTIONS; (B) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; (c) ANY INVESTMENTS, EXPENDITURES, OR COMMITMENTS BY YOU IN CONNECTION WITH THIS AGREEMENT OR YOUR USE OF OR ACCESS TO THE SERVICE OFFERINGS; OR (D) ANY UNAUTHORIZED ACCESS TO, ALTERATION OF, OR THE DELETION, DESTRUCTION, DAMAGE, LOSS OR FAILURE TO STORE ANY OF YOUR CONTENT OR OTHER DATA. IN ANY CASE, OUR AND OUR AFFILIATES' AND LICENSORS' AGGREGATE LIABILITY UNDER THIS AGREEMENT WILL BE LIMITED TO THE AMOUNT YOU ACTUALLY PAY US UNDER THIS AGREEMENT FOR THE SERVICE THAT GAVE RISE TO THE CLAIM DURING THE 12 MONTHS PRECEDING THE CLAIM.

## 12. Modifications to the Agreement.

We may modify this Agreement (including any Policies) at any time by posting a revised version on the AWS Site or by otherwise notifying you in accordance with Section 13.7; provided, however, that we will provide at least 90 days advance notice in accordance with Section 13.7 for adverse changes to any Service Level Agreement. Subject to the 90-day advance notice requirement with respect to adverse changes to Service Level Agreements, the modified terms will become effective upon posting or, if we notify you by email, as stated in the email message.

NAVISTONE_004840

PROPRIETARY AND CONFIDENTIAL INFORMATION

By continuing to use the Service Offerings after the effective date of any modifications to this Agreement, you agree to be bound by the modified terms. It is your responsibility to check the AWS Site regularly for modifications to this Agreement. We last modified this Agreement on the date listed at the end of this Agreement.

## 13. Miscellaneous.

**13.1 Confidentiality and Publicity.** You may use AWS Confidential information only in connection with your use of the Service Offerings as permitted under this Agreement. You will not disclose AWS Confidential Information during the Term or at any time during the 5 year period following the end of the Term. You will take all reasonable measures to avoid disclosure, dissemination or unauthorized use of AWS Confidential Information, including, at a minimum, those measures you take to protect your own confidential information of a similar nature. You will not issue any press release or make any other public communication with respect to this Agreement or your use of the Service Offerings. You will not misrepresent or embellish the relationship between us and you (including by expressing or implying that we support, sponsor, endorse, or contribute to you or your business endeavors), or express or imply any relationship or affiliation between us and you or any other person or entity except as expressly permitted by this Agreement.

**13.2 Force Majeure.** We and our affiliates will not be liable for any delay or failure to perform any obligation under this Agreement where the delay or failure results from any cause beyond our reasonable control, including acts of God, labor disputes or other industrial disturbances, systemic electrical, telecommunications, or other utility failures, earthquake, storms or other elements of nature, blockages, embargoes, riots, acts or orders of government, acts of terrorism, or war.

**13.3 Independent Contractors; Non-Exclusive Rights.** We and you are independent contractors, and neither party, nor any of their respective affiliates, is an agent of the other for any purpose or has the authority to bind the other. Both parties reserve the right (a) to develop or have developed for it products, services, concepts, systems, or techniques that are similar to or compete with the products, services, concepts, systems, or techniques developed or contemplated by the other party and (b) to assist third party developers or systems integrators who may offer products or services which compete with the other party's products or services.

**13.4 No Third Party Beneficiaries.** This Agreement does not create any third party beneficiary rights in any individual or entity that is not a party to this Agreement.

**13.5 U.S. Government Rights.** The Service Offerings are provided to the U.S. Government as "commercial items," "commercial computer software," "commercial computer software documentation," and "technical data" with the same rights and restrictions generally applicable to the Service Offerings. If you are using the Service Offerings on behalf of the U.S. Government and these terms fail to meet the U.S. Government's needs or are inconsistent in any respect with federal law, you will immediately discontinue your use of the Service Offerings. The terms "commercial item" "commercial computer software," "commercial computer software

NAVISTONE_004841

PROPRIETARY AND CONFIDENTIAL INFORMATION

documentation," and "technical data" are defined in the Federal Acquisition Regulation and the Defense Federal Acquisition Regulation Supplement.

**13.6 Import and Export Compliance.** In connection with this Agreement, each party will comply with all applicable import, re-import, export, and re-export control laws and regulations, including the Export Administration Regulations, the International Traffic in Arms Regulations, and country-specific economic sanctions programs implemented by the Office of Foreign Assets Control. For clarity, you are solely responsible for compliance related to the manner in which you choose to use the Service Offerings, including your transfer and processing of Your Content, the provision of Your Content to End Users, and the AWS region in which any of the foregoing occur.

**13.7 Notice.**

(a) To You. We may provide any notice to you under this Agreement by: (i) posting a notice on the AWS Site; or (ii) sending a message to the email address then associated with your account. Notices we provide by posting on the AWS Site will be effective upon posting and notices we provide by email will be effective when we send the email. It is your responsibility to keep your email address current. You will be deemed to have received any email sent to the email address then associated with your account when we send the email, whether or not you actually receive the email.

(b) To Us. To give us notice under this Agreement, you must contact AWS as follows: (i) by facsimile transmission to 206-266-7010; or (ii) by personal delivery, overnight courier or registered or certified mail to Amazon Web Services, Inc., 410 Terry Avenue North, Seattle, WA 98109-5210. We may update the facsimile number or address for notices to us by posting a notice on the AWS Site. Notices provided by personal delivery will be effective immediately. Notices provided by facsimile transmission or overnight courier will be effective one business day after they are sent. Notices provided registered or certified mail will be effective three business days after they are sent.

(c) Language. All communications and notices to be made or given pursuant to this Agreement must be in the English language.

**13.8 Assignment.** You will not assign this Agreement, or delegate or sublicense any of your rights under this Agreement, without our prior written consent. Any assignment or transfer in violation of this Section 13.8 will be void. Subject to the foregoing, this Agreement will be binding upon, and inure to the benefit of the parties and their respective successors and assigns.

**13.9 No Waivers.** The failure by us to enforce any provision of this Agreement will not constitute a present or future waiver of such provision nor limit our right to enforce such provision at a later time. All waivers by us must be in writing to be effective.

**13.10 Severability.** If any portion of this Agreement is held to be invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect. Any invalid or unenforceable portions will be interpreted to effect and intent of the original portion. If such

NAVISTONE_004842

PROPRIETARY AND CONFIDENTIAL INFORMATION

construction is not possible, the invalid or unenforceable portion will be severed from this Agreement but the rest of the Agreement will remain in full force and effect.

**13.11 Governing Law; Venue.** The laws of the State of Washington, without reference to conflict of law rules, govern this Agreement and any dispute of any sort that might arise between you and us. The United Nations Convention for the International Sale of Goods does not apply to this Agreement.

**13.12 Disputes. Any dispute or claim relating in any way to your use of the Service Offerings, or to any products or services sold or distributed by AWS will be resolved by binding arbitration, rather than in court**, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this Agreement. **There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of this Agreement as a court would.** To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98501. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, which are available at www.adr.org or by calling 1-800-778-7879. Payment of filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. We will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or at a mutually agreed location. **We and you agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.** If for any reason a claim proceeds in court rather than in arbitration **we and you waive any right to a jury trial.** Subject to Section 8.5, we and you both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.

**13.13 Entire Agreement; English Language.** This Agreement includes the Policies and is the entire agreement between you and us regarding the subject matter of this Agreement. This Agreement supersedes all prior or contemporaneous representations, understandings, agreements, or communications between you and us, whether written or verbal, regarding the subject matter of this Agreement. Notwithstanding any other agreement between you and us, the security and data privacy provisions in Section 3 of this Agreement contain our and our affiliates' entire obligation regarding the security, privacy and confidentiality of Your Content. We will not be bound by, and specifically object to, any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) and which is submitted by you in any order, receipt, acceptance, confirmation, correspondence or other document. If the terms of this document are inconsistent with the terms contained in any Policy, the terms contained in this document will control, except that the Service Terms will control over this document. If we provide a translation of the English language version of this Agreement, the English language version of the Agreement will control if there is any conflict.

NAVISTONE_004843

PROPRIETARY AND CONFIDENTIAL INFORMATION

## 14. Definitions.

**"Acceptable Use Policy"** means the policy currently available at http://aws.amazon.com/aup, as it may be updated by us from time to time.

**"Account Information"** means information about you that you provide to us in connection with the creation or administration of your AWS account. For example, Account Information includes names, usernames, phone numbers, email addresses and billing information associated with your AWS account.

**"API"** means an application program interface.

**"AWS Confidential Information"** means all nonpublic information disclosed by us, our affiliates, business partners or our or their respective employees, contractors or agents that is designated as confidential or that, given the nature of the information or circumstances surrounding its disclosure, reasonably should be understood to be confidential. AWS Confidential Information includes: (a) nonpublic information relating to our or our affiliates or business partners' technology, customers, business plans, promotional and marketing activities, finances and other business affairs; (b) third-party information that we are obligated to keep confidential; and (c) the nature, content and existence of any discussions or negotiations between you and us or our affiliates. AWS Confidential Information does not include any information that: (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been known to you at the time of your receipt from us; (iii) is received from a third party who did not acquire or disclose the same by a wrongful or tortious act; or (iv) can be shown by documentation to have been independently developed by you without reference to the AWS Confidential Information.

**"AWS Content"** means Content we or any of its affiliates make available in connection with the Services or on the AWS Site to allow access to and use of the Services, including WSDLs; Documentation; sample code; software libraries; command line tools; and other related technology. AWS Content does not include the Services.

**"AWS Marks"** means any trademarks, service marks, service or trade names, logos, and other designations of AWS and its affiliates that we may make available to you in connection with this Agreement.

**"AWS Support Guidelines"** means the guidelines currently available at https://aws.amazon.com/premiumsupport/compare-plans/, as they may be updated by us from time to time.

**"AWS Site"** means http://aws.amazon.com and any successor or related site designated by us.

**"Content"** means software (including machine images), data, text, audio, video, or images.

**"Documentation"** means the developer guides, getting started guides, user guides, quick reference guides, and other technical and operations manuals and specifications for the Services

NAVISTONE_004844

*PROPRIETARY AND CONFIDENTIAL INFORMATION*

located at http://aws.amazon.com/documentation, as such documentation may be updated by us from time to time.

**"End User"** means any individual or entity that directly or indirectly through another user: (a) accesses or uses Your Content; or (b) otherwise accesses or uses the Service Offerings under your account. The term "End User" does not include individuals or entities when they are accessing or using the Services or any Content under their own AWS account, rather than your account.

**"Policies"** means the Acceptable Use Policy, the Site Terms, the Service Terms, the Trademark Use Guidelines, all restrictions described in the AWS Content and on the AWS Site, and any other policy or terms referenced in or incorporated into this Agreement. Policies does not include whitepapers or other marketing materials referenced on the AWS Site.

**"Privacy Policy"** means the privacy policy currently referenced at http://aws.amazon.com/privacy, as it may be updated by us from time to time.

**"Service"** means each of the web services made available by us or our affiliates, including those web services described in the Service Terms.

**"Service Attributes"** means Service usage data related to your account, such as resource identifiers, metadata tags, security and access roles, rules, usage policies, permissions, usage statistics and analytics.

**"Service Level Agreement"** means all service level agreements that we offer with respect to the Services and post on the AWS Site, as they may be updated by us from time to time. The service level agreements we currently offer with respect to the Services are located at http://aws.amazon.com/ec2-sla/, http://aws.amazon.com/s3-sla/, http://aws.amazon.com/cloudfront/sla, http://aws.amazon.com/route53/sla and http://aws.amazon.com/rds/sla.

**"Service Offerings"** means the Services (including associated APIs), the AWS Content, the AWS Marks, the AWS Site, and any other product or service provided by us under this Agreement. Service Offerings do not include Third Party Content.

**"Service Terms"** means the rights and restrictions for particular Services located at http://aws.amazon.com/serviceterms, as they may be updated by us from time to time.

**"Site Terms"** means the terms of use located at http://aws.amazon.com/terms/, as they may be updated by us from time to time.

**"Suggestions"** means all suggested improvements to the Service Offerings that you provide to us.

**"Term"** means the term of this Agreement described in Section 7.1.

NAVISTONE_004845

PROPRIETARY AND CONFIDENTIAL INFORMATION

**"Third Party Content"** means Content made available to you by any third party on the AWS Site or in conjunction with the Services.

**"Trademark Use Guidelines"** means the guidelines and license located at http://aws.amazon.com/trademark-guidelines/, as they may be updated by us from time to time.

**"Your Content"** means Content that you or any End User transfers to us for processing, storage or hosting by the Services in connection with your AWS account and any computational results that you or any End User derive from the foregoing through their use of the Services. For example, Your Content includes Content that you or any End User stores in Amazon Simple Storage Service. Your Content does not include Account Information.

**"Your Submissions"** means Content that you post or otherwise submit to developer forums, sample code repositories, public data repositories, or similar community-focused areas of the AWS Site or the Services.

*Last updated March 18, 2016*

NAVISTONE_004846

**EXHIBIT 12**

```
                    Exhibit - 0044 - 07_MJ-(Revitch)-0026476
db2 => select * from users where users_id = 118124090 with ur;

USERS_ID              DN
```

```
   REGISTERTYPE PROFILETYPE LANGUAGE_ID FIELD1

                         SETCCURR FIELD3

                         FIELD2

                    LASTORDER
REGISTRATION            LASTSESSION              REGISTRATIONUPDATE
REGISTRATIONCANCEL      PREVLASTSESSION          OPTCOUNTER PERSONALIZATIONID
-------------------- ------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------
------------ ---------- ----------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
-- -------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
--
------------------------------------------------------------------------------
------------------------------------------------------------------------------
------------------------------------------------------------------------------
-- ----------------------- ----------------------- -----------------------
----------------------- ----------------------- -----------------------
---------- ------------------------------
        118124090 uid=jeremy@revitch.com,o=default organization,o=root
organization
```

EXHIBIT
0044

Exhibit - 0044 - 07_MJ-(Revitch)-0026476

R                    C                              -1 -

                                                USD        -

                                                           -

                                                           -
2017-03-01-12.13.45.329000 2017-12-15-13.57.01.490000 2017-03-01-12.13.45.329000 -
                       2017-03-01-12.11.17.225000         7 1488388228635-1642795

   1 record(s) selected.

db2 => select * from userreg where users_id = 118124090 with ur;

USERS_ID                STATUS        PLCYACCT_ID LOGONID

                                          LOGONPASSWORD

                                    PASSWORDEXPIRED CHALLENGEQUESTION

                                          CHALLENGEANSWER

                                          TIMEOUT

PASSWORDRETRIES SALT

                    PASSWORDCREATION        PASSWORDINVALID        OPTCOUNTER
------------------- ---------- ----------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
------- ---------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
-- ------------------- ---------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
-- ------------------------ ------------------------ ----------
             118124090          1          -1 jeremy@revitch.com

x'4B364933344754585461557177A6B4671503133792B4733765062315556573938 6E534E475872596D36

Exhibit - 0044 - 07_MJ-(Revitch)-0026476
6B453D2020202020202020202020202020202020202020202020202020202020202020202020202020
2020202020202020202020202020202020202020202020202020202020202020202020202020202020
202020'            O -


            -


                                    -1              - 81dudveshf64


2017-03-01-12.13.45.363000 -                              6586

  1 record(s) selected.

db2 => select * from userdemo where users_id = 118124090 with ur;

USERS_ID              GENDER AGE          INCOME      MARITALSTATUS INCOMECURRENCY
CHILDREN   HOUSEHOLD   COMPANYNAME
                                                      HOBBIES

                                                      ORDERBEFORE

FIELD1 TIMEZONE FIELD2 FIELD7
   FIELD3 FIELD4 FIELD5


            FIELD6      DATEOFBIRTH OPTCOUNTER
------------------- ------ ---------- ----------- ------------- --------------
----------- -----------
----------------------------------------------------------------------------------
-------------------------------------------
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
-- ---------- ------ ------- ------
-------------------------------------------------------------- ----- -----
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
-- ---------- ---------- ----------
            118124090 N            -          - -            -
       -        - -
                                                          -


                                              -          -      -
       -       -                                          -
   -      -


              - -                    20235

  1 record(s) selected.

db2 => select * from x_si_avalara_users where xusers_id = 118124090 with ur;

XUSERS_ID              CUSTOMERUSAGECODE


              EXEMPTIONNO
  TAXEXEMPT   XFIELD1     XFIELD2
                                  Page 3

Exhibit - 0044 - 07_MJ-(Revitch)-0026476

CUSTOMERVATID

```
--------------------
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
-- ----------------------------------------------------------- ----------
-----------
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
--
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
----------------------------------------------------------------------------------
----
          118124090 -

                        -
          0              - -


                      -


  1 record(s) selected.

db2 => select * from address where member_id = 118124090 with ur;

ADDRESS_ID              ADDRESSTYPE MEMBER_ID              ADDRBOOK_ID
ORGUNITNAME
                                            FIELD3
                  BILLINGCODE      BILLINGCODETYPE STATUS ORGNAME
                    ISPRIMARY    LASTNAME
PERSONTITLE                                          FIRSTNAME
          MIDDLENAME
                                            BUSINESSTITLE
          PHONE1                          FAX1
PHONE2                          ADDRESS1

                      FAX2                            NICKNAME

                                            ADDRESS2
                  ADDRESS3
                                            CITY
                  STATE
                                            COUNTRY
                  ZIPCODE                  EMAIL1

                                            EMAIL2
```

Page 4

Exhibit - 0044 - 07_MJ-(Revitch)-0026476

PHONE1TYPE PHONE2TYPE PUBLISHPHONE1 PUBLISHPHONE2 BESTCALLINGTIME PACKAGESUPPRESSION
LASTCREATE                          OFFICEADDRESS
                                                                    SELFADDRESS
FIELD1                                                    FIELD2
                                    TAXGEOCODE

                                    SHIPPINGGEOCODE

                                    MOBILEPHONE1
MOBILEPHONE1CNTRY
                                    OPTCOUNTER
------------------- ---------- -------------------- --------------------
---------------------------------------------------------------------------
--------------------------------------------
----------------------------------------------------------------- ----------------
--------------- ------
---------------------------------------------------------------------------
------------------------------------------------ ----------
---------------------------------------------------------------------------
----------------------------------------------
---------------------------------------------------------------------------
------------------------------------------------
---------------------------------------------------------------------------
------------------------------------------------
---------------------------------------------------------------------------
------------------------------------------- ------------------------------
------------------------------------- ----------------------------
---------------------------------------------------------------------------
---------------------------------------------------------------------------
---- -------------------------------
---------------------------------------------------------------------------
---------------------------------------------------------------------------
--
---------------------------------------------------------------------------
------------------------------------------
---------------------------------------------------------------------------
------------------------------------------
---------------------------------------------------------------------------
------------------------------------------
---------------------------------------------------------------------------
------------------------------------------
---------------------------------------------------------------------------
-----------------------------------------
---------------------------------------------------------------------------
---------------------------------------------------------------------------
----
---------------------------------------------------------------------------
---------------------------------------------------------------------------
---- ---------- --------- ------------- ------------- ---------------
----------------- ------------------------
---------------------------------------------------------------------------
-------------------------------------------------- ----------

Exhibit - 0044 - 07_MJ-(Revitch)-0026476



```
------------------------------------------------------------
------------------------------------------------------------
-----------------------------------------------------------------
-----------------------------------------------------------------
-----------------------------------------------------------------
--
-----------------------------------------------------------------
-----------------------------------------------------------------
-----------------------------------------------------------------
-- ------------------------------
-----------------------------------------------------------------
----------------------------------------------- ----------
        114717894 SB                118124090              111499575 -

             -              -            P        -

              1 Revitch
                                                      -
                   Jeremy
                                                              -

                          -
4159879800                      -                       -
         41 Meadow Dr

             -                          Jerem Revit 41 Meadow  Mill  CA

                                            -
       -
                                         Mill Valley
     CA
                                         US
        94941-5204                       jeremy@revitch.com

                                              -
              -        - -                -            -
2017-03-01-12.13.45.342000 -
                                                                      1 S
                                              -
                      -

                      -

                      -                                        -
                   6159

   1 record(s) selected.
```

**EXHIBIT 13**

```
1                IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                           --oOo--

4    JEREMIAH REVITCH,

     individually and on

5    behalf of all others

     similarly situated,

6

                       Plaintiff,

7

     vs.                              Case No.

8                                     3:18-cv-06827-VC

     NEW MOOSEJAW, LLC and

9    NAVISTONE, INC.,

10                 Defendants.

     _____/

11

12

13

14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16

17    VIDEO-RECORDED DEPOSITION OF DANIEL JOE PINGREE

18                  VERITEXT VIRTUAL

19              THURSDAY, JULY 23, 2020

20

21

22   Job No.  4183731

23   Reported by:

24   Anrae Wimberley, CSR No. 7778

25   Pages 1 - 262
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Correct.                                    11:50:21

2      Q.   Do you think the average consumer knows

3   about Google?

4      A.   Yes.

5      Q.   How about Facebook?                          11:50:29

6      A.   Yes.

7      Q.   Do you think consumers don't know about

8   NaviStone because no one discloses them in their

9   privacy policies?

10      MR. WONG:  Objection; calls for speculation,    11:50:40

11   argumentative.

12      THE WITNESS:  No.

13   BY MR. KLORCZYK:

14      Q.   Well, if it's not in a privacy policy, I

15   can't learn about it by reading a privacy policy,   11:50:53

16   can I?

17      A.   Do you think consumers even read privacy

18   policies on average?

19      Q.   Do you?  That's a good question.

20           Do you think consumers read privacy         11:51:04

21   policies on average?

22      A.   No, I don't.

23      Q.   Do you read privacy policies?

24      A.   As a digital marketer, it behooves me --

25      Q.   No, as a consumer.                          11:51:23

                                              Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4            That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12           Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript ( ) was (X) was not requested.

16           I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any attorney of any party to this

19   action.

20           IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated:  July 30, 2020

23

24

25           ANRAE WIMBERLEY, CSR No. 7778

                                      Page  262

**EXHIBIT 14**

**BRANN & ISAACSON**
DAVID W. BERTONI (admitted *pro hac vice*)
dbertoni@brannlaw.com
DAVID SWETNAM-BURLAND (State Bar No. 226216)
dsb@brannlaw.com
EAMONN R.C. HART (admitted *pro hac vice*)
ehart@brannlaw.com
184 Main Street
P.O. Box 3070
Lewiston, ME 04243-3070
Tel.: (207) 786-3566
Fax: (207) 783-9325

**LAW OFFICES OF RICHARD PACHTER**
RICHARD PACHTER (State Bar No. 120069)
richard@pachterlaw.com
555 University Avenue, Suite 200
Sacramento CA 95825
Tel.: (916) 485-1617
Fax: (916) 379-7838

Attorneys for Defendant NaviStone, Inc.


# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JEREMIAH REVITCH, individually and on behalf of all others similarly situated,<br><br>v.<br><br>NEW MOOSEJAW, LLC and NAVISTONE, INC.,<br><br>DEFENDANTS. | Case No.  3:18-cv-06827-VC |

NaviStone, Inc.'s Responses to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

**DEFENDANT NAVISTONE, INC.'S RESPONSES TO
PLAINTIFF'S THIRD SET OF INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 26 and 34 and Civil L.R. 26–1 and 34–1, Defendant NaviStone, Inc. ("NaviStone") serves these Objections and Responses ("Responses") to Plaintiff Jeremiah Revitch's ("Plaintiff's") Third Set of Interrogatories ("Interrogatories") (No. 16).

## GENERAL OBJECTIONS

NaviStone makes the following General Objections to each of the Interrogatories it has been served.  In addition to these General Objections, NaviStone also states specific objections to specific Interrogatories where appropriate, including objections that are not generally applicable to all Interrogatories.  By setting forth such specific objections, NaviStone does not intend to limit or restrict the General Objections. To the extent that NaviStone responds to Interrogatories to which it objects, such response will not constitute a waiver of any General Objection or specific objection.  In addition, the inadvertent disclosure of privileged information will not constitute a waiver of any applicable privilege.

1.      NaviStone objects to these Interrogatories to the extent that they reflect the fact that Plaintiff did not conduct an adequate pre–filing investigation into the facts alleged in the original, first amended, or second amended complaint. *See* Fed. R. Civ. P. 11. Thus, the Interrogatories are based on false factual assertions that an adequate pre–filing investigation would have demonstrated to be untrue and incapable of substantiation. Further, counsel for NaviStone sent Plaintiff's counsel a letter in December 2018 identifying the false allegations in the complaint and offering to provide further accurate information to demonstrate their falsity. Plaintiff did not take up NaviStone's offer, but instead continued to assert and reassert false and unsupported factual allegations in support of its claims.

1          NaviStone, Inc.'s Response to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

2.      NaviStone objects to these Interrogatories and Definitions to the extent they seek to impose obligations upon NaviStone that exceed, or are different from, those set forth in the Federal Rules of Civil Procedure, the Civil Local Rules of the U.S. District Court of the Northern District of California, or any Order of the Court in this action. NaviStone will follow the Federal Rules of Civil Procedure, the Civil Local Rules, and Court Orders in the above-captioned litigation in providing its Responses, supplemental responses, and any documents and things requested.

3.      NaviStone objects to these Interrogatories to the extent they seek information, documents, or things that are neither relevant to the claims or defenses in this action nor likely to lead to the discovery of admissible evidence.

4.      NaviStone objects to these Interrogatories to the extent they are not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

5.      NaviStone objects to these Interrogatories to the extent they would require the disclosure of confidential, trade secret, or commercially sensitive information.  Any such information or documents that NaviStone agrees to produce will be made available only pursuant to the protections set forth in the Protective Order to be entered by the Court.

6.      NaviStone objects to each interrogatory to the extent it is duplicative of other interrogatories, vague, ambiguous, overly broad, or unduly burdensome.

7.      NaviStone objects to each interrogatory to the extent that it seeks the identification of documents dated or prepared after the filing of the complaint in this action as overly broad,

2                    NaviStone, Inc.'s Response to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and as an attempt to seek production of attorney work product.

8.      NaviStone has no duty to supplement its responses to the Interrogatories except to the extent required by Fed. R. Civ. P. 26(e) or any other applicable rule or Order of this Court.

9.      NaviStone objects to each interrogatory to the extent that it seeks publicly available information, information that is equally accessible to Plaintiff, and/or information that is already in Plaintiff's possession, custody, or control. Because such information is equally convenient for Plaintiff to obtain, there is no reason to burden NaviStone with a search for such information unnecessarily.

10.     NaviStone objects to each interrogatory to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, and/or any other applicable privilege or immunity.

11.     NaviStone objects to each interrogatory to the extent that it seeks information unrelated to any issue in the present litigation as neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

12.     NaviStone objects to each interrogatory to the extent that it seeks information or identification of documents subject to confidentiality agreements, protective orders, or any other obligation pursuant to which Defendants are required to protect or maintain the confidentiality of a third party's information or documents.

13.     NaviStone does not concede that any of the information sought or provided is relevant, material, admissible in evidence, or reasonably calculated to lead the discovery of admissible evidence.

3                    NaviStone, Inc.'s Response to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

14.     NaviStone objects to each definition, and/or interrogatory to the extent it is: (i) compound; (ii) phrased disjunctively or conjunctively; (iii) includes impermissible subparts; and/or (iv) collectively exceeds the number of interrogatories permitted by the applicable discovery order(s).

15.     NaviStone objects to each interrogatory based on its current employees' present knowledge, information, and belief. NaviStone's responses are at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of their current employees' recollections, they are subject to such refreshing of recollection and such additional knowledge of facts as may result from further discovery or investigation. NaviStone's investigation into this matter remains ongoing, and it will supplement this response if warranted.

16.     Statements by NaviStone that it will provide information in response to a particular interrogatory will not be construed as a representation that NaviStone in fact has any information in response to that interrogatory, or that such information exists, but rather, that NaviStone intends, subject to their objections, to conduct a reasonable search for responsive information.

17.     NaviStone reserves all objections or other questions as to the competency, relevance, materiality, privilege, or admissibility in any subsequent proceeding or trial of this or any other action for any purpose whatsoever of NaviStone's responses herein and any document or thing identified or provided in response to Plaintiff's Interrogatories.

18.     NaviStone reserves the right to respond to Plaintiff's Interrogatories in accordance with Federal Rule 33(d).

19.     NaviStone objects to each definition and/or interrogatory insofar as it fails to specify a time period or specifies an unduly broad time period.

4                   NaviStone, Inc.'s Response to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

20.     NaviStone objects to each definition and/or interrogatory to the extent that it requires NaviStone to draw legal conclusions. No response will be construed as a concession or admission to any statement, inference, or allegation implied by any interrogatory.

21.     NaviStone objects to each definition and/or interrogatory to the extent it contains any factual and/or legal misrepresentation.

**Interrogatory No. 16**

This interrogatory pertains to the Microsoft Excel sheet produced in this action on April 8, 2020 by American Computer Group d/b/a Computech Direct, with the file name "Moosejaw California file 040620.xlsx." Please identify by row number(s), name, and address (where available) each of these individuals for whom you contend viewed Moosejaw's privacy policy on the moosejaw.com website, and the date on which they viewed it.

**OBJECTIONS:**     Subject to and without waiving its general objections, NaviStone objects to this Interrogatory insofar as it uses the terms "individuals" and "Moosejaw's privacy policy on the Moosejaw.com website" in ways that render the request vague and unduly burdensome. The interrogatory is not limited in time; nor is it limited to information relating to the named plaintiff in this action. NaviStone further objects to this interrogatory to the extent that it requires NaviStone to obtain information in the possession, custody, or control of third parties.

**RESPONSE:** Subject to and without waiving its general and specific objections, NaviStone responds that it does not know if or when any of these individuals—to the extent they are identifiable individuals—viewed or read Moosejaw's privacy policy.  NaviStone has no way to connect the names and addresses in this document, which it did not create, to the anonymous identifiers (cookies) assigned to each browser instance that visited the Moosejaw website. Further, NaviStone does not know whether the names and addresses contained in the document were

NaviStone, Inc.'s Response to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

included as a result of the cookie syncing described in NaviStone's prior answers to Plaintiff's

discovery; under their contracts, neither NaviStone nor its client, Moosejaw, receives a list of such

names and addresses. NaviStone only has access to this document (and the names and address it

contains) as a result of Plaintiff's demand that they be produced by a third party, American

Computer Group d/b/a Computech Direct, pursuant to a subpoena.

6                  NaviStone, Inc.'s Response to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

Dated:  July 8, 2020

Larry Kavanagh
for *Defendant NaviStone, Inc.*

**AS TO OBJECTIONS**

Dated: July 8, 2020

/s/ David W. Bertoni
David W. Bertoni (pro hac vice)
dbertoni@brannlaw.com
David Swetnam-Burland (226216)
dsb@brannlaw.com
Eamonn R.C. Hart (pro hac vice)
ehart@brannlaw.com
BRANN & ISAACSON
184 Main Street, 4th Floor
P.O. Box 3070
Lewiston, ME 04243-3070
Tel.: (207) 786-3566
Fax: (207) 783-9325

Richard Pachter (120069)
richard@pachterlaw.com
LAW OFFICES OF RICHARD PACHTER
555 University Avenue, Suite 200
Sacramento, CA 95825
Tel.: (916) 485-1617
Fax: (916) 379-7838

*Attorneys for NaviStone, Inc.*

7                  NaviStone, Inc.'s Response to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

## PROOF OF SERVICE

I am a resident of the State of Maine. I am over the age of eighteen years, and not a party to the within action. My business address is Brann & Isaacson, 184 Main Street, 4th Floor, Lewiston, Maine 04240. On March 26, 2020, I served the below documents in the manner described below:

**DEFENDANT NAVISTONE, INC.'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES**

☐ (BY U.S. MAIL) by placing a copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Lewiston, Maine addressed as set forth below.

☐ (BY MESSENGER SERVICE) by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐ (BY FACSIMILE) by facsimile transmission on this date. This document was transmitted by using a facsimile machine, telephone number (207) 783-9325, to the offices of addressee(s) at the numbers listed below. The transmission was reported as complete and without error.

☐ (BY OVERNIGHT MAIL) by placing a copy of the document(s) listed above in a sealed envelope with delivery fees provided for UPS pick up at Brann & Isaacson, 184 Main Street, 4th Floor, Lewiston, Maine, for overnight delivery, and addressed as set forth below.

☒ (BY ELECTRONIC MAIL) by e-mail transmission on this date. I caused said documents to be prepared in PDF and then served by electronic mail to the parties listed below.

BURSOR & FISHER, P.A.
L. Timothy Fisher
Joel D. Smith
Frederick J. Klorczyk II
Neal J. Deckant
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel. (925) 300-4455
Fax (925) 407-2700
ltfisher@bursor.com
jsmith@bursor.com
fklorczyk@bursor.com
ndeckant@bursor.com

BURSOR & FISHER, P.A.
Scott A. Bursor
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133-5402
Tel. (305) 330-5512
Fax (305) 676-9006
scott@bursor.com

*Attorneys for Plaintiff,* Jeremiah Revitch

8                        NaviStone, Inc.'s Response to
                          Plaintiff's Third Set of Interrogatories
                          3:18-cv-06827-VC

COOLEY LLP
Michael G. Rhodes
Kyle C. Wong
Max A. Bernstein
Maxwell E. Alderman
101 California Street, 5th Floor
San Francisco, CA 94114
Tel. (415) 693-2000
Fax (415) 693-2222
rhodesmg@colley.com
kwong@cooley.com
mbernstein@colley.com
malderman@colley.com

*Attorney for Defendant*
New Moosejaw, LLC

     Executed on July 8, 2020, at Lewiston, Maine.


                              /s/ Eamonn Hart_____
                              Eamonn R.C. Hart

NaviStone, Inc.'s Response to
Plaintiff's Third Set of Interrogatories
3:18-cv-06827-VC

# EXHIBIT 15 FILED UNDER SEAL

# EXHIBIT 16 FILED UNDER SEAL